# EXHIBIT

# A

# National Science Foundation Office of Inspector General Office of Investigations I-Manual



This Manual is an internal NSF OIG document

No portion of it may be distributed outside of NSF OIG

February 10, 2022

5.    **Whistleblower Issues Relating to Allegations**

Regardless of the means by which we received an allegation, care must be taken to determine and document if the allegation is one that raises issues concerning whistleblower protection. Such protections have been enacted in a number of statutes and now extend to federal employees, contractors, and subcontractors, as well as to grantees and subgrantees. Allegations of whistleblower retaliation have stringent time requirements and must be addressed expeditiously. Investigative Attorneys assigned to the investigations can provide information regarding applicable whistleblower criteria and issues, particularly the unique time limitations and procedural requirements.

Individuals may be referred to the OIG webpage for information on whistleblowing and whistleblower protection (nsf.gov/oig/whistleblower.jsp) or the Ombudsman for Whistleblower Protection (ombudsman@nsf.gov).

B.    **Evaluation of Allegations**

The AIGI determines whether to initiate OI investigative activity pursuant to *The Attorney General Guidelines for Domestic FBI Operations* (Appendix CC). Such determination is generally made after consideration by, and recommendations from, the OI management team during a weekly intake meeting. During this intake meeting, each complaint is evaluated against investigative functions, priorities, and guidelines consistent with the below policy. Allegations approved for investigative activity are classified and appropriate staff are assigned.

1.    **Case Opening Criteria**

In order to allocate investigative resources relative to the volume and breadth of allegations received, and to align investigative activity with NSF OIG OI's strategic goals, OI has developed the following criteria to be considered when evaluating allegations to determine whether to open an investigation. The purpose of these criteria is to ensure that the highest priority is given to the most serious allegations and those likely to have a substantive and significant impact on NSF. The OI management team is encouraged to weigh each allegation in terms of the enhancing and mitigating factors set forth below in making recommendations to the AIGI. The OI management team should also consider the guidance regarding specific categories of allegations set forth below.

a.    **Enhancement Factors**

Below is a list of enhancement factors, in no particular order. Generally, a case may be opened only if one or more of the below enhancement factors is present. However, if an incoming allegation meets or exceeds a threshold standard, it is not mandatory that a case be opened. In such instances, other factors may be considered.

- Congressional request/interest
- Significant media interest
- National Science Board interest

- Inspector General interest
- Significant program vulnerability
- Prosecutor request/interest
- Position held by the subject, including pay grade/pay band
- Strong nexus to NSF/NSF funds
- Specificity and level of detail included in the allegation (*i.e.,* more than general statement that there is "misuse of funds")
- NSF OIG has sole jurisdiction
- Major health and safety concern
- Seriousness/Nature of the offense
- Systemic violations or a pattern of misconduct
- Significant policy or systemic implications
- Request from a law enforcement agency or awardee institution
- Violation and/or harm is ongoing
- High dollar risk/loss
- Relation to investigative priorities, as may be identified by the AIGI

**b.    Mitigating Factors**

Below is a list of mitigation factors, in no particular order, which would tend to support a decision to not open an investigation. Generally, investigations should not be initiated if their merits do not overcome these mitigating factors:

- No, or only a weak, nexus to NSF/NSF funds
- No prosecutor interest or minimal likelihood a case will be accepted for prosecution
- Low potential for administrative action by NSF
- No identifiable criminal statute, civil statute, regulation, rule, or order
- Age of alleged violation/statute of limitations
- Insufficient information to initiate an investigation or referral, including allegations that lack specific details regarding subjects or their actions, or impacted awards
- Magnitude of offense or dollar loss is deemed *de minimis*
- Low potential for recovery (e.g., entity no longer exists, no remaining assets, subject outside of U.S. jurisdiction)
- Another entity is already taking action to address and mitigate concerns raised by the allegation and/or another agency is already investigating the allegation
- Other remedies are available

**c.    Investigative Priorities**

Over time, OIG and OI priorities and areas of greatest concern may change. The AIGI may periodically identify Investigative Priorities. In determining these priorities, the AIGI will

11

consider the results of prior investigations, the OIG's Performance and Strategic Plans, or other factors in accord with the AIGI's professional judgment.

### d.        Specific Categories of Allegations

In addition to the above enhancement and mitigation factors, specific categories of allegations should be considered in accordance with the below guidance.

#### i.    Allegations of Whistleblower (WB) Retaliation

Facially valid allegations of whistleblower retaliation should be assigned to a staff member to conduct a preliminary jurisdictional analysis. If that analysis determines that the allegation meets statutory standards, OI will open a case.

By their very nature, WB retaliation allegations often include an underlying allegation of fraud, waste, abuse, or some other wrongdoing. Separate and apart from the retaliation, the underlying facts presented by the allegation should be evaluated in terms of the enhancement and mitigating factors to determine whether an investigation of the underlying allegation should be initiated.

#### ii.    *Qui tam* Complaints

The False Claims Act, 31 U.S.C. §§ 3729 – 3733, provides a mechanism for private individuals with knowledge of fraud against the government to file a complaint on behalf of the government. Such complaints are often filed under seal in Federal District Court, with a copy to be served on the Department of Justice (DOJ). DOJ, in conjunction with the local U.S. Attorney's Office (USAO), has 60 days to determine whether it will intervene in the action. These complaints are typically referred to OIG by the USAO in which the matter was filed. Notifications of *qui tam* suits should be forwarded as intakes for processing. If there is an NSF nexus, such complaints will be investigated in coordination with DOJ and/or the relevant USAO.

#### iii.    Allegations of Research Misconduct

NSF has delegated its authority to investigate allegations of research misconduct to OIG (45 C.F.R. § 689). Within OIG, RIAI conducts and oversees inquiries and investigations into suspected or alleged research misconduct. Allegations of research misconduct will be assessed consistent with regulatory obligations and the above enhancement and mitigating factors.

### 2.   Referral of Allegations

#### a.        Referrals to NSF Management

An allegation should generally be referred to appropriate NSF management when it involves management or personnel issues under NSF's jurisdiction. Allegations received by OI relating to sexual harassment, discrimination, or Equal Employment Opportunity will be referred to NSF's Office of Diversity and Inclusion. Procedures for handling allegations involving discrimination are found at Appendix Q.

the case file. If we are aware that the person is represented by counsel, we provide that information to the USPS, and correspondence to or from the counsel is excluded from the mail cover (39 C.F.R. § 233.3(g)(3)).

### O.    Interviewing and Affidavits / Sworn Statements

OIG frequently uses interviews to gather information. We document every interview, including interviews conducted telephonically. We comply with the requirements of the Privacy Act (5 U.S.C. § 552a) when conducting interviews, as well as issues related to disclosure of a witness's identity, and potential rights that the witness may have. We also provide subjects with all appropriate advisements. Our practice is to have the case lead and Investigative Attorney prepare an interview outline in advance. Any issues, such as scheduling, potential hostile witnesses, or other complicating factors, are discussed with the Investigative Attorney and case supervisor. All interviews should be conducted by two individuals, usually the case lead and Investigative Attorney or other assigned investigator.

### 1.    Memorializing an Interview

We record all significant interviews (including subjects, complainants in cases involving potential criminal culpability, and primary witnesses). The decision to not record a particular interview should be discussed with the case supervisor prior to the interview. Our policy is broader than and consistent with the DOJ policy issued May 12, 2014 (Appendix H). Further policy guidance may occasionally be issued by the AIGI.

For all interviews, use the information located at Appendix DK as a guide, capturing all relevant information. Unless the USAO handling the case has expressed a desire to the contrary, prepare an MOI promptly after the interview describing the interview. The interview MOI is limited to a brief, factual, and professional summary of the interview. Commentary deemed necessary for inclusion (such as observations of an interviewee, if deemed pertinent to the investigation; discrepancies noted; and other information deemed necessary for inclusion, e.g.) must be set out and identified as "Investigator's Note" within the MOI. Great discretion must be used in the inclusion of such comments. Questions regarding inclusion of investigator notes can be directed to case managers.

All such MOIs will include an Introductory Paragraph, briefly addressing the facts and circumstances of the investigation to which the interview is related. Include next the Action Detail Paragraph(s), which address details such as the identity of the individual interviewed, the reason for the interview, and the consent to the recording. The Action Detail Paragraph(s) will conclude with a variation of the below template:

> The following is a summary of the interview, highlighting and directing the reader to a number of matters addressed in the interview. It is for internal purposes only; is not intended to be a verbatim account of the interview; and does not purport to note every relevant matter addressed in the interview. [A full and complete account of the interview can be found in the attached transcript (Attachment X) and a recording of

the interview is in eLOC under the Evidence (Media) folder.] [Interviewee last name] provided the following information:

The interview concluded at approximately [time].

## 2.    Interviewees Who are Subjects in Other Cases

If the person interviewed has formally been named as the defendant in a separate case, then we contact the appropriate prosecutor prior to any official OIG interview. We conduct the interview once the prosecutor authorizes us to do so and advises us what warnings we should give the subject, if any. If the person interviewed is the subject in a separate OIG investigation, the case leads should coordinate.

## 3.    Access to an Interviewee's Financial Records

We do not obtain access to an individual person's financial records from a bank or other financial institution without either the written consent of the individual, a subpoena issued in compliance with the RFPA to which the individual consented or did not file a timely challenge with a court, or a court order (see the RFPA Section). If we determine that a review of an individual's financial records is necessary, we try to get the individual's consent to review those records or obtain the records directly from the individual when the interview is conducted, using Form 29, Financial Information and Records Release Form.

We can obtain financial or any other records relevant to our investigation directly from the individual with the individual's consent or by issuing a subpoena to the individual.

## 4.         Timeliness

It is essential that MOIs of interviews be completed in a timely manner consistent with performance standards. Unless an exception is granted by the case manager and is reflected in a case note:

- For all non-recorded interviews and recorded interviews that the case manager has determined need not be transcribed, MOIs must be completed within 10 business days of the interview.
- For transcribed interviews, MOIs must be completed within 10 business days of receipt of the transcript.

OI preserves notes until the closure of a case. The term "notes" includes notes written during the interview, any work papers prepared or used during the interview, and any work papers drafted after the interview relating to matters on which the interviewee was directly questioned. The person taking the notes should number, date, and initial each note page. Notes should include the time and date, and indicate the interviewee, the interviewer, witness, and location of the interview. Document interviews on a MOI (Form 5). For investigations tracked in KMS, the original notes remain with the case file until the case is closed. For investigations tracked in eLOC, notes should be scanned and uploaded as an attachment to the MOI. Upon closure, the original paper notes for KMS and eLOC cases will be disposed of.

**5.    Obtaining Affidavits and Sworn Statements**

**a.         Authority to Administer or Take Oaths, Affirmations, or Affidavits**

OI staff have the authority to take oaths, affirmations, or affidavits, whenever necessary in the performance of their duties (IG Act § 6(a)(5)).

**b.         Use of Affidavits**

We use an affidavit to:

- Provide a permanent record of oral testimony of complainants, subjects, or material witnesses and to assist attorneys to prepare and present cases more effectively;
- Reduce admissions or confessions of guilt to writing;
- Provide the most accurate and truthful account possible of oral testimony;
- Render less likely a change of testimony on the part of the interviewee;
- Provide a permanent record of what was said by an individual who may not be available to provide personal testimony in a hearing or court due to an infirmity or death, or due to absence from the jurisdiction of a court or its subpoena powers;
- Provide the subject of an investigation an opportunity to present written testimony on his or her behalf;
- Provide a method to impeach the credibility of a person whose later testimony may vary or conflict with earlier statements; and
- Create a written statement of information from a witness in any circumstance.

Apart from using an affidavit as evidence of admissions, confessions, or for impeachment purposes, affidavits are generally inadmissible as evidence under the federal "hearsay" exclusionary rules of evidence (Federal Rules of Evidence 801-807). Generally, in adversarial types of proceedings, an accused or a witness must be present in court to provide testimony under oath and be subject to cross examination. However, these written statements may be admissible in administrative proceedings.

**c.         Taking an Affidavit**

We use Form 16, Affidavit, to take affidavits. If we are working with an AUSA, we first consult the AUSA to decide whether to try to get an affidavit in addition to the recorded interview.

If the interviewee does not speak English, we obtain an interpreter. At the conclusion of the statement, the interpreter should include a brief description of his/her role in the interview and should sign the statement as a witness. It may be preferable to rely on the recording of interviews with non-English-speakers.

41

### d.        Securing an Affidavit

All affidavits must be furnished voluntarily. We do not use promises, threats, pressure, or coercion of any kind to obtain a statement.

### e.        Writing the Affidavit

Ideally, the interviewee writes the affidavit. However, either OIG staff or the interviewee may type or legibly handwrite in ink the affidavit. It is preferable to type the affidavit and then to allow the interviewee to make handwritten revisions and to expand the text freely. The interviewee initials each change. The interviewee signs the affidavit; we sign as witness to the signature; and, if available, a third person signs as witness to the signature. Each page of the affidavit includes a page number, the initials of the affiant, and the date the affidavit was signed. We initial and attach any evidence discussed during or obtained during the interview.

### f.        Administering an Oath or Affirmation

The oath or affirmation is administered in a formal manner and should be witnessed by a second party, preferably an assigned Investigative Attorney or another OIG investigator. We ask the interviewee:

> Do you solemnly swear or affirm under penalty of perjury that the information you provided in this statement is true and correct to the best of your knowledge and belief?

### g.        Interviewees Declining to Furnish an Affidavit

An interviewee may decline to furnish a statement in an affidavit format, but agree to furnish one in another form, such as a letter. If this happens, we accept the statement as the best available and ask the interviewee to sign the document.

### h.        Interviewees Declining to Sign Their Affidavits

If the person interviewed declines to sign the affidavit, we write a statement to this effect on the signature page, including the reason for the declination. If accurate, we add that the interviewee orally confirmed the accuracy of the information in the statement.

### P.    Privacy Act

### 1.    Witnesses

The Privacy Act may require that we tell the witness certain information before asking questions and may prohibit us from telling the witness certain things about the subject.

If it is certain that the investigation has no possible criminal aspects, the Privacy Act, 5 U.S.C. § 552a(e)(3), requires that the witness (including the complainant) be told:

- The authority that permits the solicitation of information and whether providing the information is mandatory or voluntary;

42

# EXHIBIT

# B

991 F.2d 790
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals,
Fourth Circuit.

Timothy R. MCGOWAN, *Plaintiff-Appellant,*

v.

Mark J. CROSS; Cross, Clayton &
Associates *Defendants-Appellees.*
Timothy R. McGowan, *Plaintiff-Appellee,*

v.

Mark J. Cross; Cross, Clayton &
Associates *Defendants-Appellants.*

Nos. 92-1480, 92-1584.
|
Submitted: April 8, 1993
|
Decided: April 22, 1993

Appeals from the United States District Court for the Eastern
District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior
District Judge. (CA-91-1774-A)

**Attorneys and Law Firms**

Timothy R. McGowan, Appellant Pro Se.

Mark J. Cross, Clifton, Virginia; Cross, Clayton & Associates,
Clifton, Virginia, Appellees.

**Synopsis**
E.D.Va.

AFFIRMED.

**Procedural Posture(s):** On Appeal.

Before PHILLIPS and HAMILTON, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

PER CURIAM:

OPINION

**\*1** In No. 92-1480, Timothy McGowan appeals the district
court's decision awarding summary judgment to Defendants
Mark Cross and Cross, Clayton & Associates in a copyright
infringement action. In No. 92-1584, Defendants appeal the
district court's denial of their motion for sanctions. We affirm
the decision in each case. [1]

I.

This lawsuit has its roots in a dispute between McGowan
and his wife and Wendy and Edwin Allen over a parcel of
land in Fairfax County, Virginia, which each couple thought
it had purchased. The McGowans prevailed in state trial
court. They purchased a copyrighted house plan, made twenty
modifications to the plan, and began construction of a house
on the land.

The Allens prevailed on appeal. *Allen v. Lindstrom,* 379
S.E.2d 450, 455 (Va. 1989). The property was conveyed
to the Allens by court order on September 11, 1989. The
Allens then completed construction of the house begun by
the McGowans. Defendant Mark Cross, a landscape architect
and relative of the Allens, assisted, using the McGowan plan
on file with Fairfax County. Cross applied for and received a
building permit based on the plan. On or before November 2,
1989, Cross made several copies of the plan in order to obtain
required permits and to complete the dwelling. At that time,
McGowan had not received a copyright on the modified plan,
and there was no notice on file with Fairfax County that a
copyright was claimed.

In May 1990 the Allens and the McGowans entered into a
settlement agreement which provided that the Allens would
pay the McGowans for the property, including improvements
made on the property. The agreement contained a clause
providing that the McGowans would not interfere in any way
with the Allens' work on their house.

Following a series of letters to the Allens, McGowan filed
this action, alleging copyright infringement by Cross and
his firm. McGowan claimed that on January 8, 1990, he
created and obtained a valid copyright for original works,
his modifications to the original house plan. He asserted that
the works were for his private use and enjoyment and were
unpublished. He claimed that Cross had made twelve copies
of the drawings and sought, among other things, royalties of
$1,200,000.

Defendants moved for summary judgment. McGowan countered with his own motion. Following a hearing, the court noted that it was not convinced that the minor alterations to the original plan were entitled to copyright protection. However, the court rested its decision to grant Defendants' motion on the finding that the settlement agreement gave the Allens an implied, non-exclusive license to complete the house and for their agents to use the plans in accomplishing the task and that Defendants' use of the plans constituted a fair use. In No. 921480, McGowan appeals this decision. In No. 92-1584, Defendants appeal the denial of their motion for sanctions, costs, and attorney's fees.

II.

We review the district court's award of summary judgment de novo. *Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127-28 (4th Cir. 1987).* Assuming without deciding that the copyright was entitled to protection under the copyright laws, we agree with the district court that the fair use doctrine entitled the Allens or their agent, Cross, to use the plan without violating the copyright laws.[2]

**\*2** "Any individual may reproduce a copyrighted work for a 'fair use'; the copyright owner does not possess the exclusive right to such a use." *Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 433 (1984).* This principle is embodied in the Copyright Act: "the fair use of a copyrighted work ... is not an infringement of copyright." 17 U.S.C.A. § 107 (West Supp. 1992). This statute sets for the four factors to be considered when deciding whether a particular use constitutes a "fair" use:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* These factors are not exclusive, but are "particularly relevant to the fair use questions." *Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1260 (2d Cir. 1986),* cert. denied, 55 U.S.L.W. 3776 (1987).

In this case, Cross did not intend the modified plan to be used for commercial purposes. Rather, Cross reproduced the plan solely so that the house could be completed. "The crux of the profit/non-profit distinction is ... whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562 (1985).*

With respect to the second factor, McGowan made twenty fairly insignificant changes to the original plan, including the substitution of materials and replacement of windows. This modified plan constituted "a work more of diligence than of originality or inventiveness," *New York Times Co. v. Roxbury Data Interface, Inc., 434 F.Supp. 217, 221 (D.N.J. 1977),* and therefore was more factual than creative in nature. The second factor thus weighs in favor of Cross. *See* 2 P. Goldstein, *Copyright* § 10.2.2.2 at 226 (1988). By contrast, the third factor weighs in favor of McGowan because the modified plan was copied in its entirety.

The fourth factor is "undoubtedly the single most important element of fair use," *Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. at 566.* "A use which does not materially impair the marketability of the copyrighted work will be deemed fair." *N.A.D.A. Servs. Corp. v. Business Data of Va., Inc., 651 F.Supp. 44, 48 (E.D. Va. 1986).* Typically, an adverse effect on market value is most clearly shown in cases where the plaintiffs and defendants compete or where the defendant's use is of a manner and type which the plaintiff has previously licensed. *See* 2 Goldstein *Copyright* § 10.2.2.4 at 233-34.

Neither factual situation is present in the subject case. The copying of the plan was for the sole purpose of completing the house. There has never been any suggestion of an attempt to compete with McGowan by marketing his plan.

**\*3** We conclude that the statutory factors weight in favor of Defendants and that copying the modified house plan was a fair use of the plans under the copyright laws.

III.

Defendants moved for imposition of sanctions, costs, and attorney's fees. They claimed entitlement under Fed. R. Civ. P. 11, 28 U.S.C. § 1927 (1988), the American Rule, and 17 U.S.C. § 505 (1988). The district court denied the motion with the following order:

McGowan v. Cross, 991 F.2d 790 (1993)

1993 WL 125416, 1993 Copr.L.Dec. P 27,085

The defendant's motion is DENIED, the court finding insufficient abuse on the part of the plaintiff so as to warrant imposition of Rule 11 sanctions; being unwilling in its discretion to award attorneys fees as part of costs pursuant to 17 U.S.C. § 505; and not being persuaded that costs were multiplied unreasonably and vexatiously as contemplated by 28 U.S.C. § 1927, or that there was sufficient evidence of bad faith so as to warrant otherwise an award of attorney's fees.

This Court reviews the district court's decision for an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384 (1990); *Harris v. Emus Records Corp.,* 734 F.2d 1329 (9th Cir. 1984); *Miltier v. Beorn,* 896 F.2d 848, 855 (4th Cir. 1990); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247 (1975).

We hold that the district court did not abuse its discretion in denying the sanctions request.

IV.

Accordingly, we affirm the decision of the district court in both appeals. We dispense with oral argument because our review of the record and other materials before us reveals that argument would not aid the decisional process.

*AFFIRMED*

1    We note that Cross, Clayton & Associates is not represented by counsel on appeal. Mark Cross, who is proceeding pro se as a named party in both appeals, seeks also to represent Cross, Clayton & Associates in each appeal. Corporations and partnerships, as artificial entities, may not appear pro se but must instead appear through counsel. *See* Fed. R. App. 4(a); *Eagle Assoc. v. Bank of Montreal,* 926 F.2d 1305 (2d Cir. 1991); *Palazzo v. Gulf Oil Corp.,* 764 F.2d 1381, 1385 (11th Cir. 1985), *cert. denied,* 474 U.S. 1058 (1986).
We accordingly grant McGowan's "Request to Take Notice" that Cross, Clayton & Associates is not represented by counsel on appeal, dismiss No. 92-1584 as to Cross, Clayton & Associates, and strike the brief of Cross, Clayton & Associates in No. 92-1480. This decision does not affect the right of Mark Cross to appear pro se in each appeal or on his own behalf.

2    Having resolved this issue in favor of Defendants, we do not discuss the alternative finding that Defendants possessed a nonexclusive license.

**All Citations**

991 F.2d 790 (Table), 1993 WL 125416, 1993 Copr.L.Dec. P 27,085

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5958144
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Welborn FREEMAN, Plaintiff,

v.

UNITED STATES, Defendant.

Case No. 13–cv–02421–WHO

|

Filed 11/07/2013

**Attorneys and Law Firms**

Welborn Freeman, Oakland, CA, pro se.

Rebecca Ann Falk, U.S. Attorney's Office, San Francisco, CA, for Defendant.

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 5, 31

WILLIAM H. ORRICK, United States District Judge

**\*1** Currently before the Court is the United States' motion to dismiss. That motion is scheduled for hearing on November 20, 2013. Pursuant to Civil Local Rule 7–1(b), the Court finds this matter appropriate for resolution without oral argument, and hereby VACATES the hearing. For the reasons discussed below, the Court GRANTS defendant's motion to dismiss, with leave to amend in part. Plaintiff's negligence claim is NOT dismissed and remains in the case.

**BACKGROUND**

Plaintiff Freeman filed this action on May 29, 2013, asserting causes of action against the United States based on complications he suffered during a heart surgery performed by doctors at the VA Medical Center in San Francisco. Complaint, pg. 3. Plaintiff asserts claims against the "United States" for negligence (First Cause of Action); discrimination under 42 U.S.C. section 1983 (Second Cause of Action); violation of equal protection and due process under the Fourteenth Amendment (Third Cause of Action); negligent infliction of emotional distress, loss of consortium, and loss of society (Fourth Cause of Action); and "Other Causes of

Action" including the loss of civil rights under section 1983, misrepresentation, deceit, fraud, violation of the California Unruh Civil Rights Act (Fifth Cause of Action).

The United States moves to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction, as to claims barred by sovereign immunity. The United States also moves to dismiss under Rule 12(b)(6), as to claims which fail to allege sufficient facts. The United States does not move to dismiss Mr. Freeman's first cause of action for negligence, which the United States admits has been exhausted and is appropriately alleged under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2680. Mr. Freeman opposes the motion to dismiss.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss a complaint if the court does not have jurisdiction over it. In reviewing a "facial" jurisdictional attack, the jurisdictional challenge is confined to the allegations pled in the complaint. See Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir.2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction. See Safe Air Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir.2004). To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal. See Wolfe, 392 F.3d at 362.

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

**\*2** In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. See Usher v. City of Los

Case 1:23-cv-01323-MSN-JFA    Document 13-1    Filed 01/11/24    Page 15 of 76 PageID# 110

Freeman v. United States, Not Reported in Fed. Supp. (2013)
2013 WL 5958144

*Angeles,* 828 F.2d 556, 561 (9th Cir.1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir.2008).

Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972). Where a plaintiff is proceeding pro se, the Court has an obligation to construe the pleadings liberally and to afford the plaintiff the benefit of any doubt. *Bretz v. Kelman,* 773 F.2d 1026, 1027 n.1 (9th Cir.1985) (en banc). However, pro se pleadings must still allege facts sufficient to allow a reviewing court to determine whether a claim has been stated. *Ivey v. Bd. of Regents of Univ. of Alaska,* 673 F.2d 266, 268 (9th Cir.1982).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000) (citations and internal quotation marks omitted). Dismissal of a pro se complaint without leave to amend is proper only if it is "absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987) (quoting *Broughton v. Cutter Labs.,* 622 F.2d 458, 460 (9th Cir.1980)).

## DISCUSSION

### I. SECTION 1983 AND CIVIL RIGHTS CAUSES OF ACTION

The United States, as sovereign, is immune from suit unless it unequivocally waives its sovereign immunity. *United States v. Mitchell,* 445 U.S. 535, 538 (1980). Mr. Freeman alleges various causes of action against the United States under Section 1983 for constitutional deprivations, including "discrimination" (Second), violation of due process and equal protection (Third), and deprivation of right to travel, to contract, etc. (Fifth/Other). As part of his Second Cause of Action, Mr. Freeman also asserts a claim under Title VI of the Civil Rights Act, 42 U.S.C. § 2000(d). Sovereign immunity bars Mr. Freeman's section 1983 and Title VI causes of action asserted against the United States or against federal agencies. *See, e.g., Jachetta v. United States,* 653 F.3d 898,

908 (9th Cir.2011) ("We find no evidence in either statute that Congress intended to subject federal agencies to § 1983 and § 1985 liability. To the contrary, §§ 1983 and 1985 impose liability upon a 'person,' and a federal agency is not a 'person' within the meaning of these provisions."). Therefore, the section 1983 and other civil rights claims asserted against the United States are DISMISSED with prejudice. [1]

[1]    Mr. Freeman cannot get around the sovereign immunity bar by asserting his constitutional deprivation claims against the United States under either the FTCA or supplemental (formerly pendent or ancillary) jurisdiction. *See F.D.I.C. v. Meyer,* 510 U.S. 471, 477 (1994) (constitutional tort claim is not cognizable under FTCA); *United States v. Park Place Associates, Ltd.,* 563 F.3d 907, 934 (9th Cir.2009) (supplemental jurisdiction statute "does not constitute a waiver of the United States' sovereign immunity.").

**\*3** Mr. Freeman argues that the motion to dismiss should be denied in light of the availability of a *Bivens* claim. *See* Docket No. 29, pg. 12 of 16. It is conceivable that Mr. Freeman could be able to allege violations of his constitutional rights against federal employees and officials acting in their individual capacity under a *Bivens* action. *See Starr v. Baca,* 652 F.3d 1202, 1206 (9th Cir.2011) ("A *Bivens* action seeks to hold federal officers individually liable for constitutional violations."). But, as with section 1983, a *Bivens* action for violation of constitutional rights cannot be asserted against United States. A *Bivens* action must be asserted against specific, named individuals who are responsible for the alleged deprivations. *See, e.g., Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government–official defendant, through the official's own individual actions, has violated the Constitution.").

Here, Mr. Freeman has not named any individual defendant or defendants responsible for an alleged constitutional violation. Mr. Freeman will be allowed to amend his Complaint to add a *Bivens* claim. If he does, Mr. Freeman must allege that at least one specific named individual defendant violated a specific constitutional right. Mr. Freeman would also need to allege the *facts* that explain how each named individual defendant subjected him to unconstitutional discrimination, violation of equal protection or violation of his due process rights.

Freeman v. United States, Not Reported in Fed. Supp. (2013)

2013 WL 5958144

## II. OTHER CALIFORNIA TORT AND STATUTORY CAUSES OF ACTION

The United States recognizes that a limited waiver of sovereign immunity has been granted under the FTCA for conduct that is tortious under California law. *See Schwarder v. United States,* 974 F.2d 1118, 1122 (9th Cir.1992) ("the FTCA directs us to look to the law of the state in which the government official committed the tort to determine the scope of sovereign immunity. If the law of that state makes private parties liable for wrongful deaths, then the United States is liable for the same."); *see also* 28 U.S.C. § 1346(b) (FTCA provides remedy "for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").

The United States does not seek to dismiss Mr. Freeman's First Cause of Action for negligence, recognizing that Mr. Freeman has exhausted his claim for negligence under the FTCA. However, the government does move to dismiss Mr. Freeman's other causes of action, because the claims asserted by Mr. Freeman are either not recognized under California law, are redundant because of the existing negligence claim, or fail to state a claim.

### A. Negligence Per Se

The United States argues that to the extent Mr. Freeman is attempting to state a claim for "negligence per se" he cannot do so because, under California law, "negligence per se is an evidentiary presumption rather than an independent right of action." *Quiroz v. Seventh Ave. Ctr.,* 140 Cal.App. 4th 1256, 1286 (2006). The Court agrees that negligence per se cannot be a separate cause of action. Therefore, this claim must be DISMISSED with prejudice.

### B. Negligent Infliction of Emotional Distress

The Court finds that Mr. Freeman's claim for negligent infliction of emotional distress must be dismissed because it is duplicative of his existing claim for negligence. *See Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 984 807 (1993) (recognizing that there "is no independent tort of negligent infliction of emotional distress."); *see also Robinson v. United States,* 175 F.Supp.2d 1215, 1224 (E.D.Cal.2001)

(recognizing negligent causing of emotional distress is not an independent tort but simply the tort of negligence). If Mr. Freeman proves his negligence claim, then he can seek damages for his emotional distress suffered as a result.

**\*4** Mr. Freeman also cannot assert a claim for negligent infliction of emotional distress suffered by his wife Deborah Freeman—who witnessed Mr. Freeman's suffering, *see* Complaint, pg. 5—because she is not a party to this lawsuit. Therefore, this claim must be DISMISSED, as to Mr. Freeman, with prejudice.

### C. Intentional Infliction of Emotional Distress

In his opposition papers, Mr. Freeman argues that he has stated a claim for intentional infliction of emotional distress. However, the Complaint does not include a claim for intentional infliction of emotional distress. If Mr. Freeman wants to include this claim in his Amended Complaint, he must plead facts showing the following: (1) extreme and outrageous conduct by a specific individual defendant who had the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) plaintiff suffered severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 1001 (1993). To be "outrageous," the conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community. *Id.* Mr. Freeman's current complaint does not include specific facts showing that the doctors or other potential defendants engaged in outrageous conduct with the intention of causing Mr. Freeman emotional distress.

### D. Loss of Consortium/Loss of Society

While California recognizes a claim for loss of consortium, it can be asserted only by the *spouse* of the injured party. *See, e.g., Rodriguez v. Bethlehem Steel Corp.,* 12 Cal.3d 382, 408 (1974) (recognizing that "each spouse has a cause of action for loss of consortium, as defined herein, caused by a negligent or intentional injury to the other spouse by a third party."). Mr. Freeman cannot assert a claim for his loss of consortium due to his own injuries, and his wife is not a party to this lawsuit. Therefore, the claim must be DISMISSED, as to Mr. Freeman, with prejudice.

### E. Misrepresentation/Deceit/Fraud and Breach of Contract

**Freeman v. United States, Not Reported in Fed. Supp. (2013)**
2013 WL 5958144

The United States moves to dismiss Mr. Freeman's claims asserted in his "Other" or Fifth Cause of Action for misrepresentations/deceit/fraud and "contract (Breach of an Implied Warranty to Contract) based on surgeon's promise to a particular result." Complaint at 6. As the United States points out, these claims cannot be asserted under the FTCA and are barred by sovereign immunity because Section 2680(h) of the FTCA provides that no claims can be made against the United States under the FTCA for "misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). Accordingly, these claims are DISMISSED with prejudice.

### F. Unruh Act

Plaintiff asserts a claim for violation of the Unruh Act, California Civil Code § 51.[2] Section 51 provides that "all persons" are "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ.Code § 51. As the Ninth Circuit has noted, "The Unruh Act forbids business establishments to deny any person 'full and equal accommodations, advantages, facilities, privileges, or services' on account of race, and has been limited to cases 'where the plaintiff was in a relationship with the offending organization similar to that of the customer in the customer-proprietor relationship.' " *Delta Sav. Bank v. United States,* 265 F.3d 1017, 1025 (9th Cir.2001) (quoting *Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859, 873–74 (9th Cir.1996). The Unruh Act can provide a basis for a claim against the United States under the FTCA. *See Delta Sav. Bank v. United States,* 265 F.3d at 1025.

[2]      Mr. Freeman also asserts a claim under section 51.3 of the Unruh Act. However, that section prohibits discrimination in housing and there are no housing-related allegations alleged in Mr. Freeman's complaint. Therefore, the claim under section 51.3 of the Unruh Act is DISMISSED with prejudice.

**\*5** The United States argues that Mr. Freeman has failed to allege a claim under the Unruh Act because he has failed to allege that he was denied accommodations, advantages, facilities, privileged or services on account of his race. Mr. Freeman has alleged that the problems he suffered during and from his operation were "racist" and that "Black veterans should be treated like White veterans similarly situated during an aortic valve repair." Complaint, pg. 5. However, Mr. Freeman does not allege any facts to support his contention that veterans received different medical treatment based on

their race. The Court will give Mr. Freeman leave to amend this claim to describe specifically the basis for his contention that defendants discriminated against him because of his race when they performed his aortic valve repair surgery.[3] Therefore, the government's motion to dismiss the section 51 Unruh Act violation is GRANTED with leave to amend.[4]

[3]      The government relies on the Ninth Circuit's decision in *Delta Saving Bank* to argue that Mr. Freeman's allegations cannot state a claim under the Unruh Act. In *Delta Savings,* the Court found that the claims alleged there—that the United States engaged in a racially-based conspiracy to investigate a bank operated by the plaintiff—did not state a claim under the Unruh Act because the allegations did not involve a "customer-proprietor" relationship. The broad allegation made by Mr. Freeman here—that he received inferior medical care based on his race from a hospital—is more akin to the "customer-proprietor" relationships covered by the Unruh Act. However, Mr. Freeman fails to state sufficient facts to demonstrate a plausible basis for his claim. *See Iqbal,* 556 U.S. at 678.

[4]      In his opposition papers, Mr. Freeman moves to strike United States' Exhibits B and C as unreliable and prejudicial. Docket No. 29 at pg. 10 of 16. However, Exhibits B and C are relevant at this juncture only to show that Mr. Freeman's negligence claim was exhausted under the FTCA. The Court has not considered, and need not consider, the determinations made by the Veterans Administration on Mr. Freeman's claim at this point in the case. The Motion to Strike is DENIED.

### III. SERVICE AND COUNSEL

In his opposition papers, Mr. Freeman asks for a continuance so he can secure counsel. He also asks the Court to assist him in serving various defendants. *See* Docket No. 29 at pg. 10 of 16. The Court will not appoint counsel for Mr. Freeman at this time. Mr. Freeman may speak with an attorney through the Court's Legal Help Center. The Center can provide information about the court procedures applicable to his case, including advice on how to serve defendants, as well as limited-scope legal advice and can help preparing simple pleadings. The attorney at the Legal Help Center can provide information, advice, and basic legal help, but cannot represent plaintiff as his lawyer. Help is provided by appointment only.

2013 WL 5958144

There are two ways to schedule an appointment and only one appointment may be scheduled at a time:

  1. Sign up in the appointment book located on the table outside the door of the Legal Help Center in San Francisco or Oakland; or

  2. Call to make an appointment at 415–782–8982.

The Legal Help Center in Oakland, is located in the United States Courthouse, 1301 Clay Street, 4th Floor, Room 470S, Oakland, CA 94612.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss in part.

Mr. Freeman's claims for constitutional violations against the United States are DISMISSED WITH PREJUDICE.

Mr. Freeman is given leave to amend to state a *Bivens* action for alleged constitutional violations against specifically named individual defendants.

Mr. Freeman's claims for negligence per se, negligent infliction of emotional distress, loss of consortium/society, misrepresentation/deceit/fraud, and breach of contract are DISMISSED WITH PREJUDICE.

Mr. Freeman is given leave to amend to state a claim for Intentional Infliction of Emotional Distress.

 **\*6** Mr. Freeman's claim for violation of Section 51 of the Unruh Act is DISMISSED with leave to amend.

Mr. Freeman's claim for negligence is NOT dismissed and remains in this case

The Amended Complaint shall be filed within **thirty (30)** days of the date of this Order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2013 WL 5958144

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Robertson v. Foster, Not Reported in Fed. Supp. (2017)

2017 WL 1104664

2017 WL 1104664
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Travis ROBERTSON, Plaintiff,

v.

Edward FOSTER, et al., Defendants.

Civil Action No. ELH-16-3610
|
Signed 03/23/2017

**Attorneys and Law Firms**

Travis J. Robertson, Baltimore, MD, pro se.

Mark John-Charles Dimenna, Baltimore City Department of Law, Baltimore, MD, for Defendants.

**MEMORANDUM**

Ellen Lipton Hollander, United States District Judge

*1 Travis Robertson, the self-represented plaintiff, has filed suit against Edward Foster, a security officer; the Enoch Pratt Free Library; and the City of Baltimore (collectively, "defendants"). ECF 1. Robertson asserts claims for "constitutional rights violations"; "ADA compliance violations"; and "civil rights violations" based on the alleged actions of Mr. Foster. ECF 1 at 4, 6. [1] Robertson also appears to assert claims under 18 U.S.C. §§ 241 and 242. *See id.* at 6. On the civil cover sheet (ECF 1-1), plaintiff indicates that he is pursuing a claim under the First Amendment, although he does not refer to the First Amendment in the text of his Complaint. *See* ECF 1. And, in the "Relief" section of the Complaint form, Robertson references claims for false arrest and false imprisonment. ECF 1 at 7. However, he does not otherwise mention such claims. [2]

[1] On the form "Complaint for a Civil Case", Robertson indicates that he has filed suit pursuant to the Court's federal question jurisdiction. *Id.* at 4; *see* 28 U.S.C. § 1332.

[2] Because the State law claims are only mentioned in the "Relief" section, I have not addressed them.

However, plaintiff may include such claims in an amended complaint.

Robertson states under the "Amount in Controversy" section of the Complaint form that he is "suing for $275,000 ...." ECF 1 at 5. However, under the "Relief" section of the Complaint form, Robertson states, *id.* at 7: "The total lawsuit amount is $100,000."

Now pending is defendants' motion to dismiss (ECF 6), which is supported by a memorandum of law. ECF 6-1 (collectively, "Motion"). The Motion seeks dismissal of the case based on a lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 6. Robertson has responded in opposition. ECF 9 ("Opposition"). Defendants did not reply, and the time to do so has expired. *See* docket; Local Rule 105.2.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.

**I. Factual Background** [3]

[3] Given the procedural posture of this case, I accept as true the facts alleged in the Complaint. The Court is also mindful of its obligation to construe liberally the pleadings of a *pro se* litigant, which are "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also White v. White,* 886 F.2d 721, 722-23 (4th Cir. 1989).

Robertson asserts that he is "filing this Complaint and law suit today because [he has] observed several violation [sic] such as constitutional violation & ADA compliance violations." ECF 1 at 6. Robertson also contends, *id.*: "The officer don't know how to deal with those who are mentally ill and those who are mentally disable. I have spoken to many young women and men who have been harassed by Mr. Edward Foster...."

According to Robertson, on October 31, 2016, he was "criminally harassed" by Foster when Foster asked Robertson to leave the Enoch Pratt Free Library ("Pratt Library"), claiming that Robertson was causing a disruption. *Id.* It is common knowledge that the Pratt Library has a main location in Baltimore and many branch locations throughout the City. But, plaintiff does not specify the location of the incident. In any event, Robertson claims that he refused to leave

2017 WL 1104664

and called for "a Baltimore City Police Office and a senior supervisor" to assist him. *Id.* As a result, Foster "got mad at [him] calling the police [and] knocked the phone out of [his] hand...." *Id.* According to Robertson, Foster and another security guard then placed him in handcuffs and banned him from the Pratt Library, in "retaliation" for his complaints. *Id.*

## II. Rule 12(b)(1)

**\*2** Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting " 'that the jurisdictional allegations of the complaint [are] not true.' " *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted) (alteration in original); *see also Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 736 (D. Md. 2001).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *accord Clear Channel Outdoor, Inc.*, 22 F. Supp. 3d at 524. In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Here, defendants assert a facial challenge to subject matter jurisdiction, arguing that plaintiff has failed to plead the existence of jurisdiction.

Construing the Complaint liberally, plaintiff has met his burden of establishing subject matter jurisdiction. Plaintiff has asserted claims that appear to arise under the Constitution and laws of the United States. *See* 28 U.S.C. § 1331. Therefore, plaintiff has met his initial burden of proving the existence of subject-matter jurisdiction. To the extent that

## III. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, ─── U.S. ───, 133 S. Ct. 1709 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' ...." (citation omitted)); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ─── U.S. ───, 135 S. Ct. 346, 346 (2014) (per curiam).

**\*3** Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

Case 1:23-cv-01323-MSN-JFA    Document 13-1    Filed 01/11/24    Page 21 of 76 PageID# 116
Robertson v. Foster, Not Reported in Fed. Supp. (2017)
2017 WL 1104664

In reviewing a Rule 12(b)(6) motion, a court " 'must accept as true all of the factual allegations contained in the complaint' " and must " 'draw all reasonable inferences [from those facts] in favor of the plaintiff.' " *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 705 (4th Cir. 2016);*Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, —— U.S. ——, 132 S. Ct. 1960 (2012).

In general, courts do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The purpose of the rule is to ensure that defendants are "given adequate notice of the nature of a claim" made against them. *Twombly*, 550 U.S. at 555–56 (2007).

In their Motion, defendants argue that the Complaint should be dismissed under Rule 12(b)(6) because "[t]he Complaint simply makes passing references to the First Amendment, ADA, and 18 U.S.C. § 241-242, without an allegation that Plaintiff, or the class he purports to represent, is disabled within the meaning of the ADA...." ECF 6-2 at 3. In his Opposition, Robertson states, ECF 9 at 1: "The US District Court ... is the correct court to bring an [sic] case for an [sic] violation of constitutional rights and Federal laws Title 18." Robertson adds: "I have a right to file litigation against an employee of an [sic] city agency. I have the right to sue the agency and the City the employee woks for...." *Id.*

Fed. R. Civ. P. 8(a)is pertinent. It provides, *id.*:

**Claim for Relief.** A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

"When determining whether a complaint fails to comply with Rule 8(a), 'courts have looked to various factors, including the length and complexity of the complaint, *whether the complaint was clear enough to enable the defendant to know how to defend himself*, and whether the plaintiff was represented by counsel.' " *Rush v. Am. Home Mortg.*, Inc., WMN-07-854, 2009 WL 4728971, at *4 (D. Md. Dec. 3, 2009) (emphasis added) (quoting *North Carolina v. McGuirt*, 114 Fed.Appx. 555, 558 (4th Cir. 2004) (per curiam) (internal citations omitted). A court may properly dismiss a complaint under Rule 12(b)(6) for failure to comport with Rule 8(a) if the complaint "does not permit the defendants to figure out what legally sufficient claim the plaintiffs are making and against whom they are making it." *McGuirt*, 114 Fed.Appx. at 559.

**\*4** In granting a motion to dismiss a complaint brought by a self-represented plaintiff, Judge Bennett explained in *Jackson v. Experian Fin. Servs.*, RDB-13-1758, 2014 WL 794360, at *1 (D. Md. Feb. 26, 2014) (alterations in *Jackson*):

As this Court has held, " 'the proper length and level of clarity for a pleading cannot be defined with any great precision and is largely a matter for the discretion of the trial court.' " *Stone v. Warfield*, 184 F.R.D. 553, 555 (D. Md. 1999) (quoting *Charles A. Wright & Arthur R. Miller, 5 Federal Practice & Procedure § 1217 (2d ed. 1990)*). Although a pro se plaintiff is generally given more leeway than a party represented by counsel, this Court "has not hesitated to require even pro se litigants to state their claims in an understandable and efficient manner." *Id.* (citing *Anderson v. Univ. of Md. Sch. of Law*, 130 F.R.D. 616, 617 (D. Md. 1989), *aff'd*, 900 F.2d 249, 1990 WL 41120 (4th Cir. 1990) (unpublished table decision)). To that end, a district court "is not obliged to ferret through a [c]omplaint, searching for viable claims." *Wynn–Bey v. Talley*, No. RWT–12–3121, 2012 WL 5986967, at *2 (D. Md. Nov. 28, 2012). Rather, a court "may dismiss

Case 1:23-cv-01323-MSN-JFA    Document 13-1    Filed 01/11/24    Page 22 of 76 PageID# 117

Robertson v. Foster, Not Reported in Fed. Supp. (2017)

2017 WL 1104664

a complaint that is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* (quoting *Salhuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988)).

And, in *Green v. United States*, GLR-15-2026, 2016 WL 7338408 (D. Md. Dec. 19, 2016), Judge Russell dismissed the case, *sua sponte,* and explained, *id.* at \*1:

> The instant Complaint "places an unjustifiable burden on defendants to determine the nature of the claim against them and to speculate on what their defenses might be" and imposes a burden on the court to sort out the factual basis of any claims fairly raised, making dismissal under Rule 8 appropriate. *Holsey v. Collins*, 90 F.R.D. 122 (D. Md. 1981); *see also Spencer v. Hedges*, 838 F.2d 1210 (Table) (4th Cir. 1988). To comply with the rule, a Plaintiff must provide enough detail to illuminate the nature of the claim and allow Defendants to respond. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007). Although district courts have a duty to construe self-represented pleadings liberally, Plaintiff must nevertheless allege facts that state a cause of action. See *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (duty to construe liberally does not require courts to conjure up questions never squarely presented).

In my view, dismissal pursuant to Rule 12(b)(6) is appropriate because the Complaint fails to comport with the requirements of Rule 8(a). Plaintiff advances wholly vague claims of "constitutional rights violations"; "ADA compliance violations"; "civil rights violations"; and violations of 18 U.S.C. §§ 241 and 242. ECF 1 at 4, 6.

With respect to plaintiff's claim of constitutional rights violations, plaintiff does not specify which constitutional rights were violated or how defendants violated those rights. *See* ECF 1. Likewise, as to plaintiff's claim for civil rights violations, he does not state which civil rights were violated or the conduct that underlies the alleged violation. *See id.* In other words, as to his claims for constitutional rights violations and civil rights violations, plaintiff has failed to provide "a short and plain statement of the claim[s] showing that [he] is entitled to relief." *See id.*; *see* Fed. R. Civ. P. 8(a)(2). Accordingly, plaintiff has not provided defendants with "fair notice" of the federal claims against them and the "grounds" entitling him to relief. *Twombly*, 550 U.S. at 555-56.

**\*5** Moreover, plaintiff's claim under the Americans with Disabilities Act of 1990 ("ADA") is similarly defective. The

ADA, *as amended*, 42 U.S.C. §§ 12101, *et seq.*, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). "The [ADA] prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131–12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182–12189." *A Helping Hand, LLC v. Baltimore County, Md.,* 515 F.3d 356, 361 (4th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004)).

Presumably, Robertson brings his ADA claim under Title III of the ADA. It provides, in relevant part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Under the ADA, disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." *Id.* § 12102(1). Discrimination is defined as "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities...." *Id.* § 12182(b)(2)(A)(ii). And, libraries are specifically enumerated as public accommodations that are covered by the ADA. *Id.* § 12181(7)(H).

To state a claim under Title III, a plaintiff must allege: "(1) that [he] is disabled within the meaning of the ADA; (2) that defendant owns, leases, or operates a place of public accommodation; and (3) defendant discriminated against [him] by denying [him] a full and equal opportunity to enjoy services provided at such place of public accommodation." *Blue v. Cumberland Cty.,* No. 5:14-CV-86-FL, 2015 WL 164722, at \*2 (E.D.N.C. Jan. 13, 2015) (citing, *inter alia*, 42 U.S.C. § 12182(a) and *Camarillo v. Carrots Corp.,* 518 F.3d 153, 156 (2d Cir. 2008)).

Robertson has failed to assert any allegations pertaining to the first or third elements of a Title III claim under the ADA. He does not assert that he is disabled within the meaning of the

Robertson v. Foster, Not Reported in Fed. Supp. (2017)

2017 WL 1104664

ADA, nor does he allege that defendants denied him "a full and equal opportunity" to enjoy the services of the library. And, if plaintiff seeks to file suit on behalf of others, he has not set forth a basis that permits him to do so. *See A Helping Hand*, 515 F.3d at 363 n.3. Accordingly, plaintiff has failed to state a claim for a violation of Title III of the ADA.

Finally, it appears that plaintiff also asserts claims under 18 U.S.C. §§ 241 and 242. Section 241 is titled "Conspiracy against rights." It provides:

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

**\*6** They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

Section 242 of 18 U.S.C. is titled "Deprivation of rights under color of law." It provides:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall

be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

However, those statutes are criminal in nature. It is well established that there is no private right of action to pursue claims under federal criminal statutes. *See, e.g.*, *United States v. Oguaju*, 76 Fed.Appx. 579, 581 (6th Cir. 2003) ("[T]he district court properly dismissed [plaintiff's] claim pursuant to 18 U.S.C. §§ 241 or 242 because [plaintiff] has no private right of action under either of these criminal statutes."); *Davis v. Sarles*, 134 F. Supp. 3d 223, 228 (D.D.C. 2015) ("[D]efendants argue correctly that plaintiffs' reliance on 18 U.S.C. § 241 and § 242 as the jurisdictional basis of their claim ... fails as a matter of law since those federal criminal statutes do not create a private right of action."); *see also Alexander v. Hendrix*, RDB-14-2666, 2015 WL 3464145, at \*3 (D. Md. May 29, 2015) (finding no private cause of action for statutes that are "criminal in nature"). Thus, dismissal with prejudice as to plaintiff's claims under 18 U.S.C. §§ 241 and 242 is appropriate.

### IV. Conclusion

In sum, Robertson has failed to comply with the requirements of Fed. R. Civ. P. 8(a) or to otherwise state a claim upon which relief may be granted. Accordingly, I shall dismiss *without prejudice* Robertson's claims for constitutional violations, civil rights violations, and violations of the ADA. However, to the extent that Robertson asserts claims under 18 U.S.C. §§ 241 or 242, I shall dismiss those claims *with prejudice*, as

2017 WL 1104664

there is no private right of action to enforce those statutes. Robertson shall be granted leave to amend, as set forth in the Order that follows.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1104664

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 469938
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Steven C. THOMPSON, Plaintiff,

v.

EVA'S VILLAGE AND SHELTERING
PROGRAM, et. al, Defendants.

No. Civ.A. 04–2548JAP.
|
Feb. 24, 2006.

**Attorneys and Law Firms**

Steven C. Thompson, Passaic, NJ, Plaintiff, pro se.

Anthony M. Juliano, Wolf, Block, Schorr & Solis–Cohen LLP, Roseland, NJ, for Defendants, Eva's Village and Sheltering Program, Derrick Williams, Gregory Anderson, Gloria Perez, Anthony McCants, and Bryant Jenkins.

Evan B. Caplan, Cozen O'Conner, Philadelphia, PA, for Defendant Narcotics Anonymous World Services, Inc. (improperly pled as World Service Organization, Inc.).

Ousmane D. Al–Misri, Newark, NJ, for Defendant Greater Paterson Area, Inc.

OPINION

PISANO, District Judge.

**\*1** Pro se Plaintiff, Steven C. Thompson, brings this action against Defendants Narcotics Anonymous World Services, Inc. ("NAWS"), [1] the Greater Paterson Area, Inc. ("Greater Paterson"), Eva's Village and Sheltering Program ("Eva's Village"), Derrick Williams, Gregory Anderson, Sister Gloria Perez, Anthony McCants, and Ronald Bryant Jenkins [2] (collectively, the "Defendants"). Jurisdiction is premised on 28 U.S.C. § 1331. Currently before the Court are Defendants' respective motions for summary judgment. Plaintiff has not formally opposed these motions. [3] The Court also considers Plaintiff's motion to amend his complaint which was filed on February 15, 2006. For the following reasons, Plaintiff's motion for leave to amend his complaint is denied. Defendants' motions for summary judgment are granted. [4]

[1] Narcotics Anonymous World Services, Inc. was improperly pled as World Service Organization, Inc.

[2] Ronald Bryant Jenkins was improperly pled as Bryant Jenkins.

[3] Plaintiff's original response to Defendants' motions for summary judgment was due on January 13, 2006. Plaintiff requested, and was granted, two extensions of this date. By order dated February 3, 2006, the Court emphasized that if Plaintiff did not file his brief by February 8, 2006, which gave him almost two months to respond to the motions, the Court would treat the motions as unopposed. Plaintiff did not file his brief by February 8, 2006. He claims, first, that he did not receive timely notice of the Court's order. Despite this claim of untimely notice, as of the date of this opinion, Plaintiff has not filed a formal opposition to these motions. Further, Plaintiff continues to claim that he needs more time to oppose these motions; however, during the two months he had to oppose these motions, Plaintiff managed to inundate the Court with four lengthy motions and at least seven voluminous letters.

Plaintiff's most recent letter, dated February 17, 2006, while apparently in response to a February 14, 2006 letter submitted to the Court by NAWS, contains various statements in response to Defendants' motions for summary judgment. Even though this submission is untimely and in violation of the Court's February 3, 2006 order, the Court will again accommodate Plaintiff by taking into account his letter in ruling on these motions.

[4] The Court decides these motions without oral argument as permitted by Fed.R.Civ.P. 78.

I. *Factual History*

Plaintiff was a sixteen-year participant in the drug recovery program, Narcotics Anonymous, or "NA." [5] During his participation in NA, Plaintiff regularly attended meetings held at Eva's Village in Paterson, New Jersey. Plaintiff attended these meetings in an effort to cure his drug addiction through the Narcotics Anonymous twelve-step self-help program.

Case 1:23-cv-01323-MSN-JFA   Document 13-1   Filed 01/11/24   Page 26 of 76 PageID# 121
Thompson v. Eva's Village and Sheltering Program, Not Reported in F.Supp.2d (2006)
2006 WL 469938

5

    In his February 17, 2006 letter to the Court, Plaintiff claims that he did not attend NA meetings at Eva's Village and "at no time was [Plaintiff] affiliated with Eva's Village." This statement is completely contradictory to allegations in Plaintiff's complaint and the evidence in the record. Further, it is absurd considering Plaintiff's participation in NA meetings at Eva's Village is the subject of this lawsuit.

The Narcotics Anonymous twelve-step program is a product of literature that is developed and sold by NAWS, the national organization of Narcotics Anonymous. Greater Paterson is a service organization that is permitted to use the Narcotics Anonymous name and literature to conduct local NA meetings. Greater Paterson operates twenty NA meetings in the Paterson, New Jersey area, including five meetings held at Eva's Village, a service facility that provides meals, shelter, and drug and alcohol recovery programs for people in need. Individual defendants Derrick Williams, Gregory Anderson, Sister Gloria Perez, Anthony McCants, and Ronald Bryant Jenkins are employees of Eva's Village.

Beginning in approximately the summer of 2002, Plaintiff complained to staff members at Eva's Village about what he perceived to be his "right to close a meeting with the prayer of his choice," namely, the "Lord's Prayer." Plaintiff was not permitted to close meetings with this prayer because of objections by other NA members. The Sixth Tradition of Narcotics Anonymous prohibits NA groups from endorsing any outside enterprise, such as a specific religion, in an effort to maintain the focus of meetings on recovery from addiction. Plaintiff's complaints became disruptive to the NA meetings. Accordingly, on January 29, 2003, Ronald Bryant Jenkins of Eva's Village informed Plaintiff that he was no longer welcome at NA meetings at Eva's Village.

Plaintiff returned to a NA meeting on February 12, 2003. Sister Gloria Perez, Executive Director of Eva's Village, called the Paterson Police Department to report that Plaintiff was trespassing at Eva's Village. An officer responded and removed Plaintiff from the premises. Sister Perez did not file a criminal complaint against Plaintiff; however, the officer informed Plaintiff that if he returned to Eva's Village, he would be arrested for trespassing.

**\*2** On June 6, 2004, Plaintiff filed the instant complaint alleging that Defendants violated the following constitutional, statutory, and common law provisions by prohibiting him from conducting prayer at NA meetings and removing him

from the facility allegedly because of his religious beliefs: 6 (1) First Amendment; (2) Fourteenth Amendment; (3) 42 U.S.C. § 1983; (4) 42 U.S.C. § 1985; (5) 42 U.S.C. § 2000a; (6) 18 U.S.C. § 371; (7) 18 U.S.C. § 245(b)(2)(B); (8) Federal Hate Crimes Act; (9) New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5–1 et seq. ("NJLAD"); (10) New Jersey Hate Crimes Act, N.J.S.A. § 2C:44–3e; (11) fraud; (12) misrepresentation; (13) defamation; (14) false light; and (15) harassment. 7

6

    Although Plaintiff makes reference to his race, African–American, and a purported disability, Plaintiff provides no evidence that his race or alleged disability played any role in the events giving rise to this lawsuit.

7

    The Court delineated Plaintiff's alleged causes of action in its November 10, 2005 letter order.

## II. *Procedural History*

The procedural history in this case is extensive. Plaintiff filed a Motion for Judgment on the Pleadings or in the alternative a Motion for Summary Judgment which was denied by the Court on September 17, 2004. Plaintiff then filed numerous motions seeking the recusal or disqualification of Judge Pisano and Magistrate Judge Madeline C. Arleo, which were denied and affirmed on appeal by the United States Court of Appeals for the Third Circuit. On September 15, 2005, Defendants filed motions for summary judgment arguing that Plaintiff's claims were barred by the New Jersey Charitable Immunity Act, N.J.S.A. § 2A:53A–7 (2005). By letter order dated November 10, 2005, the Court denied Defendants' motions because the New Jersey Charitable Immunity Act does not apply to Plaintiff's non-negligence claims. In its November 10, 2005 letter order, the Court also denied Plaintiff's Cross–Motion for Summary Judgment. The Court permitted Defendants to file motions for summary judgment that addressed the validity of the various non-negligence causes of action alleged by Plaintiff. Plaintiff moved to amend his complaint.

## III. *Motion to Amend Complaint*

On February 15, 2006, while the instant motions for summary judgment were pending, Plaintiff filed a motion to amend his complaint pursuant to Fed.R.Civ.P. 15. Plaintiff claims that amendment of his complaint is warranted because Plaintiff wishes to add a party, add new claims, dismiss a claim, correct

2006 WL 469938

certain errors in the pleadings, and discuss purported changes in the law and purported "new evidence."

Pursuant to Rule 15(a), a party may amend his pleading once as a matter of course at any time before a responsive pleading is served. This provision does not apply to this case because Defendants filed answers to Plaintiff's complaint on October 6, 2004, December 2, 2004, and June 14, 2005. Accordingly, Plaintiff may only amend his complaint if he either receives written consent of his adversaries, which Plaintiff does not have, [8] or leave of Court. Although leave to amend should be "freely given," a district court may deny a motion to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives; (2) the amendment would be futile; or (3) the amendment would prejudice the other party. *See, e.g., Hill v. City of Scranton,* 411 F.3d 118, 134 (3d Cir.2005).

[8]    Defendant NAWS submitted a letter to the Court on February 14, 2006 vehemently objecting to Plaintiff's proposed amendments to his complaint.

**\*3** The Court denies Plaintiff's motion because his proposed amendments are untimely, substantially prejudice the Defendants, and are futile. [9] First, Plaintiff unduly delayed in filing his proposed amended complaint, which was filed over one and one-half years after his original complaint was filed on June 6, 2004. Plaintiff provides no valid reason for this delay. Further, the Court's review of Plaintiff's proposed amended complaint reveals that it essentially recites the same facts and arguments presented in his original complaint. *See Hill,* 411 F.3d at 134 (affirming district court's denial of leave to amend where rather than explaining the cause of her delay in proposing amendments, plaintiff devoted most of her brief to re-arguing her original claims).

[9]    Although none of the Defendants filed substantive motions objecting to Plaintiff's proposed amended complaint, given the protracted history of this case and in the interests of judicial economy and the Court's need to manage its own docket, the Court adjudicate's Plaintiff's motion to amend without substantive responses from Defendants.

To the extent he sets forth any new facts, it is clear that Plaintiff was aware of such facts, as well as the existence of William ("Bobby") Singletary, the individual Plaintiff wishes to add as a defendant, at the time he originally filed this

lawsuit. *See Duffy v. Charles Schwab & Co., Inc.,* No. CIV.A. 98–4595, 2001 WL 1104689, at \*1–2 (D.N.J. Sept. 4, 2001) (denying leave to amend under Rule 15(a) and noting that plaintiffs were aware of the facts relating to their amended claims at the time they originally filed their complaint). In fact, Plaintiff specifically mentions Mr. Singletary and discusses his conduct in his original complaint.

Moreover, the Court finds that granting Plaintiff's motion to amend his complaint would significantly prejudice the Defendants because it would require Defendants to have to amend their motions for summary judgment or file additional dispositive motions in this matter. Further, Defendants would be forced to expend additional cost and preparation in defending against Plaintiff's accusations. *See Duffy,* 2001 WL 1104689, at \*1–3 (denying leave to amend because such would prejudice the defendant where summary judgment motions were pending and allowing amendment would result in increased cost, preparation, and motion practice).

Further, Plaintiff's proposed amendments would ultimately be futile. The new evidence and changes in law that Plaintiff relies on are irrelevant to this case and do not change the ultimate outcome. *See Oran v. Stafford,* 226 F.3d 275, 291 (3d Cir.2000) (affirming district court's denial of leave to amend where plaintiff's additional allegations were essentially irrelevant to the disposition of the matter). Additionally, a review of Plaintiff's proposed new causes of action reveals that Plaintiff provides no specific facts to sustain legally sufficient claims for a violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.;* a violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.;* negligence; promissory estoppel; abuse of process; intentional infliction of emotional distress; and intentional interference with his membership in NA. *See Oran,* 226 F.3d at 291 ("Futility is governed by the same standard of legal insufficiency that applies under rule 12(b)(6)."); *Boerger v. Commerce Ins. Services,* No. Civ. 04–1337, 2005 WL 3235009, at \*3 (D.N.J. Nov. 28, 2005) (stating that if the proposed amendment is frivolous or states a claim that is legally insufficient on its face, the court may deny leave to amend). Thus, the Court denies Plaintiff's motion to amend his complaint.

IV. *Motions for Summary Judgment*

A. *Legal Standard*

**\*4** A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine, fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson,* 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992).

B. *First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983 Claims*

Plaintiff alleges that Defendants violated Plaintiff's First Amendment rights of free speech, religion, and assembly, as well as the Equal Protection Clause of the Fourteenth Amendment, by denying Plaintiff the opportunity to close NA meetings with the prayer of his choice and subsequently preventing him from attending NA meetings at Eva's Village.

Plaintiff further alleges that Defendants' conduct violated his civil rights pursuant to 42 U.S.C. § 1983 (2006). To state a claim under § 1983, Plaintiff must establish that he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of state law. 42 U.S.C. § 1983; *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999).

In order for Plaintiff to establish that Defendants violated the First Amendment, Fourteenth Amendment, or § 1983, Plaintiff must show that the alleged discriminatory conduct involved state action. *See, e.g., Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982) (stating that the Fourteenth Amendment has a state action requirement); *Versarge v. Twp. of Clinton, N.J.,* 984 F.2d 1359, 1363 (3d Cir.1993) (indicating that state action is required to trigger application of the First Amendment (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 265 (1964))); *see also Am. Mfrs Mut. Ins. Co.,* 526 U.S. at 50 ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (citation omitted)). If the conduct satisfies this state action requirement, it also constitutes action "under color of state law" for § 1983 purposes. *Id.* at 295 n. 2 (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 (1982)).

**\*5** Defendants are undisputably private entities and individuals. Accordingly, their private conduct will only satisfy the state action requirement if there is such a close connection between the seemingly private behavior and the state action that the behavior " 'may be fairly treated as that of the State itself." ' *Brentwood Academy v. Tenn. Secondary School Athletic Assoc.,* 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974)). [10]

10      There is no evidence that Defendants perform government functions, that they were coerced to perform such functions, or that Defendants operate in significant interdependence with the state. *See, e.g., Bailey v. Harleysville Nat. Bank & Trust Co.,* No. Civ. A. 02–1541, 2005 WL 2012024, at \*3 (E.D.Pa. Aug. 22, 2005). The Court also notes that Plaintiff has not even named any state official or entity as a defendant in his complaint.

Plaintiff fails to satisfy the state action requirement. First, Plaintiff fails to allege that NAWS or Greater Paterson had *any* connection to a state official or entity, let alone the type of close connection that would justify a suit against these defendants for constitutional violations.

Furthermore, Plaintiff's claim that Eva's Village and its employees violated his rights under the constitution and § 1983 also fails because Plaintiff has not established the requisite state action. Plaintiff's sole "state action" allegation

is that Sister Perez of Eva's Village called the Paterson Police Department on February 12, 2003 to report Plaintiff for trespassing after employees at Eva's Village told Plaintiff not to return to the facility. An officer responded to the call and removed Plaintiff from the premises. This allegation is insufficient to establish state action or a deprivation of Plaintiff's rights under color of state law. *See Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 271–73 (2d Cir.1999) (holding that a private citizen's act of seeking assistance of the police in quelling a disturbance by a customer did not establish state action); *Johns v.. Home Depot U.S.A., Inc.,* 221 F.R.D. 400, 404–05 (S.D.N.Y.2004) (same); *Liwer v. Hair Anew,* No. 99–Civ. 11117, 2000 WL 223828, at *2 (S.D.N.Y. Feb. 25, 2000); ("Even assuming, arguendo, that defendant called the police for assistance, this does not mean that defendant so closely aligned itself with state actors as to come within the purview of § 1983). [11] To hold otherwise would render private citizens open to constitutional and § 1983 liability every time they called the police for legitimate assistance. Plaintiff has provided no evidence to support his bare assertions that the phone call to the police was anything other than a legitimate request for help.

[11]   The holdings in *Ginsberg, Johns,* and *Liwer* dealt specifically with the "under color of state law" requirement in § 1983 claims. The Court sees no reason why the principles of these cases should not be applied to its analysis of both the § 1983 and constitutional claims posited by Plaintiff in this matter.

Accordingly, Plaintiff's First Amendment, Fourteenth Amendment, and § 1983 claims are dismissed.

## C. *Claims Pursuant to 42 U.S.C. § 1985*

Plaintiff alleges that Defendants violated 42 U.S.C. § 1985(3), which prohibits conspiracies to deprive an individual of the "equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). Because § 1985(3) does not provide its own substantive rights, the rights vindicated by this section must be found elsewhere. *See United Brotherhood of Carpenters and Joiners of Am., Local 610, AFL–CIO et al. v. Scott,* 463 U.S. 825, 833 (1983). In support of his § 1985(3) claim, Plaintiff alleges a conspiracy to violate his First and Fourteenth Amendment rights. Thus, Plaintiff must show state involvement in the alleged conspiracy. *Id.* at 831–32; *see also Volunteer Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 226 (6th Cir.1991)

(stating that where a § 1985(3) claim is based on a conspiracy to violate rights secured under the First and Fourteenth Amendments, the complainant must show state involvement in the conspiracy); *Hauptmann v. Wilentz,* 570 F.Supp. 351, 385 (D.N.J.1983) ( "[W]hen the alleged conspiracy is aimed at interfering with rights that are by definition rights only against state interference ... the plaintiff in a § 1985(3) suit must establish that the conspiracy contemplated state involvement."). As stated in section IV.B. above, Plaintiff has not shown such state action and accordingly, his § 1985(3) claims are dismissed.

## D. *Claims Pursuant to 42 U.S.C. § 2000a*

 **\*6**  Plaintiff asserts that Defendants violated Title II of the Civil Rights Act, codified at 42 U.S.C. § 2000a by discriminating against him in denying him access to Eva's Village on the basis of his religious beliefs. [12] Section 2000a prohibits discrimination on the basis of, among other things, religion, in denying a person access to a place of public accommodation. 42 U.S.C. § 2000a.

[12]    Plaintiff cannot claim that he was improperly denied access to NA or Greater Paterson under Title II because both of those organizations lack a fixed situs. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 755–56 (9th Cir.1994) (indicating that Title II of Civil Rights Act requires that plaintiff show that the organization is connected to a particular location in order for the organization to be a place of public accommodation under the Act); *Welsh v. Boy Scouts of Am.,* 993 F.2d 1267, 1269–70 (7th Cir.1993) (affirming district court's conclusion that Boy Scouts of America was not a place of public accommodation under Title II of the Civil Rights Act because it was a membership organization that lacked a close connection to a particular site or facility).

The Court initially notes that it is skeptical that Eva's Village is a place of public accommodation for purposes of 42 U.S.C. § 2000a because it may not have the requisite ties to interstate commerce. *See, e.g., United States v. Landsdowne Swim Club,* 894 F.2d 83, 86 (3d Cir.1990) ("Under [42 U.S.C. § 2000a] a place of public accommodation has two elements: first, it must be one of the statutorily enumerated categories of establishments that serve the public ... second, its operations must affect commerce."); *Marsh v. Delaware State University,* No. Civ.A. 05–00087JJF, 2006 WL 141680,

at *5 (D. Del Jan. 19, 2006) ("Section 2000a of Title II of the Civil Rights Act, creates a private cause of action to remedy discrimination in public accommodations affecting interstate commerce."). However, the parties did not brief this issue. Accordingly, the Court presumes that Eva's Village is a place of public accommodation.

In any event, Plaintiff's § 2000a claims against NAWS and Greater Paterson are dismissed because there is no dispute that neither of these Defendants prevented Plaintiff from attending NA meetings at Eva's Village. Instead, Plaintiff alleges that employees of Eva's Village prohibited Plaintiff from attending such meetings.

Furthermore, with respect to Eva's Village and its employees, Plaintiff's claims are dismissed because the record in this case is devoid of any evidence that Plaintiff was discriminated against based on his religious beliefs. *See McAllister v. Greyhound Lines, Inc.,* No. CIV.A. 96–2225, 1997 WL 642994, at *7–8 (D.N.J. Oct. 7, 1997) (granting summary judgment on plaintiff's Title II claim where the record was "devoid of any evidence that [plaintiffs] were discriminated against"). Although Plaintiff conclusorily states numerous times that he was discriminated against because of his religious beliefs, Plaintiff presents no facts to support these assertions. While Plaintiff's insistence on closing NA meetings with the prayer of his choice undoubtedly instigated the chain of events giving rise to his ban and removal from Eva's Village, there is no evidence to suggest that his removal was for anything other than his disruptive behavior after being informed he could not close the meeting with the "Lord's Prayer." Accordingly, Plaintiff's claim of religious discrimination pursuant to 42 U.S.C. § 2000a is dismissed.

E. *Claims Pursuant to 18 U.S.C. §§ 371 & 245(b)(2)(B)*
Plaintiff claims that Defendants violated 18 U.S.C. §§ 371 and 245(b)(2)(B) by conspiring to commit an offense against the United States and conspiring against Plaintiff to deprive him of his constitutional and civil rights. Sections 371 and 245(b)(2)(B) are federal criminal statutes and thus they do not convey a private right of action. *See, e.g., Maier v. Phillips,* No. 99–7120, 2000 WL 234453, at *2 (2d Cir. Feb. 1, 2000) (dismissing claim brought pursuant to 18 U.S.C. § 371 because § 371 is a criminal statute that affords no private right of action); *Fechter v. Shiroky,* No. 04–16047, 1995 WL 377155 at *4 (9 th Cir. June 23, 1995) (affirming dismissal of § 245 claims because, as a criminal statute, there is no private right of action); *Rockefeller v. U.S. Court of Appeals*

*Office, For The Tenth Circuit Judges,* 248 F.Supp.2d 17, 23 (D.D.C.2003) (dismissing plaintiff's § 371 claims because there is no private right of action); *John's Insulation, Inc. v. Siska Const. Co., Inc.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991) (finding that § 245 does not create a private right of action for damages). Accordingly, since Plaintiff does not have the right to bring claims pursuant to 18 U.S.C. §§ 371 and 245(b)(2)(B), such claims are dismissed.

F. *Claims Pursuant to the "Federal Hate Crimes Statute"*
 *7 Plaintiff alleges that Defendants engaged in acts which violated the "Federal Hate Crimes Act;" however, Plaintiff fails to specify which federal statute Defendants allegedly violated. Thus, Plaintiff fails to state a claim for relief. To the extent that Plaintiff is referring to 18 U.S.C. § 245(b)(2)(B), this claim is dismissed for the reasons stated in section IV.E. above.

G. *New Jersey State Law Claims*
Since the Court has dismissed all of the federal claims in this action over which it had original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's New Jersey state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if the district court has dismissed all claims over which it has original jurisdiction."); *see also Jerrytone v. Musto,* No. 04–4145, 2006 WL 162656, at *6 (3d Cir. Jan. 23, 2006) (affirming district court's decision to not exercise supplemental jurisdiction over plaintiff's state law claims pursuant to § 1367(c)(3) after court granted summary judgment in favor of defendant on all of plaintiff's federal claims).

V. *Conclusion*
In conclusion, for the reasons stated above, the Court denies Plaintiff's motion to amend his complaint. The Court also grants Defendants' motions for summary judgment on all of Plaintiff's federal claims and, pursuant to 28 U.S.C. § 1367, declines to exercise supplemental jurisdiction over Plaintiff's New Jersey state law claims. Accordingly, Plaintiff's complaint is dismissed and this matter is hereby closed. An appropriate order accompanies this opinion.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 469938

**Thompson v. Eva's Village and Sheltering Program, Not Reported in F.Supp.2d (2006)**

2006 WL 469938

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 3669383

2023 WL 3669383
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

Audrey CLEMENT, Plaintiff,

v.

Kym HALL, National Capital Area
Director, National Park Service, Defendant.

No: 1:22-cv-00867-MSN-WEF
|
Signed May 24, 2023

**Attorneys and Law Firms**

Audrey Clement, Arlington, VA, Pro Se.

Dennis Carl Barghaan, Jr., United States Attorney's Office, Alexandria, VA, for Defendant.

**MEMORANDUM OPINION & ORDER**

Michael S. Nachmanoff, United States District Judge

**\*1** This matter comes before the Court on Defendant's Motion to Dismiss (Dkt. No. 7). Upon consideration of the motion, and for the reasons set forth below, this Court will grant Defendant's Motion to Dismiss.

# I. BACKGROUND

## A. Procedural Background

Clement filed a Complaint on August 1, 2023 bringing a claim under the Federal Tort Claims Act resulting from a car accident at a parking area near the Chesapeake and Ohio ("C&O") Canal National Historic Park. *See* (Dkt. No. 1) ("Compl." or "Complaint"). Clement named Kym Hall, National Capital Area Director of the National Park Service ("NPS") as the defendant. *See id.* at 2. [1] On October 6, 2022, Hall filed a motion to dismiss for lack of jurisdiction. (Dkt. No. 7) ("Mot." or "Motion"); *see also* (Dkt. No. 8) ("Def. Mem."). On October 24, 2022, Clement filed an opposition to the Motion. (Dkt. No. 11) ("Opp."). Hall filed a reply on October 31, 2022. (Dkt. No. 12) ("Reply"). On November 14, 2022, Clement filed a Motion to Reply to Defendant's Reply (Dkt. No. 13), which seeks leave to respond to Hall's Reply, and a brief responding to the Reply on the merits

(Dkt. No. 14). Although sur-replies are disfavored, *Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, No. 3:13-cv-808, 2019 WL 13189619, at \*2 (E.D. Va. Oct. 10, 2019) (" '[s]urreplies ... are highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on the matter' "), the Court grants Clement's request to file a sur-reply in this matter and has considered the arguments advanced by Clement in her sur-reply in rendering a decision on Hall's Motion.

[1]    The citations to the Complaint refer to the page numbers of the document filed as Docket Number 1.

## B. Factual Background

Clement alleges that on May 16, 2021 at 7:15 a.m., she was in a rental car in a parking lot of the C&O Canal National Historic Park near Fletcher's Cove in Washington, D.C. Compl. at 5. She was traveling "no more than 5 miles an hour" when she "accidentally rolled a 2021 Nissan Versa over a 15 foot embankment" in the parking lot. *Id.* Clement alleges that the car then "rolled down a steep embankment, flipped over, and landed upright in the empty canal." *Id.* The roof of the vehicle was partially crushed, and the rental car service determined that it was "beyond repair." *Id.* Clement alleges that she paid the rental car service $16,750 for the damages to the vehicle. *Id.* According to Clement, the accident would not have occurred had there been guardrails in that section of the parking lot. *Id.* Clement filed the Complaint against Hall alleging that the National Park Service was "negligent in failing to provide a guard rail in the parking lot abutting the C&O Canal," and seeking damages under the Federal Tort Claims Act ("FTCA") for damages in the amount that Clement paid to the car rental service. *Id.*

# II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's jurisdiction over the subject matter of the suit. It is plaintiff's burden to prove jurisdiction, and the court "regard[s] the pleadings' allegations as mere evidence on the issue[ ] and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

**\*2** A complaint by a *pro se* plaintiff should be liberally construed. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.

1978). But the Court's "task is not to discern the unexpressed intent of the plaintiff." *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006). A *pro se* complaint must still "contain sufficient facts 'to raise a right to relief above the speculation level' and 'state a claim to relief that is plausible on its face.' " *Hundley v. Thomas*, 719 F. App'x 250, 251 (4th Cir. 2018) (quoting *Twombly*, 550 U.S. at 555, 570).

## III. ANALYSIS

The Court finds that it lacks subject matter jurisdiction over this action.[2] "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 474 (1994). The FTCA waives the United States' sovereign immunity with respect to certain damages actions based on "the negligent or wrongful act[s] or omission[s]" of federal employees. 28 U.S.C. § 1346(b)(1). But there are certain limited exceptions to the FTCA's waiver of sovereign immunity. *See Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001). Hall argues that one of these limited exceptions—the discretionary function exception—to the FTCA applies here and deprives this Court of jurisdiction over Clement's suit. The Court agrees.

[2]    Because the Court dismisses the action on other grounds, the Court does not address Hall's argument that dismissal is proper because only the United States is a proper defendant on a FTCA claim and, here, Clement named only Hall—an NPS official leading the agency's national Capital Region park facilities—as a defendant. Def. Mem. at 4-5.

Under the discretionary function exception, the United States preserves its immunity as to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If the exception applies, a court lacks subject matter jurisdiction over an FTCA claim. *Holbrook v. United States*, 673 F.3d 241, 345 (4th Cir. 2012). The exception applies if (1) "the challenged governmental conduct involves an element of judgment or choice" because no "statute regulation, or policy prescribes a specific course of action," and (2) "the judgment was one that the exception was designed to protect, namely, a judgment based on considerations of public policy." *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015).

Both prongs of the exception are satisfied here. First, the challenged governmental conduct—the decision not to install guardrails in a particular section of a parking lot near the C&O Canal National Historic Park—involves an element of "judgment or choice." *See Rich*, 811 F.3d at 144. The inquiry under this first prong "boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action." *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993). Hall identifies two NPS policy statements that concern the construction of guardrails within park facilities—NPS' *Park Road Standards* document and *NPS Management Policies*. Def. Mem. at 7–8.[3] Neither of these documents, however, prescribes a specific course of action that NPS officials must take with respect to the installation of guardrails. The *Park Road Standards* document states that "guardrail or guardwalls should be installed at points of unusual danger such as sharp curves and steep embankments, particularly at those points that are unusual compared with the overall characteristics of the road." Ex. A. to Mot. (Dkt. No. 8-1) (*Park Road Standards* at 32). The use of the word "should" in the document is critical, as it signifies that the guidance regarding guardrails is *discretionary* and imposes no mandatory directive on NPS officials. *See In re Glacier Bay*, 71 F.3d 1447, 1453 (9th Cir. 1995) (finding that, in the discretionary function context, the use of "should" in government manual "place[s]" discretion in the hands of the field [officials]").[4] And the *NPS Management Policies* document expressly states that "decisions about whether to ... install guardrails and fences" is "left to the *discretion* of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing." Ex. B. to Mot. (Dkt. No. 8-1) (*NPS Management Policies 2006* at § 8.2.5.1) (emphasis added). The Court therefore concludes that NPS' decision about where and whether to install guardrails in its parks or parking areas is not the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action.

[3]    As discussed above, on a Rule 12(b)(1) motion, the Court may consider materials beyond the Complaint in order to assess whether it possesses subject matter jurisdiction. *Richmond*, 945 F.2d at 768.

[4]    In her Opposition, Clement urges the Court to ignore the distinction between "should" and "shall" in the NPS *Park Road Standards* document because the document uses "should" much more frequently

—151 times according to Clement—than "shall," which is only used four times according to Clement. Opp. at 4. That one word is used much more frequently than another does not collapse the distinction between the two terms; indeed, if anything, the usage suggests that the drafters of the *Park Road Standards* knew precisely how and when they intended certain policies to be mandatory and when they intended certain policies to be discretionary. In addition, in her sur-reply, Clement contends that the distinction drawn between "shall" and "should" by the Ninth Circuit in *In re Glacier Bay* is not applicable here because the respective policy statements were prepared for different audiences: Clement argues that because civil engineers were the intended audience of the *Park Road Standards* document, the Court can imply the policies discussed therein as mandatory based on the nature of civil engineer work, which must be exacting in order to be properly completed. Surreply (Dkt. No. 14) at 3. The Court rejects that argument, as it requires the Court to ignore the drafters' deliberate use of "shall" versus "should" in the document, and would also result in a blanket rule that *all* policies directed at civil engineers, regardless of content or specific language used, would be construed as mandatory directives.

**\*3** "If no such mandatory statute, regulation, or policy applies to remove the challenged conduct from the choice and judgment of the government, then [the Court] move[s] to the second tier of the ... analysis and ask[s] whether the choice or judgment involved is one 'based on considerations of public policy.' " *Baum, 986 F.2d at 720.* Where the relevant statute, regulation, or agency guideline permits discretion, " 'it must be presumed that the [Government's] acts are grounded in policy when exercising that discretion.' " *Clendening v. United States*, 19 F.4th 421, 435 (4th Cir. 2021) (citing *United States v. Gaubert*, 499 U.S. 315, 324 (1991)). This is a strong presumption. *Id.* Accordingly, here, there is a strong presumption that the decision whether and where to install guardrails in the parking lot in which the accident occurred is based on public policy considerations. Moreover, the *NPS Management Policies* document explicitly states that economic considerations are a large factor in driving these judgment calls, as "decisions about whether to ... install guardrails and fences" are "left to the discretion of superintendents and other decisionmakers at the park level who must work within the limits of funding and staffing." *NPS Management Policies 2006* at § 8.2.5.1.

Indeed, the Fourth Circuit's decision in *Bowman v. United States*, 820 F.2d 1393 (4th Cir. 1987), is highly instructive. The Fourth Circuit concluded that plaintiff's FTCA claim alleging negligence for NPS' failure to "place a guard rail along" an embankment of the Blue Ridge Parkway was barred under the discretionary function exception. *Id.* at 1395. The appellate court concluded that regardless of whether the decision not to install a guardrail at the spot of the accident "grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three," it was clear that the decision "was the result of a policy judgment." *Id.* So too here. Particularly because NPS officials decided to install guardrails in *some* areas of the parking lot and not in other areas—a decision that could objectively be based on any one or combination of factors, including preserving the scenic view of the canal embankment—the Court finds that NPS officials' decisions about whether to install guardrails in the parking lot of the C&O Canal National Historic Park is based on considerations of public policy. Accordingly, the Court finds that the discretionary function exception to the FTCA applies.

In her Opposition, Clement raises a new cause of action not alleged in the Complaint. She argues that the NPS' decision to install concrete barriers in the area of the parking lot utilized by park service workers but not in the area utilized by park visitors violates her constitutional right to equal protection. Opp. at 4–6; Sur-reply at 3–4. Clement states in her sur-reply that she intends to assert these as standalone claims without reference to the FTCA. Sur-reply at 4. Although Clement has not alleged these causes of action in the Complaint and the Court would be acting within its discretion in denying to consider these new allegations at this stage, *see S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well established that parties cannot amend their complaints through briefing or oral advocacy."), the Court will nevertheless briefly address the merits given plaintiff's *pro se* status, *see Smith v. Blackledge*, 451 F.2d 1201, 1202–03 (4th Cir. 1971).

Clement essentially alleges that NPS has violated her (and other park visitors') right to equal protection because NPS has prioritized the safety of workers over visitors by deciding to install barriers where workers park but not where visitors park (which abuts the canal). Opp at 4–5. The parties agree that Clement's equal protection claim would receive only rational

Clement v. Hall, Slip Copy (2023)

2023 WL 3669383

basis review. *Id.* at 5; Sur-reply at 4; Reply at 4. Indeed, a burden or classification that does not impinge a fundamental right does not ordinarily raise concerns and receives only rational basis review. *See FCC v. Beach Commc'ns,* 508 U.S. 307, 314–15 (1993). Under the rational basis standard, the challenged government conduct need only be " 'rationally related to a legitimate state interest.' " *Pulte Home Corp. v. Montgomery Cty.,* 909 F.3d 685, 693 (4th Cir. 2018). This hurdle is cleared "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach,* 508 U.S. at 313. Here, Hall provides a very conceivable rationale for treating the portion of the parking area that abuts the canal (where visitors park) differently from other portions of the parking area—a "desire not to interfere with the aesthetics of the canal and the public's view of the same." Reply at 4. Accordingly, the Court finds that even if Clement had alleged that the United States had violated her constitutional right to equal protection in her Complaint, that claim would not survive rational basis review.

## IV. CONCLUSION

**\*4** For the reasons stated above, it is hereby

**ORDERED** that Plaintiff's Motion to Reply to Defendant's Reply (Dkt. No. 13) is **GRANTED**; it is further

**ORDERED** that Defendant's Motion to Dismiss (Dkt. No. 7) is **GRANTED**; and it is further

**ORDERED** that the Complaint (Dkt. No. 1) is **DISMISSED**.

It is **SO ORDERED**.

## All Citations

Slip Copy, 2023 WL 3669383

---

**End of Document**                               © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4540256
Only the Westlaw citation is currently available.
United States District Court,
M.D. North Carolina.

William Michael BURGESS, Plaintiff,
v.
J. Michael WATSON, The United
States of America, Defendants.

No. 1:12CV810.
|
Signed Sept. 11, 2014.

**Attorneys and Law Firms**

Kenneth R. Keller, Michal Ellen Yarborough, Carruthers & Roth, P.A., Greensboro, NC, for Plaintiff.

Edward D. Gray, Rudolf A. Renfer, Jr., U.S. Attorney's Office, Raleigh, NC, for Defendants.

*MEMORANDUM OPINION, ORDER,
AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE*

JOI ELIZABETH PEAKE, United States Magistrate Judge.

***1** This Federal Tort Claims Act action comes before the Court on Motions to Dismiss filed by Defendant United States of America ("the Government").[1] The Government's first Motion [Doc. # 15] is to dismiss for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Its second Motion [Doc. # 17] is to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6). For the reasons set out below, the Court recommends that the Government's Motion to Dismiss for lack of jurisdiction be granted, and that this action be dismissed.

[1] The Government has filed a Certification [Doc. # 11] that ATF Special Agent J. Michael Watson was acting within the scope of his employment as an employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives at the time of the incident alleged in the Complaint. Therefore, the only Defendant in this action is now the United States of America. *See Maron v. United States,* 126 F.3d 317, 321 (4th Cir.1997) ("Once this certification has been made, the United States is substituted as the sole defendant."). The Clerk will be instructed to terminate J. Michael Watson as a Defendant in this action.

**I. FACTS, CLAIMS, AND PROCEDURAL HISTORY**
Plaintiff William Michael Burgess brings this action pursuant to the Federal Tort Claims Act (28 U.S.C. § 1346(b)) against ATF Special Agent J. Michael Watson and the United States Government. Plaintiff alleges that Special Agent Watson instigated the issuance of a federal arrest warrant against him in this Court for conspiracy to distribute marijuana. *United States v. Burgess,* No. 1:10CR196 (M.D.N.C.).[2] The grand jury indicted Plaintiff, his father (William Ray Burgess), his grandfather (William Randy Burgess), and a fourth person, Michael Dwight Hicks, on May 24, 2010. Count One of the indictment charged all defendants with conspiracy to distribute less than 50 kilograms of marijuana. Count Two charged William Randy Burgess and Michael Dwight Hicks with distributing 6.2 kilograms of marijuana. Count Three charged William Randy Burgess, a felon, with possession of two firearms in violation of federal law. On September 9, 2010, the Government filed motions to dismiss the indictment against Plaintiff and his father, William Ray Burgess. The Court granted those motions. Michael Dwight Hicks went to trial and was found not guilty on Counts 1 and 2. Plaintiff's grandfather, William Randy Burgess, pled guilty to Counts 2 and 3 of the Indictment. He was sentenced to six months imprisonment and three years of supervised release.

[2] The Court takes judicial notice of the public filings in Plaintiff's criminal case. *See* Fed.R.Evid. 201.

Plaintiff alleges that the investigation that led to the above charges began as an investigation by the Randolph County Sheriff's Department. That department arranged a "sting" operation which resulted in state charges against Plaintiff's grandfather, Randy, for trafficking in marijuana and conspiring to traffic in marijuana on October 30, 2009. On that same day, deputies searched the residence of Plaintiff's parents, Ray and Paula Burgess, purportedly on information that Randy and Ray Burgess were growing and selling marijuana.

During the search, officers found marijuana in a safe owned by Ray Burgess, and three bags of marijuana in another room of the house. Ray Burgess was arrested on state charges for possession with intent to sell and deliver marijuana, felony

2014 WL 4540256

possession of marijuana, and maintaining a dwelling place for controlled substance sales. Paula Burgess was charged in state court with possession with intent to sell and distribute marijuana, felony possession of marijuana, maintaining a dwelling place for controlled substances sales, and selling/delivering a handgun to a minor. On November 4, 2009, Lt. Joyce of the Randolph County Sheriff's Department procured the issuance of a state arrest warrant against Plaintiff for the misdemeanors of simple possession of marijuana and possession with intent to use drug paraphernalia (digital scales). The evidence upon which Lt. Joyce relied to obtain these warrants against Plaintiff was that a set of digital scales and purported marijuana residue were found in the closet of a bedroom of Plaintiff's parents' residence which Plaintiff, as well as others, had used at various times. According to Plaintiff, there was no evidence that he conspired to distribute marijuana. Plaintiff was not present at his parents' home when the officers searched it.

**\*2** Plaintiff further alleges that when he was arrested on November 4 on the state charges, he was released on an unsecured promise to appear. Following this arrest, Agent Watson spoke to Lt. Joyce concerning the sheriff's department investigation and Agent Watson's stated intent to bring federal charges against Randy Burgess, Ray Burgess, and Plaintiff. Plaintiff alleges that Lt. Joyce "specifically told Agent Watson that Lt. Joyce did not feel the evidence was sufficient to support any charges for conspiracy to distribute marijuana and asked Agent Watson not to proceed with any charges against Plaintiff for conspiracy to distribute marijuana." (Compl. [Doc. # 1] ¶ 21.)

Plaintiff was indicted on the federal charges on May 25, 2010, and a federal arrest warrant was issued pursuant to the indictment. Plaintiff alleges that Agent Watson arrested him on May 28, 2010. He was incarcerated in the Randolph County Jail from Friday, May 28 until June 1, 2010, when he had his initial appearance in federal court. He was then transferred to the Forsyth County Jail, where he was held until the afternoon of Friday, June 4, 2010, at which time he was released after signing a $10,000 unsecured compliance bond. About three months later, the Government moved to have all charges against him dismissed because, according to its motion, "[t]here is currently insufficient evidence to proceed with the case." (No. 1:10CR196–3 [Doc. # 63].) Pursuant to the Government's Motion, the Court dismissed all charges against Plaintiff on September 9, 2010.

Plaintiff raises four claims for relief in his Complaint: (1) negligence; (2) malicious prosecution; (3) false arrest; and (4) abuse of process. Plaintiff alleges that he timely submitted his administrative claim to the ATF, and that the agency failed to make a final disposition of his claim within six months after it was filed. Plaintiff now seeks to recover $575,000.

The Government argues in its Rule 12(b)(1) motion to dismiss that this Court lacks jurisdiction over Plaintiff's claims because the discretionary function exception to the Federal Tort Claims Act bars them. Plaintiff argues that the exception does not apply to his claims, and that even if his claim for negligence is barred, his other claims are specifically allowed under what is known as the "law enforcement exception" to the Act.

## II. DISCUSSION

### 1. Federal Tort Claims Act Discretionary Function Exception

In raising its contentions related to the FTCA, Defendant challenges the Court's subject matter jurisdiction over Plaintiff's claims. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit. Sovereign immunity is jurisdictional in nature. Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit.... In 1946, Congress passed the FTCA, which waived the sovereign immunity of the United States for certain torts committed by federal employees." *FDIC v. Meyer,* 510 U.S. 471, 475 (1994) (internal citations and quotations omitted); 28 U.S.C. § 1346(b). The Federal Tort Claims Act ("FTCA") specifically allows lawsuits against the United States for injuries caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). However, "[t]he scope of this waiver is limited by a series of specific exceptions outlined in the Act, each of which is considered jurisdictional." *Welch v. United States,* 409 F.3d 646, 651 (4th Cir.2005). The discretionary function exception to the Act provides that no liability shall lie for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Where this exception applies, sovereign immunity has not been

2014 WL 4540256

waived and the courts lack federal subject matter jurisdiction. *Holbrook v. United States,* 673 F.3d 341, 345 (4th Cir.2012).

**\*3** In determining whether an employee's actions fall within the discretionary function exception, courts should determine whether the challenged actions involved the exercise of discretion in furtherance of public policy goals. *See United States v. Gaubert,* 499 U.S. 315, 334 (1991). A discretionary act is one that involves "an element of judgment or choice." *Berkovitz v. United States,* 486 U.S. 531, 536 (1988). Thus, the exception does not apply when a federal statute, regulation, or policy "specifically prescribes a course of action for an employee to follow." *Id.* With regard to the element of furthering public policy goals, "if a government employee has discretion under the first *Gaubert* prong, it 'must be presumed' that his acts 'are grounded in policy when exercising that discretion[.]' " *Bernaldes v. United States,* 81 F.3d 428, 429 (4th Cir.1996) (quoting *Gaubert,* 499 U.S. at 324).

In *Medina v. United States,* 259 F.3d 220 (4th Cir.2001), the court found that the plaintiff's FTCA claims of assault and battery, false arrest, malicious prosecution, and infliction of emotional distress against INS agents who arrested him and attempted to have him deported were barred by the discretionary function exception. In finding that the "decision to arrest Medina was clearly clothed in public policy considerations," the court cited *Sloan v. United States Dep't of Housing and Urban Dev.,* 236 F.3d 756, 760 (D.C.Cir.2001), for the proposition that "[t]he decision to initiate a prosecution has long been regarded as a classic discretionary function." *Medina,* 259 F.3d at 229. Courts have overwhelmingly found that claims of negligent investigation or negligent arrest by law enforcement officers are barred by the discretionary function exception. *See, e.g., Suter v. United States,* 441 F.3d 306 (4th Cir.2006) (claim of victims of fraudulent investment scheme that undercover federal agent improperly participated in the scheme as an investigatory method was barred by discretionary function exception); *McCloskey v. Mueller,* 385 F.Supp.2d 74 (D.Mass.2005) (claim of estate of murder victim that FBI failed to follow up on call by self-proclaimed bank robber offering to surrender, and caller killed victim the next day, barred by discretionary function exception); *Littell v. United States,* 191 F.Supp.2d 1338 (M.D.Fla.2002) (claim of malicious prosecution by instituting, maintaining, and continuing prosecution of defendant who was later acquitted was barred by discretionary function exception; court notes that the " 'overwhelming consensus of federal case law establishes that criminal law enforcement decisions-

investigative and prosecutorial alike-are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review.' " (quoting *Mesa v. United States,* 837 F.Supp. 1210, 1213 (S.D.Fla.1993))); *Flax v. United States,* 847 F.Supp. 1183 (D.N.J.1994) (claim of negligent surveillance of kidnap victim by FBI agents barred by discretionary function exception); *Timmerman v. United States,* Civ. No. 11–1816, 2012 WL 2052149 at \*3 (D.P.R. June 5, 2012) (claim of negligent investigation by ICE agents which caused criminal charges to be filed against plaintiff barred by discretionary function exception; noting that "the First Circuit has clearly established that decisions to investigate or prosecute an individual fall squarely within the discretionary function exception.").

**\*4** It is only in cases involving egregious misconduct by federal agents that the bar has not been applied. By way of example, in *Litif v. United States,* 682 F.Supp.2d 60 (D.Mass.2010), the court held that families of murder victims could recover under the FTCA for actions of FBI agents protecting organized crime informants who committed killings. The FBI agents' actions included obstruction of justice by leaking a wiretap, racketeering by leaking information about informants providing information, and violation of agency guidelines. *Id.* at 81. The court found that the agents had no discretion to commit such acts, and, thus, the discretionary function exception did not apply. Similarly, in *Limone v. United States,* 271 F.Supp.2d 345 (D.Mass.2003), the court found that the FBI agents' actions of suborning perjury and fabricating evidence to sustain unjust convictions and cover up criminal activity was not "discretionary" within the meaning of the Act, and, thus, the bar did not apply.

In this case, Plaintiff alleges negligence on the part of Agent Watson in instituting and maintaining the conspiracy charge against him, and also alleges malicious prosecution, false arrest, and abuse of process. However, there is no allegation of egregious misconduct or facts that would take this case outside the discretionary function exception. [3] Plaintiff relies upon *Coulthurst v. United States,* 214 F.3d 106 (2d Cir.2000). (Pl.'s Resp. in Opp. [Doc. # 25] at 7–8.) In that case, the court found that the claim of a federal prisoner who was injured while lifting weights when a cable snapped was not barred by the discretionary function exception, because the complaint's allegations could be read to allege negligence in the failure of an inspector to perform a diligent inspection out of laziness or in being carelessly inattentive. Plaintiff argues based upon this case that not every action taken by a federal employee that involves a judgment call also involves the discretion

protected by the discretionary function exemption. While that may be the case, the facts of the *Coulthurst* case of an alleged failure to inspect a cable differ substantially from those of the present action. The cases cited above show that allegations of negligent investigations and arrests, absent egregious facts not alleged here, are barred by the discretionary function exception. [4]

3    Plaintiff alleges that when he was arrested, he asked Agent Watson what justified turning the misdemeanor possession and drug paraphernalia charges against him into a federal felony conspiracy, to which the agent reportedly replied, "Because I made it that way." (Compl.¶ 25.) To the extent that by this allegation Plaintiff attempts to ascribe an improper motive to Agent Watson's actions, the discretionary function exception applies "whether or not the discretion involved be abused," 28 U.S.C. § 2680(a), and "[t]he inquiry is thus whether the discretion exists, not whether in later litigation it is alleged to have been abused." *Holbrook,* 673 F.3d at 350 ("For purposes of the discretionary function exception, we thus do not inquire into 'the agent's subjective intent in exercising the discretion conferred by statute or regulation,' but instead consider whether the 'nature of the actions taken' were 'susceptible to policy analysis.' " (quoting *Gaubert,* 499 U.S. at 325)).

4    Plaintiff argues that the cases involving negligent investigations do not apply because Agent Watson conducted no investigation. That contention is baseless. Agent Watson at least spoke to the local officers who brought the state charges in the case. That he did not do more or take actions suggested by Plaintiff relate to the quality of the agent's investigation.

Plaintiff also argues that "even if Agent Watson did use discretion, he did not do so within his core statutory authority." (Pl.'s Resp. in Opp. [Doc. # 25] at 8.) In that regard, Plaintiff contends that even if Agent Watson was acting within the scope of his employment, he was nevertheless "outside the scope of his authority and therefore outside the scope of the discretionary function exception." *Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1197 (D.C.Cir.1986). [5]   In support of this contention, Plaintiff outlines the statutory investigatory responsibilities of the ATF. He states that by statute, ATF agents may arrest where the agents have reasonable grounds to believe that the person to be arrested has committed or is committing a felony. (Pl.'s Resp. in Opp. [Doc. # 25] at 9.) Plaintiff argues that the charges against him do not involve alcohol, tobacco, firearms, or explosives, and that there were no reasonable grounds to believe that he had participated in a conspiracy to distribute marijuana. (*Id.* at 10.)

5    In its Reply brief, the Government construes Plaintiff's "scope of authority" argument as a challenge to whether Agent Watson was acting within the scope of his employment during the events described in Plaintiff's Complaint. (Reply [Doc. # 27].) However, these two inquiries, scope of authority and scope of employment, are not the same. *See Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1197 n. 4 (D.C.Cir.1986) (" 'There is an area, albeit a narrow one, in which a government agent, like a private agent, can act beyond his actual authority and yet within the scope of his employment.' " (quoting *Hatahley v. United States,* 351 U.S. 173, 181 (1956))). The Fourth Circuit set out the procedure that a plaintiff must follow to challenge the Attorney General's certification of a government agent's scope of employment in *Maron v. United States,* 126 F.3d 317 (4th Cir.1997). Plaintiff has not attempted to make the showing required in *Maron.* Therefore, the Court interprets Plaintiff's argument solely as a challenge to Agent Watson's scope of authority and not his scope of employment at the relevant time.

**\*5**   However, Plaintiff fails to acknowledge that a member of the alleged conspiracy, his grandfather, was charged with a federal firearms offense. Plaintiff's grandfather pled guilty to that offense. Plaintiff cites no support for the proposition that an ATF agent acts outside the scope of his authority by investigating drug offenses involving a firearm. Agent Watson was acting within the scope of his authority as an ATF agent when investigating and charging Plaintiff. *See* 28 U.S.C. § 599A(b)(1) (authorizing the ATF to investigate criminal violations of the Federal firearms laws).

As for authority to arrest Plaintiff, Plaintiff was arrested upon a warrant issued pursuant to his indictment by a grand jury. (No. 1:10CR196 [Doc. # 1, # 4].) Plaintiff's indictment and the resulting arrest warrant issued by this Court gave Agent Watson the authority to arrest Plaintiff. *See Gerstein v.*

*Pugh,* 420 U.S. 103, 118 n. 19 (1975) (a proper indictment conclusively determines the existence of probable cause). Accordingly, the Court concludes that there is no basis to find that Agent Watson acted outside the scope of his authority, and therefore the discretionary function exception to the FTCA applies.

### 2. Law Enforcement Exception

Plaintiff next argues that even if his negligence claim is barred by the discretionary function doctrine, the Court has subject matter jurisdiction over his remaining claims pursuant to the "law enforcement exception" contained in 28 U.S.C. § 2680(h). Section 2680(h) exempts from the FTCA and preserves sovereign immunity for allegations of certain intentional torts, including malicious prosecution (Plaintiff's second claim for relief), false arrest (Plaintiff's third claim for relief), and abuse of process (Plaintiff's fourth claim for relief). "However, the statute was amended in 1974 to provide an exception to this exemption, stating that sovereign immunity *is* waived if certain intentional torts ... are committed by an investigative or law enforcement officer of the United States." *Welch v. United States,* 409 F.3d 646, 651 (4th Cir.2005). This exception includes the torts of false arrest, abuse of process, and malicious prosecution. 28 U.S.C. § 2680(h).

Plaintiff concedes, however, that in *Medina v. United States,* the Fourth Circuit held that an FTCA plaintiff's claims of an intentional tort committed by a law enforcement officer under subsection (h) "must clear the § 2680(a) discretionary function hurdle." *Medina,* 259 F.3d at 226; Pl.'s Resp. [Doc. # 25] at 11. In *Medina,* the Fourth Circuit recognized that other courts have held that suits under section 2680(h) did *not* have to clear the discretionary function "hurdle." *Medina,* 259 F.3d at 225. Plaintiff relies upon such a holding from the Eleventh Circuit to argue that the Fourth Circuit should adopt a different rule. *See Nguyen v. United States,* 556 F.3d 1244 (11th Cir.2009). Plaintiff does not, however, argue that the Fourth Circuit's rule has changed. Indeed, the Fourth Circuit has, on at least once occasion, reaffirmed the *Medina* court's conclusion regarding the interplay between subsections (a)

and (h). *See Welch,* 409 F.3d at 652 ("We therefore hold that intentional tort claims authorized by § 2680(h) must overcome the § 2680(a) due care hurdle before sovereign immunity can be deemed waived.") This Court must, of course, follow the Fourth Circuit's resolution of this question.

**\*6** Therefore, Plaintiff's argument that his intentional tort claims are cognizable under § 2680(h) must be rejected because those claims are also subject to the discretionary function exception of section 2680(a).

Thus, the Court concludes that Plaintiff's claims are barred by the discretionary function exception of the FTCA. This action should therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Welch,* 409 F.3d at 653. The Court need not address the Government's motion to dismiss pursuant to Rule 12(b)(6), and it can be denied as moot.

Finally, the Court notes that pursuant to the Government's Certification [Doc. # 11], the only Defendant in this action is now the United States of America. *See Maron v. United States,* 126 F .3d 317, 321 (4th Cir.1997) ( "Once this certification has been made, the United States is substituted as the sole defendant."). The Clerk will be instructed to terminate J. Michael Watson as a Defendant in this action.

### III. CONCLUSION

IT IS THEREFORE ORDERED that the Clerk is directed to terminate J. Michael Watson as a Defendant in this action pursuant to the Government's Certification of Scope of Employment [Doc. # 11].

IT IS RECOMMENDED that the Government's Motion to Dismiss for Lack of Jurisdiction [Doc. # 15] be granted, that the Government's second Motion to Dismiss for Failure to State a Claim [Doc. # 17] be denied as moot, and that this action be dismissed.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4540256

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5989210
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Leon H. HAUGHTON, Plaintiff,

v.

The UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, et al., Defendants.

Civil Action No. 20-cv-03189-LKG
|
Signed 12/17/2021

**Attorneys and Law Firms**

Terry Morris, Morris Palerm LLC, Rockville, MD, for
Plaintiff.

Alan Carl Lazerow, United States Attorney's Office,
Baltimore, MD, for Defendant United States of America.

Melissa O. Martinez, McGuireWoods LLP, Baltimore, MD,
for Defendant Sirchie Acquistion Company, LLC.

**MEMORANDUM OPINION AND ORDER**

LYDIA KAY GRIGGSBY, United States District Judge

**I. INTRODUCTION**

 *1 Plaintiff, Leon H. Haughton, brings this civil action
against the United States Department of Homeland Security
("DHS") and the United States Customs and Border
Protection ("CBP"), alleging claims pursuant to the Federal
Tort Claims Act, 42 U.S.C. § 1983, the United States
Constitution and state law. *See generally* Am. Compl., ECF
No. 6. The government has moved to substitute the United
States as the defendant in this case and to dismiss the amended
complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and (6). Def.
Mot., ECF No. 15; Def. Mem., ECF No. 15-1. No hearing
is necessary to resolve these motions. L.R. 105.6 (D. Md.
2021). For the reasons that follow, the Court **GRANTS** the
government's motions to substitute and to dismiss this matter.

**II. FACTUAL AND PROCEDURAL BACKGROUND**[1]

[1]     The facts recited in this Memorandum Opinion
        and Order are taken from the amended complaint
        ("Am. Compl.") and the government's motions to

substitute and to dismiss ("Def. Mot."), and these
facts are undisputed unless otherwise noted.

**A. Factual Background**

Plaintiff, Leon Haughton, is a Maryland resident and a
permanent resident alien who is lawfully present in the United
States. Am. Compl. at ¶ 10. In this case, plaintiff asserts
claims under the Federal Tort Claims Act, 42 U.S.C § 1983,
the United States Constitution and state law, related to his
unfortunate 82-day incarceration at the Anne Arundel County
Detention Center following a false-positive field drug test.
*See generally id.*

Specifically, in Count I of the amended complaint, plaintiff
alleges that the government violated his Fourth and
Fourteenth Amendment rights, by depriving him of the right
to be free from unlawful detention and unreasonable use of
force, and the right to due process. *Id.* at ¶¶ 47-50. In Count
II, plaintiff alleges that the government violated 42 U.S.C. §
1983, by failing to train and to supervise its law enforcement
agents to, among other things, properly conduct field drug
tests and follow-up testing. *Id.* at ¶¶ 51-58.

In addition, in Count III of the amended complaint, plaintiff
alleges various state law claims against the government,
including false arrest, false imprisonment and due process
violations of the Constitution of the State of Maryland. *Id.*
at ¶¶ 59-60. In Count IV of the amended complaint, plaintiff
alleges that the government breached a duty to act with
reasonable care in exercising its civil arrest and detention
authority. *Id.* at ¶¶ 61-66. Lastly, in Counts VI and VII of
the amended complaint, plaintiff alleges that the government
conspired with the State of Maryland, through the State's
Attorney's Office, to violate plaintiff's state and constitutional
rights. *Id.* at ¶¶ 77-96. [2]

[2]
        On May 7, 2020, plaintiff filed a notice of
        voluntary dismissal as to his claims against Sirchie
        Acquisition Company, LLC raised in Count V of
        the amended complaint. *See* ECF No. 14.

The facts giving rise to plaintiff's claims are unfortunate and
undisputed. On December 29, 2018, plaintiff was detained by
CBP agents when he was exiting customs at the Baltimore-
Washington International Airport following a flight from
Jamaica to the United States. *Id.* at ¶ 18. During a subsequent
search of plaintiff's luggage, the CBP agents found three
plastic containers labeled "Honey." *Id.* at ¶ 20. The CBP
agents subsequently performed a presumptive drug field test

on the honey for the presence of controlled substances and this field test produced a false-positive result for the presence of methamphetamines. *Id.* at ¶¶ 21-22.

**\*2** Based upon the "positive" field test, the CBP agents placed plaintiff under arrest and plaintiff was charged with felony drug possession and several misdemeanor drug possession charges. *Id.* at ¶ 24. After a brief hospital stay on December 29, 2018, plaintiff was transported to the Anne Arundel County Detention Center. *Id.* at ¶ 25.

Because of plaintiff's status as a permanent resident alien charged with drug offenses, he became subject to a United States Immigration and Customs Enforcement detainer hold ("Detainer Hold"). *Id.* at ¶ 26. The Detainer Hold requests that the Anne Arundel County Detention Center:

> Maintain custody of [plaintiff] for a period **NOT TO EXCEED 48 HOURS** beyond the time when he[ ] would otherwise have been released from your custody to allow DHS to assume custody.... This detainer arises from DHS authorities and should not impact decisions about [plaintiff's] bail, ... parole, release ... or other matters.

Def. Mot. Ex. A at 1, ECF No. 15-2 (emphasis in original).

On December 31, 2018, plaintiff appeared before the District Court for Anne Arundel County for his first bail review hearing. Am. Compl. at ¶ 26. Plaintiff alleges that the Detainer Hold required that the Anne Arundel District Court order him detained without bail. *Id.* at ¶ 27. And so, plaintiff further alleges that the district court refused to set bail due to the Detainer Hold. *Id.* at ¶ 26.

It is undisputed that, on January 17, 2019, the State of Maryland Police Laboratory conducted follow-up testing on the honey seized from plaintiff's luggage and that this follow-up test determined that no controlled substances were present in the honey. *Id.* at ¶ 30; Def. Mem. at 1. Plaintiff alleges that, on January 17, 2019, the Maryland State's Attorney's Office contacted the DHS agent in charge of his case to inform the government that the honey found in plaintiff's luggage did not contain any controlled substances. *Id.* at ¶ 31. But, plaintiff

alleges that the DHS agent in charge refused to withdraw the Detainer Hold. *Id.* at ¶ 33.

There are no factual allegations in the amended complaint about plaintiff's second bail review hearing. *See generally id.* Plaintiff alleges that he appeared for a third bail review hearing on February 5, 2019, and that the district court again denied bail because of the Detainer Hold. *Id.* at ¶ 34.

Plaintiff was subsequently released from incarceration on March 21, 2019. Def. Mem. at 4. It is undisputed that DHS did not withdraw the Detainer Hold at the time of plaintiff's release. *See generally* Am. Compl.; Def. Reply at 2, ECF No. 28.

### B. Procedural History

Plaintiff commenced this matter on November 4, 2020. *See* Compl., ECF No. 1. On December 30, 2020, plaintiff filed an amended complaint. Am. Compl.

On May 16, 2021, the government moved to substitute the United States as the defendant in this case and to dismiss the amended complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and (6). Def. Mot.; Def. Mem. On July 12, 2021, plaintiff filed a response in opposition to the government's motions to substitute and to dismiss. Pl. Resp., ECF No. 27. On July 26, 2021, the government filed a reply in support of its motions to substitute and to dismiss. Def. Reply.

The government's motions to substitute and to dismiss having been fully briefed, the Court resolves the pending motions.

### III. LEGAL STANDARDS

#### A. Jurisdiction And Fed. R. Civ. P. 12(b)(1)

**\*3** A motion to dismiss for lack of subject-matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), is a challenge to the Court's "competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). The United States Supreme Court has explained that subject-matter jurisdiction is a "threshold matter" that is "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1995) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). And so, an objection that the Court lacks subject-matter jurisdiction "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

Haughton v. United States Department of Homeland Security, Not Reported in Fed...

2021 WL 5989210

The United States Court of Appeals for the Fourth Circuit has also explained that the plaintiff bears the burden of establishing that subject-matter jurisdiction exists. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citing *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Given this, the Court "regard[s] the pleadings as mere evidence on the issue[ ] and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment," when deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). *Id.* (citation omitted). And so, if a plaintiff "fails to allege facts upon which the court may base jurisdiction," then the Court should grant a motion to dismiss for lack of subject-matter jurisdiction. *Davis*, 367 F. Supp. 2d at 799.

### B. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). When evaluating the sufficiency of a plaintiff's claims under Fed. R. Civ. P. 12(b)(6), the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Nemet Chevrolet, Inc. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005) (citations omitted). But, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement...." *Nemet Chevrolet*, 591 F.3d at 255. And so, the Court should grant a motion to dismiss for failure to state a claim if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *GE Inv. Private Placement Partners II, L.P. v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989)).

### C. The Federal Tort Claims Act

The Federal Tort Claims Act ("FTCA") waives "the sovereign immunity of the United States for certain torts committed by federal employees acting within the scope of their employment." *Brownback v. King*, 141 S. Ct. 740, 746

(2021) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994) (internal quotation marks omitted)). Under the FTCA, the United States district courts have jurisdiction, with certain exceptions, over claims for money damages resulting from "the negligent or wrongful act or omission of any employee of the [g]overnment while acting in the scope of his office or employment," so long as "a private person[ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Jackson v. United States*, 77 F. Supp. 2d 709, 712 (D. Md. 1999) ("Under the [FTCA], the United States will be liable for acts or omissions of its agents that are tortious under the law of the place where the act or omission occurred.").

**\*4**  To bring a cognizable claim pursuant to the FTCA, plaintiff must show that his claim is:

> "[1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Meyer*, 510 U.S. at 477 (quoting 28 U.S.C. § 1346(b)) (brackets existing). The FTCA also contains certain exceptions to the government's general waiver of sovereign immunity for tortious conduct, including an express exception for claims arising out of intentional torts. 28 U.S.C. § 2680 ("The provisions of ... section 1346(b) of this title shall not apply to ... [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights...."). But, if a claim involves the actions of "investigative or law enforcement officers of the United States Government," the intentional tort exception under the FTCA does not bar claims arising out of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution...." *Id.* § 2680(h). And so, the so-called "law enforcement proviso" in the FTCA does not bar claims that "both arise[ ] out of one of the proviso's six intentional torts[ ] and [are] related to the acts or omissions of an investigative or law enforcement officer." *Millbrook v. United States*, 569 U.S. 50, 54-55 (2013) (internal quotation marks omitted).

In addition, this Court applies Maryland law when considering an FTCA claim based upon events that occurred

Case 1:23-cv-01323-MSN-JFA    Document 13-1    Filed 01/11/24    Page 44 of 76 PageID# 139

Haughton v. United States Department of Homeland Security, Not Reported in Fed....

2021 WL 5989210

in Maryland. *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (The FTCA "does not itself provide for a substantive cause of action[,]" but rather requires courts to "apply the substantive law of the state where the alleged tort took place"); *see also Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) ("Since the incident in question occurred in Maryland, then Maryland substantive law applies."). Relevant to this dispute, the "elements of false arrest and false imprisonment are identical" under Maryland law a plaintiff must show: (1) the deprivation of the liberty of another; (2) without consent; and (3) without legal justification. *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000); *see also McCullough v. Anne Arundel Cty., Md.*, No. 19-926, 2020 WL 836235, at *11 (D. Md. Feb. 20, 2020). The determination of "[w]hether legal justification exists depends on whether the officer acted with legal authority to arrest." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 380 (D. Md. 2018) (citing *Montgomery Ward v. Wilson*, 664 A.2d 916, 926 (Md. 1995)).

In this regard, "a law enforcement officer is not liable for ... tortious conduct performed during the course of his official duties unless he acted with 'actual malice.' " *Jackson*, 77 F. Supp. 2d at 715. Maryland courts have defined "actual malice" to be "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, or ill-will or fraud....' " *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004) (citation omitted) (ellipses in original). And so, this Court has explained that a showing of actual malice requires proof that the law enforcement officer "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Rich v. United States*, 158 F. Supp. 2d 619, 629 (D. Md. 2001) (quoting *Lovelace v. Anderson*, 730 A.2d 774, 788-89 (Md. 1999), *rev'd on other grounds*, 655 A.2d 401 (Md. 1995)).

## IV. ANALYSIS

**\*5** The government has moved to substitute the United States as the defendant in this FTCA action pursuant to 28 U.S.C. § 2679(a), because the only proper defendant in an FTCA action is the United States. Def. Mem. at 7-8. The government has also moved to dismiss the amended complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), for four reasons. *See id.* at 8-19.

First, the government argues that the Court should dismiss Counts I, II, III, IV, VI and VII of the amended complaint for failure to state a claim upon which relief can be granted,

because plaintiff fails to allege facts from which the Court could infer actual malice on the part of the DHS and CBP agents at issue in this case. *Id.* at 8-11. Second, the government argues that the Court should also dismiss Counts I, III and IV of the amended complaint for lack of subject-matter jurisdiction, because the United States has not waived its sovereign immunity for the state and constitutional tort claims alleged in those counts. *Id.* at 11, 15, 17-18. Third, the government argues that the Court should dismiss Count II of the amended complaint for lack of subject-matter jurisdiction, because 42 U.S.C. § 1983 does not apply to federal actors. *Id.* at 12-14. Lastly, the government argues that the Court should dismiss plaintiff's conspiracy claims raised in Counts VI and VII of the amended complaint, because the United States has not waived its sovereign immunity with respect to the underlying tort claims upon which plaintiff bases these claims. *Id.* at 18-19. And so, the government requests that the Court dismiss the amended complaint in its entirety. *Id.* at 19.

Plaintiff counters in his response in opposition that he asserts plausible FTCA claims in the amended complaint, because the amended complaint contains sufficient facts to show or infer that the DHS agent in charge of his case acted with actual malice. Pl. Resp. at 4-6. Plaintiff also argues that he alleges a plausible false imprisonment claim in the amended complaint, because the factual allegations contained therein show that DHS had no legal justification for keeping the Detainer Hold in place after the agency became aware of the false-positive field test on plaintiff's honey. *Id.* at 6-7. Lastly, plaintiff argues that he alleges a plausible claim for conspiracy to commit false imprisonment, because the amended complaint contains sufficient factual allegations to satisfy the elements of a civil conspiracy claim under Maryland law. *Id.* at 7-8. And so, plaintiff requests that the Court deny the government's motion to dismiss. *Id.* at 8. [3]

[3]     Plaintiff does not oppose the government's motion to substitute and he fails to respond to the other arguments raised in the government's motion to dismiss. *See generally* Pl. Resp.

For the reasons discussed below, the United States is the proper defendant in this FTCA action. But, the United States has not waived its sovereign immunity with respect to plaintiff's constitutional tort claims and plaintiff's Section 1983 claims may not be brought against federal actors.

A careful reading of the amended complaint also shows that plaintiff fails to allege a plausible FTCA claim in Count

IV of the amended complaint, because he does not allege sufficient facts to show or infer that the DHS and CBP agents at issue acted with actual malice. Plaintiff's state law claims for false imprisonment, false arrest, and violations of the Constitution of the State of Maryland in Count III of the amended complaint are also not plausible, because plaintiff fails to allege actual malice, it is undisputed that the Detainer Hold requires only that plaintiff be detained for a period of 48 hours after being granted release from custody, and the government has not waived its sovereign immunity with regards to plaintiff's state constitutional law claim. Because plaintiff fails to allege a plausible false imprisonment claim, he also fails to allege plausible conspiracy claims based upon this tort in Counts VI and VII of the amended complaint. And so, for the reasons discussed below, the Court **GRANTS** the government's motions to substitute and to dismiss this matter and **DISMISSES** the amended complaint.

### A. The United States Is The Proper Defendant In This FTCA Action

**\*6** As an initial matter, the United States is the only proper defendant in this FTCA action. It is well-established that, under 28 U.S.C. § 2679(a), the United States is the only proper defendant in an FTCA action. 28 U.S.C. § 2679(a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title...."); *see also Young v. United States*, No. 8-3349, 2009 WL 2170068, at \*2 (D. Md. July 20, 2009) ("The FTCA mandates that any suit for a tort committed by an employee of the federal government must be asserted against the United States rather than a federal agency by its own name."). Given this, the Court must dismiss DHS and CBP as the named defendants in this case and substitute the United States as the sole defendant. *Young*, 2009 WL 2170068, at \*2 ("An FTCA claim asserted against a federal agency must be dismissed as to the agency."). And so, the Court GRANTS the government's motion to substitute.

### B. The Court May Not Consider Plaintiff's Constitutional Tort And Section 1983 Claims

Turning to the merits of plaintiff's claims, the Court must dismiss the constitutional tort claim found in Count I of the amended complaint and the Section 1983 claim found in Count II of the amended complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). In Count I of the amended complaint, plaintiff alleges that the government has deprived him of the right to be free from unlawful detention in

violation of the Fourth and Fourteenth Amendments. *See* Am. Compl. at ¶¶ 47-50. But, plaintiff does not dispute that there has been no waiver of the government's sovereign immunity from suit for such constitutional tort claims under the FTCA. *See generally* Pl. Resp.; *see also Meyer*, 510 U.S. at 478 ("[T]he United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims."); *Harris v. United States*, No. 10-027, 2010 WL 2733448, at \*3 (E.D. Va. June 8, 2010). And so, the Court DISMISSES Count I of the amended complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

The Court also may not consider plaintiff's Section 1983 claim. In Count II of the amended complaint, plaintiff alleges that the government and the federal law enforcement officers at issue have deprived him of certain rights in violation of Section 1983. Am. Compl. at ¶¶ 51-58. But, it is well-established that plaintiff may only bring a Section 1983 claim against persons acting under the color of law for a state, territory, or the District of Columbia. 42 U.S.C. § 1983; *see also Gilbert v. United States Bureau of Alcohol, Tobacco, Firearms & Explosives*, 306 F. Supp. 3d 776, 785 (D. Md. 2018). Because plaintiff asserts a Section 1983 claim against the government and other federal actors in this case, the Court must also DISMISS Count II of the amended complaint for lack of subject-matter jurisdiction. [4] Fed. R. Civ. P. 12(b)(1).

[4]    To the extent that the amended complaint can be read to assert a failure to train and supervise claims against the United States under the FTCA, plaintiff does not dispute that the discretionary function exception would bar this claim. *See generally* Pl. Resp.; 28 U.S.C. § 2680(a) (Providing that the government is not liable under the FTCA for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.").

### C. Plaintiff Fails To Allege Plausible FTCA, False Imprisonment, False Arrest, State Constitutional Law And Conspiracy Claims

A careful reading of the amended complaint also shows that plaintiff fails to state plausible FTCA, false imprisonment, false arrest, state constitutional law and conspiracy claims in the amended complaint. And so, the Court must **DISMISS** these claims pursuant to Fed. R. Civ. P. 12 (b)(6).

**\*7** First, plaintiff fails to state a plausible claim under the FTCA in Count IV of the amended complaint, because he fails to allege facts to show or infer actual malice on the part of the government. In Count IV, plaintiff alleges that the DHS and CBP agents that arrested and detained him were negligent and breached a duty to act with reasonable care by incarcerating him for 82 days. Am. Compl. at ¶¶ 61-66. The parties agree that the Court applies Maryland law to analyze this claim and that plaintiff must show, among other things, that the law enforcement officers at issue acted with "actual malice." Def. Mem. at 8-9; Pl. Resp. at 5-6; *see also* 28 U.S.C. § 1346(b); *Coleman*, 369 F. App'x at 461; *Jackson*, 77 F. Supp. at 715.

In this regard, the Maryland Court of Appeals has held that actual malice means conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud. *Lee*, 863 A.2d at 311. And so, actual malice can be established by showing that the law enforcement officers at issue in this case "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Rich*, 158 F. Supp.2d at 629 (quoting *Lovelace*, 730 A.2d at 788-89). The Court can also infer that these officers acted with actual malice based upon evidence that the law enforcement officers were motivated by personal animosity toward plaintiff, or by personal ambitions, in connection with the challenged conduct. *See Marks v. Dann*, No. 13-347, 2013 WL 8292331, at \*11 (D. Md. July 24, 2013) (citation omitted).

The amended complaint makes clear that plaintiff cannot make such a showing here. Plaintiff alleges that the DHS and CBP law enforcement officers involved in his arrest and incarceration were negligent when they breached their duty "to act with reasonable care in exercising their civil arrest and detention authority." Am. Compl. at ¶ 62. But, the amended complaint is devoid of any factual allegations to show that the DHS and CBP law enforcement officers acted with personal animosity towards plaintiff, or that these officers were influenced by their personal ambitions in connection with the decisions to arrest plaintiff and to keep the Detainer Hold in place. *See generally id.* (Failing to allege any personal animosity against plaintiff or personal ambition on the part of the DHS agent in charge regarding the decision not to withdraw the Detainer Hold).

Perhaps, more importantly, the amended complaint fails to show that the Detainer Hold was the reason for plaintiff's

continued incarceration after January 17, 2019. In this regard, it is undisputed that the Detainer Hold provides that any detention of plaintiff beyond the time specified by the State of Maryland must be for no more than 48 hours. *Id.* at ¶ 29; Def. Mot. Ex. A at 1 (requesting that the Anne Arundel County Detention Center "[m]aintain custody of [plaintiff] for a period **NOT TO EXCEED 48 HOURS** beyond the time when he[ ] would otherwise have been released from your custody to allow DHS to assume custody.") (emphasis in original). Given this, the facts in the amended complaint, accepted as true, simply do not show that the law enforcement officers at issue in this case acted with actual malice, or that the Detainer Hold was the reason for plaintiff's continued incarceration. And so, the Court must DISMISS Count IV of the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Second, a careful review of the amended complaint also shows that plaintiff fails to state plausible state law claims in this action. In Count III of the amended complaint, plaintiff asserts pendant state law claims and he alleges that the conduct of the law enforcement officers at issue constitute false arrest, false imprisonment, and due process violations of the Constitution of the State of Maryland. Am. Compl. at ¶¶ 59-60. But, as discussed above, plaintiff's false arrest and false imprisonment claims are not plausible, because the amended complaint does not contain factual allegations to show or infer that the law enforcement officers at issue acted with actual malice and the terms of the Detainer Hold make clear that this document was not the reason for plaintiff's continued incarceration. *See* Def. Mot. Ex. A at 1; *see generally* Am. Compl.; Pl. Resp. (not disputing the authenticity of the Detainer Hold submitted as Exhibit A to the government's motions to substitute and to dismiss). It is also well-settled that the United States has not waived its sovereign immunity for state constitutional law claims. *See, e.g.*, *Chin v. Wilhelm*, 291 F. Supp.2d 400, 405 (D. Md. 2003) ("[T]he United States has not waived its sovereign immunity as to state constitutional claims."); *Voh v. United States*, No. 17-1641, 2018 WL 2048372, at \*4 (D. Md. May 2, 2018). And so, the Court must also DISMISS Count III of the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). [5]

[5]    Plaintiff appears to withdraw his false arrest claim in his response in opposition to the government's motion to dismiss. *See* Pl. Resp. at 6-10. Nonetheless, to the extent that plaintiff continues to assert a false arrest claim in this action, this claim is also not plausible because plaintiff does not dispute that the field drug test on his honey

returned a false-positive result, providing probable cause for his arrest. Am. Compl. at ¶ 22; *Heron*, 761 A.2d at 59 (to prove a false arrest claim, plaintiff must show (1) the deprivation of the liberty of another; (2) without consent; and (3) without legal justification).

**\*8** Lastly, and for many of the same reasons, plaintiff's conspiracy claims found in Counts VI and VII of the amended complaint are also not plausible. In Counts VI and VII, plaintiff alleges "conspiracy to violate state and constitutional rights" claims related to his alleged false arrest and false imprisonment. Am. Compl. at ¶¶ 77-96. Plaintiff clarifies in his response in opposition to the government's motion to dismiss that these conspiracy claims are based upon the tort of false imprisonment. Pl. Resp. at 7-8. Under Maryland law, "a defendant may not be adjudged liable for civil conspiracy unless that defendant was legally capable of committing the underlying tort alleged." *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 428 (Md. 2009); *see also Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 821 (D. Md. 2005) (citations omitted) (stating that civil "[c]onspiracy is not a tort on its own[ ] but is dependent on some underlying tort that caused injury to the plaintiff."). And so here, plaintiff must show that the government was legally capable of committing the tort of false imprisonment to assert a plausible conspiracy claim based upon this tort. *Id.*

As discussed above, plaintiff fails to allege a plausible false imprisonment claim in the amended complaint. Given this, plaintiff's civil conspiracy claims based upon the tort of false imprisonment are also not plausible. And so, the Court DISMISSES Counts VI and VII of the amended complaint. Fed. R. Civ. P. 12(b)(6).

## V. CONCLUSION

In sum, the United States is the only proper defendant in this FTCA action and the Court does not possess subject-matter jurisdiction to consider plaintiff's constitutional tort and Section 1983 claims. In addition, a careful reading of the amended complaint shows that plaintiff fails to state plausible FTCA, false imprisonment, false arrest, state law and civil conspiracy claims in this case. And so, for the foregoing reasons, the Court:

    1. **GRANTS** the government's motions to substitute and to dismiss this matter; and

    2. **DISMISSES** the amended complaint.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2021 WL 5989210

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469...

2012 WL 2798805
United States District Court, W.D. Virginia,
Abingdon Division.

John K. BEASLEY, Plaintiff,
v.
CONSOLIDATION COAL
COMPANY, et al., Defendants.

No. 1:11CV00055.
|
June 13, 2012.

**Attorneys and Law Firms**

Daniel Robert Sullivan, Thomas Jack Bondurant, Jr., William
David Paxton, Gentry Locke Rakes & Moore, Roanoke, VA,
for Plaintiff.

Cameron Scott Bell, Stephen M. Hodges, Penn Stuart &
Eskridge, Abingdon, VA, for Defendants.

**Opinion**

JAMES P. JONES, District Judge.

 *1  The plaintiff in this action, an underground coal miner,
was fired by the coal company when he was accused by a
fellow employee of having smoking materials in the mine
and after he refused to open his locker where such materials
were later found. Although the plaintiff was charged by state
regulators with a criminal offense relating to the smoking
materials, the charge was later dismissed and the plaintiff has
now sued his accuser, his supervisor, and the company for
damages under various state and federal causes of action. In
advance of trial, the parties have filed motions for summary
judgment which are resolved in this opinion.

I

The essential facts of the case, either undisputed or, where
disputed, recited in the light most favorable to the nonmovant
on the summary judgment record, are as follows.

The plaintiff, John K. Beasley, was employed by defendant
Consolidation Coal Company ("Consol") beginning in June
1982. At the time of his firing on January 30, 2011, he held
the position of Construction Foreman at Consol's Buchanan
Mine, located in this judicial district. At that time and for

several years prior, defendant William J. Meade was the
General Superintendent of the Buchanan Mine and, as such,
was Beasley's indirect supervisor. Meade, in turn, reported to
Jack Richardson, a Division Vice President.

Throughout his employment, Beasley missed significant
amounts of work—sometimes up to six months at a time—for
a variety of health related reasons such as colitis and serious
shoulder problems. Despite the fact that the majority of these
absences qualified for approved medical leave, Meade and
other Consol managers allegedly harassed, criticized, and
retaliated against Beasley for missing work. For example,
Beasley received low work performance rankings for 2008
and 2009, purportedly because of absences related to his
serious medical conditions. Additionally, on April 28, 2009,
Consol managers, including Meade, collaborated to issue a
disciplinary letter to Beasley, labeling him a "chronic and
excessive[ly] absent employee," and imposing a disciplinary
program that required him to maintain a particular rate of
attendance for the next six reporting periods. [1] Finally, on
January 22, 2010, Richardson met privately with Beasley to
discuss his health problems and attendance record. During
this meeting, Beasley complained about harassment by
Meade and other Consol managers due to his absences from
work.

[1] 
> Beasley objected to this charge of chronic
> absenteeism, submitting a six-page written
> complaint responding to the allegations and
> requesting that Consol and Meade stop harassing
> him for taking time off to recover from
> serious medical conditions. Shortly afterwards,
> Consol's Human Resources Department reviewed
> the disciplinary letter, recognized that Consol
> had improperly categorized Beasley's approved
> medical leave as "absenteeism," and ordered that
> the letter and its disciplinary program be retracted.

Shortly after Beasley's meeting with Richardson, on January
29, 2010, defendant James C. Hampton, a Consol employee
who operated an underground coal storage facility, reported
to supervisor Jim Mullins that he had discovered smoking
materials in Beasley's coat underground on January 23,
2010, but had not reported it earlier because of fear of the
consequences. Specifically, Hampton reported that he
had discovered a pack of cigarettes, a lighter, and a baggie
of cigarette butts in Beasley's coat pocket. The incident
was quickly reported up the chain of command to Meade

2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469...

and Richardson. Smoking materials are strictly forbidden in underground coal mines because of the danger of explosion.

 **\*2**  On January 30, 2010, Beasley was called to the mine and asked by Meade to open the locker supplied to him by the company. Beasley originally consented, but withdrew consent after Meade refused to tell him why Consol needed to search the locker. At that point, Meade, in the presence of other Consol employees, allegedly said that Consol had evidence Beasley had been smoking cigarettes underground. Beasley denied the accusation but refused to open the locker. Meade then told Beasley that if he refused access to the locker, he could resign or would be fired. Beasley would not resign and would not open the locker and he was fired. Subsequently, Consol opened Beasley's locker and found a jacket with smoking materials of the kind previously described by Hampton.

In February 2010, Meade communicated to others within Consol and also to the Virginia Department of Mines, Minerals, and Energy ("DMME") that Beasley had violated the law and company policy by taking smoking materials underground. DMME subsequently initiated proceedings to revoke Beasley's mining certifications. Additionally, on May 6, 2010, Terry Ratliff, a DMME mine safety official, swore out a criminal warrant charging Beasley with a violation of Virginia Code § 45.1–161.177, which makes it a felony to take smoking materials into an underground mine. After an eleven-hour preliminary hearing, a judge of the Buchanan County, Virginia, General District Court dismissed the criminal charge for lack of probable cause. Afterwards, Consol attempted to persuade the Commonwealth's Attorney for Buchanan County to seek a direct grand jury indictment, but the Commonwealth's Attorney decided not to further pursue a charge against Beasley.

In the present action, Beasley alleges that his termination and the resulting proceedings against him were the result of maliciously false accusations by Consol and its employees. Specifically, Beasley contends that Consol employees conspired to have a false allegation made that he had smoked underground, and planted evidence in his locker to corroborate that accusation. Beasley claims the motivating cause for Consol's scheme was to produce a pretext to fire him because he had missed time from work due to his legitimate disabilities and serious health conditions.

Beasley asserts claims against the defendants for defamation, defamation per se, insulting words in violation of Virginia

Code § 8 .01–45, and malicious prosecution. Additionally, Beasley asserts a claim against Consol for discrimination due to missed time from work because of chronic medical conditions, in violation of the Americans with Disabilities Act ("ADA"), and a claim against Consol and Meade for interfering with his rights to be granted leave from work for serious health conditions without harassment or discrimination, in violation of the Family and Medical Leave Act ("FMLA").

Jurisdiction of this court is based upon the federal causes of action, 28 U.S.C.A. § 1331 (West 2006), with supplemental jurisdiction over the state law claims. 28 U.S.C.A. § 1367(a) (West 2006).

 **\*3**  The defendants have moved for summary judgment on all six counts, and the plaintiff has moved for partial summary judgment solely on the FMLA claim. See Fed.R.Civ.P. 56(a). The motions have been briefed and argued and are ripe for decision.

II

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Fed.R.Civ.P. 56(a). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. See Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985), overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

Applying these standards, the defendants' Motion for Summary Judgment must be granted in part and denied in part, and the plaintiff's Motion for Partial Summary Judgment must be denied.

A. DEFAMATION AND DEFAMATION PER SE.

In Count One, Beasley sets forth a claim of defamation. In order to prevail on this claim, the plaintiff must prove the publication of an actionable statement about the plaintiff, with the requisite intent. See Jordan v. Kollman, 612 S.E.2d 203, 206 (Va.2005).

The defendants first argue that Beasley cannot prove that any "actionable statements" were made about the plaintiff. A statement "must be both false and defamatory" to be actionable. *Id.* True statements do not support a cause of action for defamation. Further, statements of pure opinion are generally not actionable because such statements cannot be objectively characterized as true or false. However, statements of verifiable facts simply couched as opinion can constitute the basis for defamation if they can be reasonably interpreted to contain provably false factual connotation. *See, e.g., Raytheon Technical Servs. Co. v. Hyland,* 641 S.E.2d 84, 90–91 (Va.2007).

The defendants contend that summary judgment should be granted with respect to Meade because his communications were either true, or expressions of opinion that are not actionable as defamation. The defendants allege that Meade simply told Beasley, in front of two other Consol employees, that Consol had received a report from Hampton of smoking materials in Beasley's coat underground. Because this would be considered as true, the defendants argue that it is not an actionable statement. However, factual disputes remain as to Meade's exact statements. Beasley alleges that Meade did not just indicate that Consol had received a report of smoking materials underground, but instead stated he had evidence Beasley had been *smoking* underground. A jury could reasonably find such a statement to be defamatory and false, since no one ever directly accused Beasley of actually smoking underground.

Furthermore, the defendants argue that Beasley has no proof that Meade told others within Consol or DMME that Beasley was smoking underground. However, Terry Ratliff confirmed that Meade told him he personally believed Beasley had smoked underground. (Defs.' Mot. for Summ. J. Attach. N, ¶ 9.) The defendants contend that this statement is a pure opinion, not an actionable statement. However, I disagree. Meade's statement did not necessarily depend on his own experience or point of view, but rather contained factual assertions capable of being proven true or false. This is not the type of pure opinion excluded from defamation claims.

 **\*4** Next, the defendants seek summary judgment on the ground that the allegedly defamatory statements were privileged. The defendants first argue that Meade and Hampton's statements to DMME are absolutely privileged because they qualify as "reports to law enforcement." The defendants cite cases as support for the notion that all reports to law enforcement are absolutely privileged. *See*

*Mangold v. Analytic Servs., Inc.,* 77 F.3d 1442, 1446–47 (4th Cir.1996); *Holmes v. Eddy,* 341 F.2d 477, 480 (4th Cir.1965); *Shabazz v. PYA Monarch, LLC,* 271 F.Supp.2d 797, 806 (E.D.Va.2003). However, all of these cases dealt with federal investigations in which the Virginia common law defamation claims were overridden by federal common law principles. Because DMME is a state body, the logic behind these cases does not apply. Moreover, under Virginia common law, absolute immunity is not provided for statements made to Virginia agencies outside of quasi-judicial proceedings. *See Lindeman v. Lesnick,* 604 S.E.2d 55, 58–59 (Va.2004); *Elder v. Holland,* 155 S.E.2d 369, 374–75 (Va.1967). Since none of Meade's or Hampton's statements to DMME took place within the safeguards of a formal, quasi-judicial proceeding, their statements do not qualify for absolute immunity.

The defendants alternatively claim that Meade's and Hampton's allegedly defamatory statements are qualifiedly privileged because they were made in the employment context. "Communications between persons on a subject in which the persons have an interest or duty are occasions of privilege." *Larimore v. Blaylock,* 528 S.E.2d 119, 121 (Va.2000). However, this privilege may be defeated if the plaintiff proves by clear and convincing evidence that the defamatory statements were made maliciously. *See id.* The type of malice necessary to overcome a qualified privilege is " 'behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made.' " *See Se. Tidewater Opportunity Project, Inc. v. Bade,* 435 S.E.2d 131, 132 (Va.1993) (quoting *Smalls v. Wright,* 399 S.E.2d 805, 808 (Va.1991)).

In this case, the defendants argue that the evidence is wholly insufficient to support a finding that their statements were made with the requisite intent. However, I find that Beasley has presented enough evidence to create genuine issues of material fact as to whether the defendants' statements were malicious. For instance, Meade's history of conflict with Beasley, and his knowledge that Beasley had complained about him to Richardson just a week earlier, could be seen as sources of Meade's malicious motive. The fact that Hampton waited six days to report Beasley's alleged misconduct, and that he changed basic details of his story when retelling it to others, also suggests that his accusations may have been fabricated and malicious. Furthermore, Consol's former reprimand of Beasley for unreliable work habits, its inconsistent explanations regarding why Beasley was fired, and the fact that Consol chose to report the accusations to DMME despite not reporting a similar incident

**Beasley v. Consolidation Coal Co., Not Reported in F.Supp.2d (2012)**

2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469...

involving a different employee, could all serve as evidence of the defendants' malicious intent. Thus, at this stage in the proceedings, it would be inappropriate for me to find in favor of the defendants on the issue of malice.

**\*5** The defendants further contend that summary judgment is appropriate because the defendants' statements did not proximately cause the criminal charges or DMME administrative enforcement actions that allegedly injured Beasley. As in any tort case, the defendants are liable only for those damages proximately caused by their tortious conduct. " 'The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." ' *Coleman v. Blankenship Oil Corp.,* 267 S.E.2d 143, 147 (Va.1980) (quoting *Beale v. Jones,* 171 S.E.2d 851, 853 (Va.1970)).

Here, the defendants claim that the DMME enforcement actions and the criminal prosecution were caused by an independent, intervening cause—namely, independent investigation by state mining regulators and prosecutors. However, this argument ignores the fact that an intervening cause that stems from the defendants' own conduct cannot sever the chain of liability. *See, e.g., id.* The investigation by state mining regulators arguably never would have begun but for the defendants' reports. Additionally, Beasley alleges that Consol was actively involved in the pursuit of criminal charges against him, going so far as to "prep" the Assistant Commonwealth's Attorney in advance of the court proceeding. Such evidence is sufficient to survive summary judgment on the issue of proximate cause.

Finally, the defendants argue that Beasley's defamation claim is barred by the Virginia Workers' Compensation Act because it results from an accident arising out of and in the course of Beasley's employment. Pursuant to Virginia law, when an employee sustains a covered injury, the Act provides the sole and exclusive remedy available against the employer. Va.Code Ann. § 65.2–307(a) (2007); *Butler v. S. States Coop., Inc.,* 620 S.E.2d 768, 772 (Va.2005).

In order to be covered under the Act, Beasley's injury must have been (1) an injury by accident; (2) arising out of his employment; and (3) arising in the course of his employment. *See Combs v. Va. Elec. & Power Co.,* 525 S.E.2d 278, 281 (Va.2000). An "injury by accident" has been defined within the context of the Act as an injury caused by an identifiable incident or sudden precipitating event

that results in an obvious sudden mechanical or structural change in the body. *Morris v. Morris,* 385 S.E.2d 858, 865 (Va.1989). Under Virginia law, the damages that flow from an action for defamation do not constitute such an injury by accident. *See, e.g., Williams v. Garraghty,* 455 S.E.2d 209, 218 (Va.1995); *Wines v. Fuller,* No. 97–239, 1998 WL 972162, at \*2 (Va.Cir.Ct. Apr. 2, 1998). Therefore, Beasley's defamation claim is not within the exclusive jurisdiction of the Act.

Accordingly, I will deny the defendants' Motion for Summary Judgment as to Count One. With respect to Count Two, the claim of defamation per se, the defendants do not assert any new arguments aside from those maintained in favor of summary judgment for the defamation claim. Thus, for the reasons discussed, I find that summary judgment is also inappropriate as to Count Two.

### B. INSULTING WORDS STATUTE.

**\*6** Beasley's claim in Count Six under Virginia's insulting words statute must also survive the defendants' Motion for Summary Judgment. Virginia law provides that "[a]ll words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace." Va.Code Ann. § 8.01–45 (2007). The Fourth Circuit has held that this statute is virtually co-extensive with the common law action for defamation. *See Dwyer v. Smith,* 867 F.2d 184, 195–96 (4th Cir.1989). As such, the facts previously discussed in connection with Beasley's defamation claims apply to the insulting words claim and make summary judgment inappropriate.

The defendants point out that the insulting words statute includes an element not found in common law defamation. The insulting words statute requires that the words must "tend to violence and breach of the peace." The defendants argue that, because there was no violence or threat of violence at the time Beasley was confronted and refused to open his locker, Beasley's insulting words claim cannot succeed. This argument attempts to prove too much. The relevant inquiry is not whether the words uttered *actually cause* physical violence, but whether they objectively *tend* to violence or breach of the peace. *See, e.g ., Trail v. Gen. Dynamics Armament & Technical Prods., Inc.,* 697 F.Supp.2d 654, 658–59 (W.D.Va.2010). While the exact substance of Meade's words to Beasley is disputed, both sides agree that Meade's statements suggested that Beasley had committed a felony and endangered the lives of his co-workers. The Supreme Court of Virginia has repeatedly noted that false accusations

Beasley v. Consolidation Coal Co., Not Reported in F.Supp.2d (2012)

2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469...

of a crime are "insulting and [tend] to violence and breach of the peace." *Id.* at 658 (quoting *Zayre of Va., Inc. v. Gowdy,* 147 S.E.2d 710, 713 (Va.1966)). Because of the serious nature of Meade's statements, particularly in the mining community, a jury could reasonably conclude that the statements were ones that tend to provoke violence. Accordingly, I will deny the defendants' Motion for Summary Judgment as to Count Six.

## C. MALICIOUS PROSECUTION.

Count Three of the plaintiff's Third Amended Complaint sets forth a claim of malicious prosecution. Under Virginia law, the elements of malicious prosecution are: (1) institution of judicial proceedings against the plaintiff; (2) the termination of such proceedings in the plaintiff's favor; (3) actual malice on the part of the defendant in instituting the proceedings; and (4) lack of probable cause for instituting the proceedings. *See Brice v. Nkaru,* 220 F.3d 233, 237 (4th Cir.2000).

The defendants' primary argument as to Count Three is that all of the defendants were merely witnesses who did nothing to "institute" the criminal prosecution. However, there is ample evidence showing that the defendants cooperated with DMME in seeking criminal charges against Beasley. For instance, Consol deliberately chose to report Beasley's suspected crime to DMME, despite the fact that Hampton had given three inconsistent statements about the incident, and even though Consol had previously chosen not to report a similar incident involving a different employee. Meade also purportedly told DMME that he believed Beasley had smoked underground. Furthermore, Beasley alleges that Consol stayed in close contact with the Commonwealth Attorney's office over the course of the prosecution, providing what it thought was helpful information and making suggestions about how to handle the case. Such adoption and ratification of the charges initially filed by DMME is sufficient to establish the first element of a malicious prosecution claim. *See Clinchfield Coal Corp. v. Redd,* 96 S.E. 836, 839 (Va.1918).

**\*7** The defendants alternatively argue that they had probable cause to institute the proceedings against Beasley, and that Beasley cannot prove malice by the defendants in instituting the proceedings. I find these arguments to be unpersuasive. Hampton's inconsistent statements and failure to promptly report the incident, Beasley's general reputation for safety in the workplace, and the fact that Beasley's locker was allegedly accessible to others at the mine, all support a lack of probable cause to institute criminal proceedings against Beasley. Finally, as previously discussed with respect to the

defamation claims, there are still genuine issues of material fact as to whether the defendants acted maliciously.

The defendants also contend that Beasley's malicious prosecution claim is barred by the exclusive remedy provisions of the Virginia Workers' Compensation Act. As previously stated, in order to be covered under the Act, Beasley's injury must have been (1) an injury by accident; (2) arising out of his employment; and (3) arising in the course of his employment. *See Combs,* 525 S.E.2d at 281. The Supreme Court of Virginia has noted that the expressions "arising out of" and "in the course of" are not synonymous, and both conditions must be present in order to fall within the Act. *See Brown v. Reed,* 165 S.E.2d 394, 396 (Va.1969). While it is true that the criminal charges pursued against Beasley "arose out of" an incident connected to his employment, the allegedly malicious prosecution did not occur "in the course of" his employment. An accident occurs "in the course of" employment when it takes place within the period of employment. *See id.* It has been held that terminated employees are not entitled to workers' compensation, even for injuries they suffer while winding up their affairs and still on the employer's premises. *See, e.g., Nat'l Biscuit Co. v. Litzky,* 22 F.2d 939, 941–42 (6th Cir.1927); *Adams v. Uvalde Asphalt Paving Co.,* 200 N.Y.S. 886, 887–88 (N.Y.App.Div.1923). Because Beasley had already been discharged and had left Consol's premises before the prosecution began, his malicious prosecution claim does not fall within the exclusive jurisdiction of the Act.

Accordingly, I find that Count Three must survive the defendants' Motion for Summary Judgment.[2]

[2] Consol also contends that it cannot be held vicariously liable for any torts committed by its employee Hamilton. However, I find that there is evidence by which the jury might find that any such acts were committed within the course of his duties for Consol.

## D. THE ADA.

Count Four sets forth three separate ways that Consol allegedly violated Beasley's rights under the ADA. Specifically, Beasley alleges that Consol harassed and discriminated against him on the basis of his disability, failed to reasonably accommodate him, and retaliated against him for receiving reasonable accommodations. Consol argues for summary judgment based on various different theories. For

2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469...

the following reasons, I will grant summary judgment for the defendants.

Consol's main argument is that Beasley cannot prevail on his ADA claims because he is not a "qualified individual" protected by the ADA. Pursuant to 42 U.S.C.A. § 12111(8) (West Supp.2012), a qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."

**\*8** Consol first contends that Beasley's poor attendance record prevents him from being considered a "qualified individual." However, Beasley alleges that, from November 2006 to April 2009, all of his absences aside from one day were approved medical leaves of absence. The ADA clearly contemplates that such approved medical leaves of absence are reasonable accommodations that cannot be used to penalize the employee. Thus, Beasley could reasonably be considered a "qualified individual" despite these absences.

Nevertheless, Consol also argues that Beasley is not qualified to perform the duties of his position based on his application for and receipt of social security disability benefits. The Supreme Court has established that an employee receiving social security disability benefits can still bring a discrimination claim under the ADA, provided there is a reasonable explanation, because the definition of "disabled" for social security purposes is different than that for ADA purposes. *See Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 802–03 (1999). Particularly, reasonable accommodations are not considered when deciding whether someone is "disabled" for social security purposes. However, "[t]he mere possibility that [an employee] *might* have been able to work at the time of his benefits application [with reasonable accommodations] cannot adequately explain the inconsistency; the record must contain evidence supporting the explanation." *EEOC v. Greater Balt. Med. Ctr., Inc.,* No. 11–1593, 2012 WL 1302604, at \*7 (4th Cir. Apr. 17, 2012) (unpublished).

In this case, Beasley argues that he could have continued to work if given a reasonable accommodation such as relocation to the position of an aboveground foreman. Yet, according to Gerald Kowzan, the Manager of Human Resources for the Central Appalachia Coal Operations of Consol, "[f]rom January 2010 to the present there were no [vacant] positions for outside work for foremen at the Buchanan Mine." (Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. Attach. U, ¶

3.) The ADA does not require Consol to create new positions to reasonably accommodate Beasley. Furthermore, even if aboveground positions had been available, a reasonable juror could not conclude that Beasley could have performed the essential functions of these jobs. The only outside work for foremen would have been at Consol's preparation plant, where Beasley would have been exposed to heights, heavy machinery, at least moderate amounts of dust and fumes, and other physical rigors that the Social Security Administration explicitly decided he could not tolerate. [3] (Defs.' Mot. for Summ. J. Attach. Q; Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. Attach. V, ¶ 5–9.) Thus, I find that Beasley is not a "qualified individual" protected by the ADA.

[3]     Beasley also suggests he could have continued to work as a mine foreman if given the reasonable accommodations provided to so-called Part 90 miners, as defined in the federal black lung regulations. However, the accommodations given to Part 90 miners only address the miners' exposure to respirable dust. *See* 30 C.F.R. § 90.3(a) (2011). Such accommodations would not have resolved Beasley's other limitations, such as lifting restrictions of twenty pounds occasionally and ten pounds frequently, or how he must avoid moderate exposure to fumes or concentrated exposure to machinery and heights.

Beasley argues that, even if he is not a "qualified individual," he can still assert an ADA retaliation claim. Beasley is correct that the ADA's retaliation provision protects all individuals and not just "qualified individuals." *See Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers, AFLCIO–CLC,* 268 F.3d 456, 458 (7th Cir.2001). However, this does not save Beasley's retaliation claim because he is unable to prove any damages associated with this claim.

**\*9** In his ADA claim, Beasley alleges that Consol's retaliation caused him to suffer personal and emotional damages, loss, and other compensatory damages, as well as lost wages and benefits. He also alleges that Consol's violations warrant an award of punitive damages. However, compensatory and punitive damages are not allowable for ADA retaliation claims. *See Rhoads v. FDIC,* 94 F. App'x. 187, 188 (4th Cir.2004) (unpublished). Thus, Beasley's only viable claim for monetary relief under the ADA—a claim for lost wages and benefits—is based upon the allegation that he would have worked an additional twenty-nine months

2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469...

for Consol if he had not been fired. However, as previously discussed, Beasley was totally disabled and could not perform his job at Consol, even with the suggested accommodations. Thus, Beasley's ADA retaliation claim must fail because he has not made a reasonable showing of any associated damages.

Accordingly, I will grant summary judgment to Consol as to Count Four.

E. THE FMLA.

Count Five sets forth claims under the FMLA, 29 U.S.C.A. §§ 2601–2619 (West 2009). Beasley contends that Consol violated the FMLA by failing to provide him notice of his rights under the FMLA, by interfering with his FMLA rights, and by retaliating against him for utilizing his FMLA rights. Both parties have moved for summary judgment based on various different grounds.

To begin with, the defendants contend that Beasley's claims of violations of the FMLA prior to January 23, 2009, are barred by the statute of limitations. 29 U.S.C.A. § 2617(c) provides that an action may be brought no later than two years after the date of the last event constituting the alleged violations, or within three years in the case of willful violations. "A willful violation is shown when an employer knew or showed reckless disregard regarding whether its conduct was prohibited." Settle v. S.W. Rodgers Co., No. 98–2312, 1999 WL 486643, at *3 (4th Cir. July 12, 1999) (unpublished).

The defendants argue that Beasley is claiming at least some violations of the FMLA's notice provisions outside the two-year statute of limitations period, and that none of the alleged violations were willful. However, similar to the issue of malice, there are at least some genuine issues of material fact as to whether the defendants acted willfully. For example, the fact that Consol follows a corporate policy that is in direct conflict with the FMLA's notice requirements could reasonably be seen as evidence that the defendants willfully violated the FMLA. Thus, summary judgment for the defendants is inappropriate on this issue.

As another preliminary matter, the defendants contend that relief against Meade, individually, is not permitted under the FMLA. The defendants cite Carter v. Rental Unif. Serv. of Culpeper, Inc., 977 F.Supp. 753 (W.D.Va.1997), in which Judge Michael of this court held that there was no individual liability under the FMLA. However, I decline to follow this holding. The Fourth Circuit has subsequently stated that the question of individual liability under the FMLA is an open question in this circuit. See Jones v. Sternheimer, 387 F. App'x. 366, 368 (4th Cir.2010) (unpublished). Furthermore, at least three other circuits have found that such liability exists as to individual managers and supervisors of private companies. Modica v. Taylor, 465 F.3d 174, 184–87 (5th Cir.2006); Mitchell v. Chapman, 343 F.3d 811, 827 (6th Cir.2003); Darby v. Bratch, 287 F.3d 673, 681 (8th Cir.2002).

*10 The defendants argue that, even to the extent individual liability can be imposed under the FMLA, there is no factual basis to do so in this case. I disagree. Contrary to Consol's claim that Meade had no responsibility for compliance with the FMLA, his deposition testimony suggests otherwise. Meade specifically stated that it was part of his job to make sure Consol complied with the FMLA. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. Ex. 13, at 56–57.) Moreover, given Meade's supervisory role over Beasley, there is sufficient record to justify a finding that he was at least partially responsible for the alleged FMLA interference and retaliation claims. Accordingly, I decline to grant summary judgment on this ground.

Turning to the claimed violations, Beasley first alleges that Consol and Meade violated the FMLA by failing to provide Beasley notice of his rights under the FMLA.

Under 29 C.F.R. § 825.300(b)(1) (2011), employers must notify an employee of his eligibility to take FMLA leave within five business days of either (1) receiving a request for FMLA leave from the employee, or (2) acquiring knowledge that the employee's leave may be for a FMLA-qualifying reason. Further, each time the employer sends an eligibility notice, it must also provide the employee with a "rights and responsibilities notice" that details the specific expectations and obligations of the employee and explains any consequences of a failure to meet these obligations. See 29 C.F.R. § 825.300(c) (2011).

Beasley alleges that Consol's corporate policy, which states that an individualized notice will not be given to an employee until at least thirty days after the onset of a serious medical condition, is in direct violation of the FMLA's notice requirements. Beasley also alleges that he never received any FMLA notices whatsoever after injuring his shoulder on November 5, 2009. Consol itself has produced no documentation and has volunteered no testimony suggesting that Consol ever sent him any such documents. In fact, the only document provided by Consol that purports to address

Beasley's FMLA rights is a letter addressed to Beasley, dated January 8, 2009. While this notice plainly relates to Beasley's medical leave for a shoulder injury in August 2008, it does not pertain to Beasley's injury from November 2009. Moreover, Beasley contends that he never received this letter, and, even if he had received it, the letter does not comply with the FMLA's requirement that it be sent within five business days of receiving a request for FMLA leave. Given these facts, Beasley seeks summary judgment as to his claim of violation of the FMLA's notice provisions.

However, even assuming the complete accuracy of Beasley's factual recitations, Beasley cannot prove that he suffered any injury from the defendants' alleged violation of the notice provisions. "[T]he FMLA clearly provides that employees have a right of action only to recover damages or to seek equitable relief for violations of the Act, and not to act as a private attorney general in enforcing the provisions of the Act." *Dawson v. Leewood Nursing Home, Inc.,* 14 F.Supp.2d 828, 832 (E.D.Va.1998). Because Beasley does not seek injunctive relief, he must therefore make a reasonable showing of damages. Beasley does not claim that he was unaware of his FMLA rights, or that he would have taken more leave had he been given appropriate notice. Thus, summary judgment for the plaintiff is clearly inappropriate and, because Beasley has not made a reasonable showing of damages, I will grant summary judgment for the defendants on the notice claim.

**\*11** Next, Beasley alleges that Consol and Meade violated the FMLA by interfering with Beasley's exercise of his FMLA rights.

Pursuant to 29 U.S.C.A. § 2615(a) (West 2009), it is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA. In order to prevail on his interference claim, Beasley must establish that he was entitled to leave under the FMLA; that the defendants interfered with, restrained, or denied Beasley the benefits to which he was entitled; and that Beasley was prejudiced by such interference.

While it is undisputed that Beasley qualified for FMLA leave due to his two shoulder surgeries and diagnosis of colitis, it is also undisputed that Beasley was granted all of the medical leave time he requested. Beasley obviously has no claim for interference with leave that he requested and was granted. However, Beasley identifies three other events that he claims "interfered" with his FMLA rights—a low score on his job

evaluation for 2008, a disciplinary letter from Consol in April 2009 addressing his attendance, and a marked down work performance score for 2009.

These three events are better defined as instances of "retaliation" instead of "interference," since they all occurred after Beasley already requested, was granted, and took FMLA-qualified leaves of absence. In fact, all three of these actions are also listed as the bases of Beasley's retaliation claim. For instance, the performance scores for 2008 and 2009, which he claims resulted from his prior FMLA-qualified leave of absence, did not "interfere" with this leave, as he had already taken it. Nevertheless, Beasley claims that the disciplinary letter of April 2009 violated the FMLA by discouraging any future attempts to exercise his FMLA rights. However, Beasley does not specify what other leave he would have taken had he not been discouraged, and, at the time of the letter, Beasley had used up all of his FMLA leave and had no more available for several months. Additionally, the letter was quickly withdrawn within a week after it was issued, and Beasley was so informed. Accordingly, I find that there remain genuine issues of material fact as to whether Beasley was prejudiced by any so-called interference, making summary judgment inappropriate for either party.

Finally, Beasley alleges that Consol and Meade retaliated against him for engaging in activity protected by the FMLA, namely requesting and taking medical leave for serious medical conditions.

To establish a prima facie case of FMLA retaliation, Beasley must show that he engaged in protected activity, that the defendants took adverse action against him, and that the adverse action was causally connected to his protected activity. *See Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 551 (4th Cir.2006). Once Beasley meets this burden, the burden shifts to Consol and Meade to show that they took the adverse actions against Beasley for legitimate, nondiscriminatory reasons unrelated to the exercise of his FMLA rights. *See Nichols v. Ashland Hosp. Corp.,* 251 F.3d 496, 502 (4th Cir.2001). If the defendants in turn can establish such non-discriminatory reasons for the adverse actions, the burden shifts back on Beasley to show that the reasons proffered by the defendants are pretextual. *Id.*

**\*12** First, a reasonable jury could find that Beasley has established a prima facie case of FMLA retaliation. It is undisputed that Beasley requested and took at least some FMLA leave that qualifies as "protected activity." It is

2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469...

also undisputed that the same three events Beasley notes in his interference claim—his low performance evaluation score for 2008, the lowering of his initial performance evaluation score for 2009, and the April 2009 disciplinary letter addressing his attendance—as well as Meade's refusal to grant Beasley's request to move to a preferred shift, all qualify as "adverse actions." Furthermore, Beasley reasonably could connect these events to his use of FMLA qualified medical leave. Meade affirmed in his deposition that Beasley's low performance ranking for 2008 was based on his unavailability due to medical leave of absence, at least some of which was indisputably FMLA-qualified. Beasley's performance score for 2009 was marked down less than a week after Meade allegedly complained about Beasley's attendance and Consol supervisors met with Beasley to discuss his absences. Additionally, the April 2009 disciplinary letter explicitly stated that it was based on medical leaves of absence that qualified Beasley for protected leave under the FMLA. Finally, Beasley alleges that neither Consol nor Meade gave any explanation as to why they denied his request to move shifts, possibly suggesting the denial was linked to his protected activity.

Even though Beasley can reasonably establish a prima facie case of FMLA retaliation, his motion for summary judgment must be denied because the defendants have asserted arguably legitimate, non-discriminatory reasons for their adverse actions. However, in the same sense, Beasley has raised genuine issues of material fact as to whether these non-discriminatory reasons are simply pretextual. Thus, the defendants' motion for summary judgment also must be denied.

To elaborate, the defendants argue that Beasley's low performance ranking for 2008 was due to other performance issues aside from absences, such as Beasley's request for a job change in 2008 due to problems with stress, and reports that Beasley was affected by mood swings. However, Beasley alleges that the defendants never recorded any reports of mood swings, and that he was never confronted about this issue. Moreover, Meade admits that he commended Beasley for his "excellent" performance earlier in 2008.

The defendants also allege that Beasley's 2009 performance rating was marked down due to general displeasure with Beasley's performance, and because Consol wanted to moderate the magnitude of score changes from year-to-

year. Yet, Beasley alleges that his 2008 performance rating was already exceptionally low due to the defendants' prior retaliation. Beasley also argues that Consol supervisors are unable to point out any problems with Beasley's performance in 2009 aside from his medical absences.

Finally, the defendants assert that their failure to change Beasley's shift was not for retaliation, but due to operational requirements at the mine. While a reasonable jury could certainly find this to be a plausible justification, Beasley notes that there is no documentation of this explanation, nor any alternative explanation, for Consol's refusal to change Beasley's shift.

**\*13** It is clear that genuine issues of material fact remain regarding the defendants' motivation for their treatment of Beasley. [4] Accordingly, I find summary judgment to be inappropriate as to the FMLA interference and retaliation claims in Count Five.

[4]  I note that although the defendants have not specifically provided a nondiscriminatory justification for the final adverse action, the disciplinary letter of April 2009, they allege that the letter was withdrawn within a week of being sent, and that Beasley was so informed. Thus, as previously discussed, there are genuine issues of material fact as to whether Beasley was damaged or prejudiced by the letter.

III

For the reasons stated, it is **ORDERED** that the plaintiff's Motion for Partial Summary Judgment (EFC No. 59) is DENIED, and the defendants' Motion for Summary Judgment (ECF No. 54) is GRANTED IN PART and DENIED IN PART. The defendants' Motion for Summary Judgment is GRANTED with respect to Count Four and the FMLA notice claim of Count Five, and it is DENIED as to all other claims.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2798805, 162 Lab.Cas. P 61,261, 19 Wage & Hour Cas.2d (BNA) 469, 26 A.D. Cases 1118, 45 NDLR P 124

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 210722
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Jesse DUPRIS, et al., Plaintiffs

v.

Selanhongva McDONALD, et al., Defendants.

Nos. 08–8132–PCT–PGR, 08–8133–PCT–PGR.
|
Jan. 24, 2012.

**Attorneys and Law Firms**

Anne E. Findling, Joel B. Robbins, Robbins & Curtin PLLC, Phoenix, AZ, for Plaintiffs.

James George Bartolotto, Kelly Heidrich, US Dept. of Justice, Washington, DC, John T. Masterson, Jones Skelton & Hochuli PLC, Phoenix, AZ, for Defendants.

**AMENDED ORDER**

PAUL G. ROSENBLATT, District Judge.

 **\*1** Before the Court are the following motions: Individual Defendants' Motion for Summary Judgment (Doc. 169) and Defendant United States' Motion for Summary Judgment as to Plaintiffs' FTCA Claim (Doc. 168), both of which are joined in part by Defendants Massey and Anderson (Docs.183, 184), and Plaintiffs' Motion for Partial Summary Judgment Re: Federal Employee Status of Tribal Officer Defendants (Doc. 170).

For the reasons set forth below, the Court will grant summary judgment for the Individual Defendants and the United States. The Court will deny Plaintiffs' motion for partial summary judgment. [1]

[1]    Plaintiffs' requests for oral argument (Docs.192, 196) will be denied because the parties have fully briefed the issues and oral argument will not aid in the Court's decision. *See Partridge v. Reich,* 141 F.3d 920, 926 (9th Cir.1998).

**INTRODUCTION**

Plaintiffs Jesse Dupris and Jeremy Reed filed suit against tribal police officers of the White Mountain Apache Tribe and agents of the Bureau of Indian Affairs ("BIA") in their individual capacities, alleging civil rights violations under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1) and 2671, et seq. Plaintiffs claim that their Fourth and Fifth Amendment rights were violated when they were unreasonably seized, wrongfully arrested, and maliciously prosecuted. Plaintiffs contend that the actions taken by the Individual Defendants constituted those violations.

**FACTUAL BACKGROUND**

In early September 2006, the BIA created the "Operation Mountain Line" Task Force to investigate a series of sexual assaults occurring on the White Mountain Apache Indian Reservation in Whiteriver, Arizona. The crimes were committed by a man or men who posed as police or security officers. The majority of the fifteen victims were minor females assaulted at night on a trail near an abandoned house.

BIA Agents Molly Hernandez, Tino Lopez, Perry Proctor, Michael McCoy, Duston Whiting, and Warren Youngman were assigned to the Task Force. McCoy was the Incident Commander, Youngman the Assistant Incident Commander, and Whiting the case agent. Perphelia Massey and Joshua Anderson, officers from the White Mountain Apache Police Force, were also assigned to the Task Force.

As discussed in more detail below, and described in a previous order (Doc. 48), the Task Force investigation included interviews with victims and witnesses, some of whom identified Plaintiffs as their attackers.

On October 20, 2006, McCoy and Youngman met with tribal prosecutor Paula King to see whether the Tribe wanted to pursue tribal charges against Plaintiffs. King agreed to charge and prosecute Plaintiffs and gave permission to McCoy and Youngman to have Plaintiffs arrested on tribal charges.

That same day, Officer Anderson arrested Reed at his home on the Reservation. Officer Massey arrested Durpis at the Hon–Dah police substation on the Reservation. Individual Defendant Hernandez was present at Reed's arrest in a back-

Dupris v. McDonald, Not Reported in F.Supp.2d (2012)
2012 WL 210722

up capacity, but did not participate because Reed did not resist arrest.

On October 24, 2006, King modified the tribal charges against Reed and signed the complaint. On October 25, 2006, at the arraignment, King tried to modify the tribal charges against Dupris but the Tribal Court denied her request and determined that Plaintiffs should continue to be held in tribal jail.

**\*2** On November 1, 2006, Reed was released on bond by the Tribal Court. Dupris was released on November 12.

On November 16, 2006, King moved to dismiss the charges against Reed "without prejudice" in case additional evidence was provided. On February 20, 2007, King moved to dismiss the charges against Dupris "with prejudice." On April 27, 2007, King's request to change Reed's dismissal of charges to "with prejudice" was granted.

### SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party, who must demonstrate the existence of a factual dispute and that the fact in contention is material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Triton Energy Corp. v. Square D. Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. *See* Fed.R.Civ.P. 56(c). The

judge's function is not to weigh the evidence and determine the truth but to decide whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 248–49.

### INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Individual Defendants Hernandez, Lopez, and Proctor, joined by Massey and Anderson, move for summary judgment on Plaintiffs' *Bivens* claims. [2] (Docs.169, 183.) The Individual Defendants argue that they are entitled to qualified immunity because they were not personally involved in the alleged violation of Plaintiffs' constitutional rights. They also contend, along with Massey and Anderson, that no constitutional violation occurred because the arrests were supported by probable cause and because the existence of probable cause defeats the malicious prosecution claim. Plaintiffs filed a response opposing the motion. (Doc. 191.)

[2]    The *Bivens* claims against BIA Agent McDonald were dismissed January 26, 2011 (Doc. 121); the claims against Agents McCoy and Youngman were dismissed on June 27, 2011 (Doc. 158). Plaintiffs concede that the claims against Individual Defendant Daniel Hawkins should also be dismissed. (Doc. 191 at 5 n. 1.)

### I. Qualified Immunity Doctrine

**\*3** Qualified immunity is an affirmative defense. The defendant asserting qualified immunity bears the burden of both pleading and proving the defense. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). In the context of a motion for summary judgment in a § 1983 action, the defendant bears the burden of establishing that there is no genuine issue of material fact to be resolved regarding his immunity. *See Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir.2005).

The determination of whether a law enforcement officer is entitled to qualified immunity from a plaintiff's § 1983 claims involves a tiered analysis. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Moreno,* 431 F.3d at 638. The first step requires the court to determine if any of

Case 1:23-cv-01323-MSN-JFA   Document 13-1   Filed 01/11/24   Page 59 of 76 PageID# 154
Dupris v. McDonald, Not Reported in F.Supp.2d (2012)
2012 WL 210722

the plaintiff's constitutional rights were violated, viewing the facts in the light most favorable to the plaintiff. *Id.; Moreno,* 431 F.3d at 638; *Johnson v. County of Los Angeles,* 340 F.3d 787, 792 (9th Cir.2003). If no constitutional right was violated, there is no necessity for further inquiry. *Saucier,* 533 U.S. at 201.

The second step requires the court to determine if the violated right was clearly established at the time of the violation. *Moreno,* 431 F.3d at 638. The contours of the violated right must have been clear enough that a reasonable law enforcement officer would have understood that what he was doing violated the individual's constitutional rights. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Moreno,* 431 F.3d at 638.

The court must consider the "objective legal reasonableness" of the officer's conduct, rather than his subjective motivation, when determining if the officer is entitled to qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Brittain v. Hansen,* 451 F.3d 982, 988 (9th Cir.2006); *Butler v. Elle,* 281 F.3d 1014, 1031 (9th Cir.2002). "A defendant's good faith or bad faith is irrelevant to the qualified immunity inquiry." *Burk v. Beene,* 948 F.2d 489, 494 (8th Cir.1991).

The plaintiff bears the burden of establishing that the actions complained of constituted a violation of his constitutional rights. *Hydrick v. Hunter,* 466 F.3d 676, 705–06 (9th Cir.2006). He also bears the burden of establishing that the contour of the underlying constitutional right was clearly established at the time of the alleged misconduct. *Id.; Galvin v. Hay,* 374 F.3d 739, 745 (9th Cir.2004).

## II. Analysis

### A. Personal Involvement

In a prior order, the Court dismissed the *Bivens'* claims set forth in Plaintiffs' First Amended Complaint, finding that Plaintiffs "failed to adequately allege that the Individual Defendants, through their own actions, ... violated Plaintiffs' constitutional rights." (Doc. 48 at 10.) The Court explained that actions undertaken by the Individual Defendants—interviewing witnesses and victims and showing them photographic lineups—did not amount to a constitutional violation and that Plaintiffs' remaining assertions were directed only at the conduct of the " 'defendants' as a group." (*Id.* at 9.)

**\*4** The allegations in the Fourth Amended Complaint fail for the same reasons. Plaintiffs do not allege that Hernandez, Lopez, or Proctor, as individuals, played any role in the decisions to arrest and prosecute Plaintiffs. None of the Individual Defendants was present for the arrest of Plaintiff Dupris, and only Hernandez was present, in a back-up role, at Reed's arrest. (*See* Doc. 167, Ex. 4.)

Plaintiffs argue that the false arrest and malicious prosecution were group efforts and therefore the Individual Defendants are liable under the "integral participant" theory. (Doc. 191 at 5.) According to this principle, liability may attach to anyone who "set[s] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978). Plaintiffs argue that the decisions to arrest and prosecute them were made "as a group" by the Task Force. (Doc. 191 at 6.) Therefore, according to Plaintiffs, the Individual Defendants, as members of the Task Force, are liable as integral participants in the arrest and prosecution. (*Id.*)

The Individual Defendants' membership in the Task Force, which was headed by Incident Commanders McCoy and Youngman, is insufficient to show personal involvement. To overcome qualified immunity, a plaintiff "must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998); *see Jones v. Williams,* 297 F.3d 930, 937 (9th Cir.2002) ("we require individual participation, not simply being present or being a member of a team"); *Blankenhorn v. City of Orange,* 485 F.3d 463, 481 n. 12 (9th Cir.2007) (liability under the integral participation doctrine requires "some fundamental involvement in the conduct that allegedly caused the violation"). Plaintiffs have advanced no facts showing that the Individual Defendant's personally participated in the alleged constitutional violations.

The cases relied on by Plaintiffs, *Beck v. City of Upland,* 527 F.3d 853 (9th Cir.2008), and *Boyd v. Benton County,* 374 F.3d 773 (9th Cir.2004), do not support Plaintiffs' interpretation of the integral participant doctrine. In *Beck,* a false arrest case, the court ruled that a police chief was not entitled to qualified immunity despite the fact that he "did not sign or prepare the police report, the criminal complaint, or the declaration submitted to secure the warrant." *Id.* at 871. In finding the chief liable, the court explained that despite the clear absence of probable cause, the chief "failed to do anything to stop

2012 WL 210722

the process that led to the arrest, but instead abetted it and threatened [others] when they attempted to get involved." *Id.* at 872. In fact, the chief not only initiated the investigation and had the matter referred to the prosecutor, he was also one of "purported victims" of the plaintiff's threatening speech. *Id.*

**\*5** *Boyd* was an excessive force case. The court held that every officer who provided armed backup for another officer who unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed." *Boyd,* 374 F.3d at 780.

None of the circumstances characterizing the police chief's personal involvement in *Beck* or the officers' actions in *Boyd* are present with respect to the roles played by Hernandez, Lopez, and Proctor in Plaintiffs' arrest and prosecution. The record is clear that they did not supervise the Task Force, make the probable cause determinations, or initiate the arrest or prosecution; those decisions were made by Incident Commanders McCoy and Youngman. (*See* Doc. 167, ¶¶ 68, 77, 82–83; Doc. 193 at 79, 92–93; *id.,* Exs. 4, 5, and 8.) The Individual Defendants simply carried out routine investigative duties and were present at Task Force briefings. Neither this activity, nor Hernandez's presence at Reed's arrest, amounts to "fundamental involvement" in the conduct that resulted in the alleged constitutional violation. *Blankenhorn,* 485 F.3d at 481 n. 12. Therefore, Plaintiffs' conclusory assertions of wrongdoing on the part of the Task Force are insufficient to demonstrate that Proctor, Hernandez, and Lopez personally violated any of their constitutional rights.

Unlike the Individual Defendants, Massey and Anderson, however, did personally participate in the arrests. Nevertheless, as discussed next, they are entitled to qualified immunity if the arrests were supported by probable cause.

**B. Probable Cause**

The Individual Defendants, along with Massey and Anderson, contend that no constitutional violation occurred, and therefore they are entitled to qualified immunity, because the arrests were supported by probable cause. (Doc. 169 at 7.) "The test for whether probable cause exists is whether 'at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they

had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.' " *Blankenhorn,* 485 F.3d at 471 (quoting *United States v. Jensen,* 425 F.3d 698, 704 (9th Cir.2005)); *Peng v. Mei Chin Penghu,* 335 F.3d 970, 976 (9th Cir.2003) ("Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime.") (quoting *United States v. Buckner,* 179 F.3d 834, 837 (9th Cir.1999)).

Because qualified immunity protects all "but the plainly incompetent or those who knowingly violate the law," a law enforcement officer will be immune to claims based on an arrest without probable cause unless "it is obvious that no reasonably competent officer" would have believed that there was probable cause to arrest. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see Crowe v. County of San Diego,* 608 F.3d 406, 433–34 (9th Cir.2010). Thus, qualified immunity applies not only to officers who correctly determine that probable cause exists, but also to officers who reasonably but mistakenly conclude that it does. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

**\*6** "The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information." *Spiegel v. Cortese,* 196 F.3d 717, 725 (7th Cir.1999). The fact that charges are ultimately dismissed does not mean the arrest was not supported by probable cause. *See Freeman v. City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir.1995).

Here, the Court concludes that the Individual Defendants, and tribal officers Massey and Anderson, could have reasonably believed that probable cause existed to arrest Plaintiffs.

At the time they made the probable cause determination to arrest Dupris, Agents McCoy and Youngman were aware of various information suggesting Dupris' involvement in the attacks. (*See* Doc. 167, Exs. 7, 10.) Dupris had recently been a security guard for the White Mountain Apache Housing Authority ("WMAHA"), and in that capacity he had access to the locations and equipment used by the attacker, including handcuffs. (*Id.*) Dupris lived in the "Ben Gay" housing area, near the trail where the assaults occurred. (Doc. 167, Exs.4, 7, 10.) Michelle Young, a former tribal police officer, had observed Durpis on patrol one night around the time of one

of the attacks. (Doc. 167, Exs.6, 7, 10.) Wearing a shirt with the word "security" on it, he was running from a trail to his vehicle. (*Id.*) Young then saw Dupris change back into his WMAHA shirt. (*Id.*) Two victims, L.T. and L.B., identified Dupris from a photo lineup (*id.,* Exs. 6, 7, 8, 10), as did M.M., an eyewitness to another assault. (*Id.,* Exs. 7, 10.) Other victims provided physical details of their attacker that matched those of Dupris. (*Id.,* Exs. 3, 4, 6, 7, 8, 10.) Dupris had lied about his residence, and his polygraph answers were deemed "deceptive" by an FBI examiner. (*Id.,* Exs. 7, 10.) Victim C.D. stated that her attacker did not have the accent of an Apache man, had a "light complexion," and was not Apache. (*Id.*) Dupris is Irish and Sioux, not Apache, and had lived off of the Reservation for several years. (*Id.*) Dupris' supervisor believed that he had once gotten into trouble when he worked for WMAHA for "having a young woman in his work vehicle." (*Id.*)

When they made the decision to arrest Reed, McCoy and Youngman were aware of the following information. When shown a photo lineup, victim B.L. identified Reed as her attacker. (Doc. 167, Exs.6, 7, 10.) Reed matched the height and weight descriptions provided by several victims and witnesses, and matched descriptions that the suspect had "hairy" or "bushy" eyebrows. (*Id.,* Exs. 4, 6, 7, 10.) Like Dupris, he lived in the "Ben Gay" housing area and had worked as a WMAHA security guard. (*Id.,* Exs. 7, 10.) He was evasive and refused to speak with the Task Force or come in for an interview. (*Id.*) Dupris identified Reed as a possible suspect based on the similarity of their appearance. (*Id.*) Reed's supervisor said he was the only security guard who had a flashlight with a blue light, which matched the type of flashlight used by the suspect. (*Id.*) Reed admitted he had been accused "of picking up girls in different areas, and having two way radios." (*Id.*) Reed is an Apache who has lived on the Reservation his entire life, and victim B.L., who identified Reed from the photo lineup, stated that her attacker had a "rez boy" voice. (*Id.*)

**\*7** Finally, prior to the arrests, the United States District Court had authorized a search of Dupris' vehicle and residence, and the tribal prosecutor, after being briefed by McCoy and Youngman, authorized the arrest of Dupris and Reed on tribal charges. (*Id.*)

Plaintiffs note inconsistencies in the accounts offered by the victims and witnesses, and challenge the reliability of their identifications.[3] While some of Plaintiffs' concerns are well taken, they are not sufficient to show that Task Force agents

were incompetent or knowingly violated the law when they determined that probable cause existed to arrest Plaintiffs. "Nothing suggests that a victim's report must be unfailingly consistent to provide probable cause. The credibility of a putative victim or witness is a question, not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial." *Spiegel,* 196 F.3d at 725; *see Torchinsky v. Siwinski,* 942 F.2d 257, 262 (4th Cir.1991) ("It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker."); *Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir.1999) ("An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.") (interior quotations omitted); *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001) (information provided by a victim is sufficient to establish probable cause even where the suspect and victim provide different versions of events, "unless the circumstances raise doubt as to the person's veracity").

3    These inconsistencies principally relate to the witnesses' descriptions of the suspects' height and build. While both Dupris and Reed are six feet, four inches tall, several witnesses described their attacker as being under six feet. (*See, e.g.,* Doc. 193 at 8–14.) However, one of these witnesses, victim L.B., positively identified Plaintiff Dupris. (*See id.* at 15.) Plaintiffs also note that victim L.T. and witness M.M., both of whom identified Dupris, had been drinking at the time of the incidents, as had victim B.L., who identified Plaintiff Reed as her attacker. (*See id.* at 10–11.)

The Task Force had no reason to believe the witnesses were lying or mistaken in their identifications and descriptions of the suspects. Once probable cause to arrest Plaintiffs was established through this information, the Task Force was under "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Spiegel,* 196 F.3d at 723.

Moreover, the eyewitness identifications in this case did not stand alone but were supported by corroborating circumstantial evidence, including the fact that Plaintiffs were employed as security guards, were familiar with the area where the assaults took place, and were evasive or deceptive during their interactions with the agents; in addition, Dupris

Dupris v. McDonald, Not Reported in F.Supp.2d (2012)

2012 WL 210722

was seen running from a trail at night and then changing his clothes. The information gathered by the Task Force persuaded the tribal prosecutor to approve the arrest and initiate the prosecution of Dupris and Reed. The Court therefore concludes that the totality of the evidence before the Task Force was sufficient to support a reasonable belief that probable cause existed to arrest Plaintiffs. The Task Force agents were not required to delay the arrests "until after they have resolved each and every inconsistency or contradiction in a victim's account." *Spiegel,* 196 F.3d at 725.

### C. Malicious Prosecution

**\*8** The existence of probable cause also defeats Plaintiffs's malicious prosecution claim. There is a presumption that a prosecutor filing a criminal complaint exercised independent judgment in determining that probable cause existed to arrest the accused, thereby breaking the chain of causation between arrest and prosecution and immunizing the investigating officers from damages suffered after complaint was filed. *Beck,* 527 F.3d at 862; *see Newman v. County of Orange,* 457 F.3d 991, 993 (9th Cir.2006) ("[f]iling a criminal complaint immunizes investigating officers ... from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time") (quoting *Smiddy v. Varney,* 665 F.2d 261, 266 (9th Cir.1981)). Rebutting the presumption of independent prosecutorial judgment requires that "the plaintiff prove the absence of probable cause." *Id.* at 864.

The Court has found that McCoy and Youngman, who commanded the Task Force, reasonably determined that probable cause existed to arrest Plaintiffs. Based on this finding, the Court concludes that Plaintiffs have failed to rebut the presumption that the tribal prosecutor's judgment to prosecute was independent. The prosecutor herself has attested that her decision prosecute Plaintiffs was made independently and in good faith, based on the information she received from the Task Force. Her independence is further demonstrated by that fact that she came to believe Plaintiffs were "overcharged" and moved to modify the charges before arraignment. (Doc. 167, Ex. 5.)

The Individual Defendants have satisfied their burden of establishing that there is no genuine issue of material fact to be resolved regarding their immunity or the existence of probable cause. *See Moreno,* 431 F.3d at 638. Therefore, their summary judgment motion will be granted.

*DEFENDANT UNITED STATES'
MOTION FOR SUMMARY JUDGMENT
AS TO PLAINTIFFS' FTCA CLAIM*

In their FTCA claim, Plaintiffs allege that the negligent and/or grossly negligent acts and omissions of the Individual Defendants constituted false arrest, malicious prosecution, abuse of process, and aiding and abetting the tortious conduct of others. (Doc. 126 at 30.) The United States moves for summary judgment on the grounds that Plaintiffs' FTCA claims are barred by the discretionary function exception, by the immunity provision of Arizona's mandatory reporting statute, A.R. S. § 13–3620, and by the existence of probable cause at the time of the arrests. [4] (Doc. 168.)

[4]    Based on its analysis of these issues and its findings with respect to probable cause, the Court will not address Defendants' additional arguments.

### I. Discretionary Function Doctrine

The United States can be sued only to the extent that it has waived its sovereign immunity. *Reed v. United States Dep't of Interior,* 231 F.3d 501, 504 (9th Cir.2000). The FTCA grants such a waiver and authorizes suits against the United States

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

**\*9** 28 U.S.C. § 1346(b)(1).

However, there are exceptions to this broad waiver of sovereign immunity, one of which is the discretionary function exception, which maintains the United States' immunity for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency

2012 WL 210722

or an employee of the Government, whether or not the discretion involved is abused." 28 U.S.C. § 2680(a). "The discretionary function exception marks the boundary between Congress' willingness to impose tort liability on the United States and the desire to protect certain decision-making from judicial second-guessing." *Conrad v. United States,* 447 F.3d 760, 764 (9th Cir.2006) (citing *Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)).

In assessing whether the discretionary function exception applies to a particular case, courts look to "the nature of the conduct, rather than the status of the actor," and assess the conduct in two ways. *Berkovitz,* 486 U.S. at 536 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). The first issue is whether the action taken by the government employee is a matter of judgment. *Id.* ("conduct cannot be discretionary unless it involves an element of judgment or choice"). The discretionary function exception will not apply if there is a statute, regulation, or policy mandating particular conduct by a government employee which does not allow for the exercise of discretion in fulfilling that mandate. *Id.*

Once it has been determined that the challenged conduct involves an element of discretion, the question is whether the discretion involves the type of decision-making that the discretionary function exception was designed to protect. *Id.* The purpose of the discretionary function exception is "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 536–37 (quoting *Varig Airlines,* 467 U.S. at 814). Therefore, the exception applies if the discretionary decision is a permissible exercise of policy judgment. *Id.*

Another exception to the FTCA's waiver of sovereign immunity is for intentional torts, including malicious prosecution and false arrest. 28 U.S.C. § 2680(h). However, this exception does not apply to intentional torts committed by federal "investigative or law enforcement officers." *Id.* The Ninth Circuit and other courts have interpreted § 2680(h) as being subject to the discretionary function proviso of § 2680(a). *See Gasho v. United States,* 39 F.3d 1420, 1433 (9th Cir.1994); *Medina v. United States,* 259 F.3d 220, 225, 229 (4th Cir.2001); *Pooler v. United States,* 787 F.2d 868, 872–73 (3d Cir.1986); *Gray v. Bell,* 712 F.2d 490, 507–08 (D.C.Cir.1983). Thus, "to maintain an FTCA claim for an intentional tort, a plaintiff must first clear the 'discretionary function' hurdle." *Gasho,* 39 F.3d at 1433. "If a defendant

can show that the tortious conduct involves a 'discretionary function,' a plaintiff cannot maintain an FTCA claim, even if the discretionary act constitutes an intentional tort under section 2680(h)." *Id.* at 1435.

**\*10** The government bears the burden of proving that the discretionary function exception applies. *Myers v. United States,* 652 F.3d 1021, 1028 (9th Cir.2011). As set forth below, the Court finds that the United States has satisfied that burden.

## II. Analysis

### A. Application of discretionary function exception
As the Ninth Circuit has explained, "investigations by federal officers clearly involve the type of policy judgment protected by the discretionary-function exception." *Alfrey v. United States,* 276 F.3d 557, 566 (9th Cir.2002) (citing *Sabow v. United States,* 93 F.3d 1445, 1452 (9th Cir.1996)); *see Sloan v. United States Dep't of Housing and Urban Dev.,* 236 F.3d 756, 760 (D.C.Cir.2001) ("The decision to initiate a prosecution has long been regarded as a classic discretionary function."); *Horta v. Sullivan,* 4 F.3d 2, 21 (1st Cir.1993) ("although law enforcement agents have a mandatory duty to enforce the law, decisions as to how best to fulfill that duty are protected by the discretionary function exception to the FTCA"); *Pooler,* 787 F.2d at 871 (3d Cir.1986) ("Decision making as to investigation and enforcement, particularly when there are different types of enforcement action available, are discretionary judgments.") (interior quotation omitted). The BIA Task Force, in pursuing its investigation of the rapes on the Reservation, was exercising the type of policy judgments protected by the discretionary function exception. *See Sabow,* 93 F.3d at 1453 ("Investigations by federal law enforcement officials ... clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation" and are the types of "social and political judgments that Congress meant to shield from FTCA challenges").

Plaintiffs contend, however, that the discretionary function exception is inapplicable in this case because "Defendants did not have discretion to declare that probable cause existed when their discretionary decisions resulted in no reasonable belief that either Reed or Dupris committed the offenses for which they were charged." (Doc. 192 at 6.) In support of this allegation, Plaintiffs assert that the investigation was "shabby" and that the BIA rushed to solve the case so that it could pay out reward bonuses and gain leverage in its attempt

to shut down the tribal police force. (*Id .* at 2, 12.) These arguments are unsupported and unpersuasive.

First, a review of the relevant cases demonstrates that decisions to arrest and prosecute Reed and Dupris were the product of discretionary functions, and thus protected under § 2680(a), notwithstanding Plaintiffs' criticisms of the quality of the investigation. "Congress did not intend to provide for judicial review of the quality of investigative efforts." *Pooler,* 787 F.2d at 871; *see Vickers v. United States,* 228 F.3d 944, 950 (9th Cir.2000) ( "Under the FTCA, negligence in performing discretionary functions" is not actionable."); *Sabow,* 93 F.3d at 1452 n. 6, 1453–54; *Kerns v. United States,* No. CV–04–1937–PHX–NVW, 2007 WL 552227, at *21 (D.Ariz. Feb.21, 2007), *rev'd on other grounds,* 2009 WL 226207 (9th Cir. Jan.28, 2009) ("The discretionary function exception has been applied to shield review of the negligent investigation and arrest of a person later determined to be innocent of the charged offense."). Courts have applied the exception despite investigative deficiencies, including mishandling, altering, and failing to obtain and preserve physical evidence, irregularities in the autopsy and interviewing procedures, and failure to consider all the evidence, *Sabow,* 93 F.3d at 1452–54; failing to "verify, corroborate or surveil" the drug transactions that led to the plaintiffs' arrest and prosecution, *Pooler,* 787 F.2d at 869; failing to interview a certain witness, conduct a line-up or show the witness a photo-array, or otherwise further investigate a claim of mistaken identity, *Valdez v. United States,* 08 Civ. 4424(RPP), 2009 WL 2365549 (S.D.N.Y. July 31, 2009); conducting a "haphazard" investigation to quickly solve a "high visibility" case and showing witnesses photos of the plaintiff that were 15 to 20 years old, *Rourke v. United States,* 744 F.Supp. 100, 102 (E.D.Pa.1990).

 **\*11** The Court rejects the argument that the Task Force investigation was deficient in a manner that separates it from these cases and necessitates a finding that discretionary function immunity does not apply. Plaintiffs' allegations that the investigation was not only shabby but pursued in bad faith are neither supported by the record nor relevant, given the Court's conclusion, set forth above, that probable cause existed to arrest and prosecute Dupris and Reed.

This is not a case where officers "act[ed] entirely outside the bounds of the policy considerations supporting application of the discretionary function exception." *Casillas v. United States,* CV 07–395–DCB (HCE), 2009 WL 735193, at *15 (D. Ariz February 11, 2009) The Task Force agents did not

"depart [ ] from the duties of an investigator." *Sutton v. United States,* 819 F.2d 1289, 1293 (5th Cir.1987). To the contrary, it was through the performance of their investigative duties that they reached their probable cause determination.

There is a clear contrast between the investigation undertaken by the Task Force and cases where courts have found that the government forfeited the protections of the discretionary function exception. For example, in *Reynolds v. United States,* 549 F.3d 1108, 1112–14 (7th Cir.2008), the court ruled that the discretionary function exception did not apply to protect two federal government investigators from suit in an action alleging that the agents submitted a knowingly false affidavit to the state prosecutor, resulting in the plaintiff's prosecution and subsequent loss of her job. In *Limone v. United States,* 497 F.Supp.2d 143 (D.Mass.2007), the court found that the discretionary function exception did not preclude liability where FBI agents suborned perjured testimony, resulting in wrongful murder convictions, and where the FBI concealed information that would have exposed the agents' activities. Finally, in *Patel v. United States,* 806 F.Supp. 873, 876 (N.D.Cal.1992), the court found that the discretionary function exception did not apply to the officers' decision to burn down a structure while executing a search warrant because the decision was "not based on considerations rooted in social, economic or political policy."

Plaintiffs' criticisms of the Task Force investigation, to the extent they are supported by the record, allege nothing more than the kind of negligence that is subject to protection under the discretionary function doctrine.

The decisions made by the BIA Task Force in its investigation were discretionary and grounded in policy considerations. Therefore, Plaintiffs' FTCA claims are barred by the discretionary function exception. Moreover, the arrest and prosecution of Dupris and Reed were supported by probable cause. No genuine issues of material fact exist regarding these issues. Accordingly, the Court will grant the United States' motion for summary judgment.

## B. A.R.S. § 13–3620(J)

Under 28 U.S.C. § 1336(b), FTCA actions are governed by "the law of the place where the act or omission causing the injury occurred." *Mundt v. United States,* 611 F.2d 1257, 1259 (9th Cir.1980). The government is only liable to the same extent as a private person would be under state law. 28 U.S.C. § 1346(b)(1); *Conrad,* 447 F.3d at 767; *see* 28 U.S.C. § 2674 (the United States is liable "in the same

Dupris v. McDonald, Not Reported in F.Supp.2d (2012)

2012 WL 210722

manner and to the same extent as a private individual in like circumstances"). "Even if the conduct entails uniquely governmental functions, the court is to examine the liability of private persons in analogous situations." *Tekle v. United States,* 511 F.3d 839, 852 (9th Cir.2007) (citing *United States v. Olson,* 546 U.S. 43, 45–46, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005)). Therefore, Arizona law is used to determine the United States' tort liability in this matter. This includes applying the same immunities Arizona affords a private person. *Id.; see Dalrymple v. United States,* 460 F.3d 1318 (11th Cir.2006); *Barnes v. United States,* 448 F.3d 1065 (8th Cir.2006); *In re Fema Trailer Formaldehyde Products Liability Litigation,* 719 F.Supp.2d 677, 684 (E.D.La.2010).

**\*12** Pursuant to A.R.S. § 13–3620(A), (J), any person, including a police officer, investigating allegations of sexual assault of a minor, is immune from civil liability arising from the investigation unless they acted with malice.[5] *See Crawford v. City of Phoenix,* CV 05–2444–PHX–JAT, 2007 WL 1140396, at \*2 (D.Ariz. Apr.16, 2007). Malice is defined as "a wish to vex, annoy or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." A.R.S. § 1–215(2).

[5]     Plaintiffs contend that A.R.S. § 13–3620 is unconstitutional under the state constitution's anti-abrogation clause. (Doc. 192 at 8–11.) However, because no court has found § 13–3620 unconstitutional, its immunity provisions applied to the United States under 28 U.S.C. § 2674.

There is no dispute that the BIA Task Force was investigating sexual assaults committed against minors. Therefore, absent a showing of malice, the United States would be entitled to immunity under § 13–3620(J).

Plaintiffs contend that genuine issues of material fact exist as to whether the United States acted with malice. (Doc. 192 at 7–15.) However, Plaintiffs' specific allegations of malice, which ascribe to Task Force investigators various ulterior motives, such as time constraints and financial incentives (*see* Doc. 192 at 11–15), are conclusory, speculative, and unsupported in the record. Therefore, they are insufficient to raise a genuine issue of material fact. *See Anderson,* 477 U.S. at 257; *Jeffers v. Gomez,* 267 F.3d 895, 908 (9th Cir.2001).

Moreover, as discussed above, the arrests were supported by probable cause, which undermines any contention that they

were undertaken with a "wish to vex, annoy or injure another person, or an intent to do a wrongful act."

For the same reasons, tribal officers Massey and Anderson, who joined this aspect of the United States' motion for summary judgment, are also entitled to immunity under A.R.S. § 13–3620(J).

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FEDERAL EMPLOYEE STATUS OF TRIBAL OFFICER DEFENDANTS

Plaintiffs allege that Perphelia Massey and Joshua Anderson were "federal employees" for purposes of the FTCA and *Bivens,* and seek summary judgment on the issue. (Doc. 170.) In response, the Federal Defendants contend that the motion should be denied as moot because they do not contest the federal employee status of Massey and Anderson for purposes of the FTCA. (Doc. 185 at 2.) In the alternative, the Federal Defendants argue that the motion should be denied and the FTCA claims dismissed "because the actions by the Defendants do not meet the requirements of the proviso to the intentional tort exception of the FTCA." (*Id.*) The Federal Defendants take no position on whether Massey and Anderson are subject to liability under *Bivens.* [6] (*Id.,* n. 2.)

[6]     The Federal Defendants are represented by the United States Department of Justice, which does not represent Massey or Anderson in their individual capacities. (Doc. 185 at 2, n. 2.)

### I. 28 U.S.C. § 2680(h) and *Bivens*

As noted above, 28 U.S.C. § 2680(h), which establishes immunity for claims based on intentional torts such as false arrest and malicious prosecution, contains a proviso waiving immunity for intentional torts committed by any "investigative or law enforcement officer," defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." The parties do not dispute that "[a]bsent the power to enforce federal law, tribal officers are not federal investigative or law enforcement officers." *Trujillo v. United States,* 313 F.Supp.2d 1146, 1150 (D.N.M.2003) (citing *Dry v. United States,* 235 F.3d 1249 (10th Cir.2000)); *see Russell v. United States,* No. CV–08–8111–PCT–MHM, 2009 WL 2929426, at \*1 (D.Ariz. Sept.10, 2009).

**\*13**  In *Bivens,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). "It is widely accepted that *Bivens* provides a cause of action only against an official 'acting under color of federal law.' " *Pollard v. Geo Group, Inc.,* 607 F.3d 583, 588 (9th Cir.2010) (citing *Bivens,* 403 U.S. at 389); *see Boney v. Valline,* 597 F.Supp.2d 1167, 1172 (D.Nev.2009) (under *Bivens* plaintiff must show that the constitutional violation was "committed by a federal actor").

**II. Analysis**

Massey and Anderson were tribal police officers assigned to the Task Force. Massey arrested Dupris, and Anderson arrested Reed. Plaintiffs assert that Massey and Anderson, by virtue of their participation with the BIA Task Force, were federal law enforcement officers for purposes of § 2680(h). Plaintiffs' arguments in support of this proposition are not supported by the record or relevant legal authority.

First, the record shows that Massey and Anderson were not given Special Law Enforcement Commissions ("SLEC") from the BIA, deputized by the BIA, or otherwise authorized to make arrests under federal law. (Doc. 186, Exs.1, 2.) In addition, contrary to Plaintiffs' assertion, the fact that a 93–638 [7] contract existed between the BIA and the Tribe for the provision of law enforcement services does not "automatically confers federal law enforcement authority upon the officers in tribal police departments." *Trujillo,* 313 F.Supp.2d at 1150; *see Buxton v. United States,* No. CIV. 09–5057–JLV, 2011 WL 4528329 (D.S.D. Sept.28, 2011) (explaining that a "separate process exists for conferring federal law enforcement authority on tribal police officers"); *Bob v. United States,* No. Civ. 07–5068, 2008 WL 818499, at \*2 (D.S.D. March 26, 2008) (holding that even though tribal defendants may be considered federal employees under the FTCA, they were not federal "investigative or law enforcement officers" in light of government's affidavit stating that none of the tribal officers involved in the disputed incident held an SLEC from the BIA); *Locke v. United States,* 215 F.Supp.2d 1033, 1038–39 (D.S.D.2002).

[7]  The Indian Self–Determination and Education Assistance Act, Publ.L. No. 93–638, authorizes

the BIA to provide law enforcement services on reservations.

As further evidence that Massey and Anderson were federal officers, Plaintiffs cite the fact that they assisted in the execution of federal search warrants. This level of participation is insufficient to establish their status as federal law enforcement officers or investigators under § 2680(h). In *Locke,* for instance, the court found that neither the existence of a 638 contract nor the allegation that "in practice" tribal officers assisted in executing federal warrants or making arrests on federal violations suggested that the officer was "anything other than a Tribal police officer." 215 F.Supp.2d at 1038–39.

**\*14**  Based on these factors, the Court also finds that Massey and Anderson, when they arrested Plaintiffs, were not acting under the color of federal law for purposes of liability under *Bivens. See Boney,* 597 F.Supp.2d at 1186; *Romero v. Peterson,* 930 F.2d 1502, 1507 (10th Cir.1991) (to be federal officers entitled to qualified immunity from liability in *Bivens* action, defendants must have been acting as employees or agents of federal government or using their federal badges or other indicia of authority in furtherance of business of another entity or person). Massey and Anderson were tribal officers who arrested Plaintiffs on tribal charges. As noted, the record indicates that they were not authorized to arrest suspects on federal charges. (Doc. 186, Exs.1, 2.)

Plaintiffs are not entitled to summary judgment on the issue of the federal employee status of Massey and Anderson.

*CONCLUSION*

In their motions for summary judgment, the Individual Defendants and the United States have shown that there are no genuine disputes as to any material facts and they are entitled to judgment as a matter of law under Fed.R.Civ.P. 56(a). Plaintiffs have failed to make such a showing in their partial motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** granting the Individual Defendants' Motion for Summary Judgment (Doc. 169).

**IT IS FURTHER ORDERED** granting the United States' Motion for Summary Judgment as to Plaintiffs' FTCA Claim (Doc. 168).

2012 WL 210722

**IT IS FURTHER ORDERED** denying Plaintiffs' Motion for Partial Summary Judgement (Doc. 170).

**IT IS FURTHER ORDERED** dismissing the Fourth Amended Complaint (Doc. 126).

**IT IS FURTHER ORDERED** denying as moot Defendant's Motion in Limine to Exclude the Expert Testimony of Mr. Robertson, Dr. Lyman, and Dr. Davis (Doc. 162).

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 210722

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-01323-MSN-JFA    Document 13-1    Filed 01/11/24    Page 68 of 76 PageID# 163
Valdez v. U.S., Not Reported in F.Supp.2d (2009)
2009 WL 2365549

2009 WL 2365549
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Caonabo VALDEZ, Plaintiff,
v.
The UNITED STATES of America and
Joseph Mercurio, Officer, Defendants.

No. 08 Civ. 4424(RPP).
|
July 31, 2009.

West KeySummary

1    **United States** 🔑 Law enforcement

An arrestee's claims for false arrest and false
imprisonment against the United States and
a Special Agent of the United States Drug
Enforcement Agency (DEA) in his official
capacity were dismissed. The arrestee asserted
that the agent was negligent and reckless in
failing to interview a certain witness, conduct
a line-up or show the witness a photo-array, or
otherwise further investigate the arrestee's claims
of mistaken identity. However, such decisions
about how to conduct investigations fell squarely
within the discretionary function exception of the
Federal Tort Claims Act (FTCA). 28 U.S.C.A. §
2680(a).

14 Cases that cite this headnote

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., District Judge.

*1  Plaintiff Caonabo Valdez ("Plaintiff"), represented by
counsel, initiated this action on May 12, 2008 by filing
a two-count complaint ("Complaint") against the United
States of America ("United States") and Defendant Joseph
Mercurio ("Mercurio" or "Agent Mercurio"). The Complaint
charged Defendants with constitutional tort claims and

defamation claims based on Plaintiff's acquittal after a jury
trial commencing on March 29, 2007. Defendants filed a
motion to dismiss arguing, *inter alia,* that the Court lacks
subject matter jurisdiction over Plaintiff's constitutional tort,
Federal Tort Claims Act ("FTCA"), and defamation claims
against the United States and Agent Mercurio in his official
capacity. *See* Fed.R.Civ.P. 12(b)(1). With respect to any
constitutional tort claims Plaintiff may be seeking against
Agent Mercurio in his individual capacity, Defendant moves
for summary judgment based on qualified immunity.

For the following reasons, Defendants' motions are granted in
their entirety and all of Plaintiff's claims are dismissed.

**I. The Parties**

Plaintiff is a resident of the County of New York and a
citizen of the State of New York. (Compl.¶ 2.) Special
Agent Mercurio is a citizen of the State of New York and a
Special Agent of the United States Drug Enforcement Agency
("DEA"), a governmental agency within the United States
Department of Justice and existing under and by virtue of
the laws of the United States. (Compl.¶¶ 3, 4.) The United
States operates a unit of the DEA within the City of New
York; specifically, the DEA's New York headquarters are
located at 99 10th Avenue, New York, New York. (Compl.¶
14.) Defendant Mercurio is an employee of the DEA and,
therefore, an employee of the United States government.
(Compl.¶ 5.) Mercurio is a Special Agent of the DEA and
serves on the T32 taskforce, also known as the "REDRUM"
unit. (Compl.¶¶ 16–19.)

**II. Background**

On or about February 15, 2006, Agent Mercurio participated
in a DEA investigation of a home invasion robbery—seeking
drugs or drug proceeds—that took place on January 2, 2001.
(Compl.¶¶ 25–27.) The robbery ("Gleason Avenue robbery")
occurred at 1936 Gleason Avenue in Bronx, New York.
(Compl.¶¶ 26–27.) Agent Mercurio learned of the Gleason
Avenue robbery through his interrogation of an individual
named Maximo Guillen (a.k.a."Amadito"). (Declaration of
Joseph D. Mercurio, dated September 17, 2008 ("Mercurio
Decl.") at ¶ 5.) Amadito had been arrested and taken into
federal custody in the summer of 2004; after his arrest,
Amadito became a cooperating witness. (*Id.*) During an
interview with Amadito, which occurred on October 1,
2004, Agent Mercurio learned that a police officer named
"Caonabo" was one of several individuals involved in the
Gleason Avenue robbery. (Mercurio Decl. ¶¶ 5–7.) After

further investigation, Mercurio learned that an individual named Caonabo Valdez had been enrolled in the New York Police Department's Police Academy in 2000. (Mercurio Decl. ¶ 8.) In late 2005, Amadito identified Plaintiff, through a driver's license photograph, as the "Caonabo" who had participated in the Gleason Avenue robbery.[1] (Mercurio Decl. ¶ 8.)

[1]    On April 4, 2006—after Plaintiff's arrest but prior to his trial—Agent Mercurio interviewed Socrates Vizcaino, a defendant in the indictment and arrested for his alleged involvement in the Gleason Avenue robbery. (Mercurio Decl. ¶ 28–29.) Vizcaino corroborated the information supplied by Amadito, specifically that a Caonabo Valdez, who was Tiko's cousin and a police officer, was a participant in the Gleason Avenue robbery. (Mercurio Decl. ¶ 29.)

 **2** On December 27, 2005, Agent Mercurio testified before a federal grand jury in the Southern District of New York and presented the evidence that his unit had collected regarding the Gleason Avenue robbery. (Mercurio Decl. ¶ 13.) The grand jury returned a four-count sealed indictment[2] against eight individuals, including Plaintiff, Socrates Vizcaino, and "Tiko."[3] (*Id.*) Plaintiff was charged in Count I with conspiracy to commit robberies in violation of Section 371 of Title 18 of the United States code and, in Count II, with the substantive act of committing a robbery, both in violation of Sections 1951(b)(1) and (b)(3) of Title 18 of the United States Code. (Compl. ¶ 46; Mercurio Decl. ¶ 14.) In Count III, Plaintiff was charged with using, carrying, and brandishing a firearm, and aiding and abetting in the use, carrying, or brandishing of a firearm in furtherance of a crime, in violation of Section 924(c)(1)(A)(ii) of Title 18 of the United States Code. (*Id.*) On December 27, 2005, United States Magistrate Judge Douglas F. Eaton of the Southern District of New York issued an arrest warrant for Plaintiff based on the grand jury's indictment. On February 15, 2006, pursuant to the warrant, Agent Mercurio arrested Plaintiff for his alleged involvement in the actions charged in the indictment.[4] (Compl. ¶¶ 30–31.)

[2]    In the grand jury indictment, Plaintiff was not charged with Count IV, unlawful, intentional, and knowing distribution of controlled substances and possession with intent to distribute controlled substances. (*See* December 27, 2005 Federal Grand Jury Indictment, in Declaration of Wendy H.

Waszmer ("Waszmer Decl."), dated September 17, 2008, at Ex. B.)

[3]    A superseding indictment was filed on January 8, 2007 against Plaintiff and the other seven defendants. (Mercurio Decl. ¶ 35.) The superseding indictment alleged the same three counts against Plaintiff. (*Id.*)

[4]    Agent Mercurio, through his interviews with Amadito, also identified Plaintiff as a suspect in an attempted robbery of property located at 153rd Street, New York, New York that occurred in September 2000. (Mercurio Decl. ¶ 4.)

During the course of Defendant Mercurio's interrogation of Plaintiff regarding the Gleason Avenue robbery, Plaintiff maintained his innocence and informed Mercurio that he was the victim of identity theft by his cousin, Jacinto Polanco (a.k.a. "Tiko" and/or "Angel Diaz"), a known felon. (Compl. ¶¶ 38–41; Mercurio Decl. ¶ 21.) Plaintiff did not provide Agent Mercurio with information as to the whereabouts of Tiko. Amadito, the cooperating witness, had previously advised Agent Mercurio that Plaintiff's cousin "Tiko" was a participant in the Gleason Avenue robbery. (Mercurio Decl. ¶ 9.) Agent Mercurio states that he and the DEA did not learn of Tiko's whereabouts until on or about October 10, 2007—after Plaintiff's acquittal and release from custody on April 13, 2007. (Mercurio Decl. ¶ 9, 22.)

In mid-November of 2006, Agent Mercurio learned that the New York Police Department ("NYPD") had seized a gun involved in the Gleason Avenue robbery.[5] (Mercurio Decl. ¶ 25.) Mercurio also learned that the gun had already been destroyed by the NYPD. (Mercurio Decl. ¶ 26.)

[5]    This gun had been seized in connection with an arrest unrelated to the case at hand. (Mercurio Decl. ¶ 25.) The investigator who informed Mercurio of the existence of the gun was searching for the New York Police Department's paper file regarding the Gleason Avenue robbery (which, ultimately, was never located). (*Id.*)

Plaintiff's trial commenced on March 29, 2007. At the trial, a witness to and victim of the Gleason Avenue robbery, Malaisy Gil, testified that she had never seen the Plaintiff and that he was not a participant in the robbery. (Compl. ¶ 56–59.) Agent Mercurio asserts that, as of December 27, 2005—the date of Plaintiff's grand jury indictment—he had not interviewed

Malaisy Gil, who was incarcerated out of state on unrelated charges, nor did he know that she could not identify Plaintiff as a suspect in the Gleason Avenue robbery. (Mercurio Decl. ¶¶ 12, 30.) After Gil was brought to New York (on or about January 31, 2007) in connection with Plaintiff's trial, she was shown a photo book which included photographs of the indicted defendants. (Mercurio Decl. ¶ 31.) Gil did not identify Plaintiff as a participant in the Gleason Avenue robbery. (Mercurio Decl. ¶ 31–32.) Prior to Gil's viewing the photo books on January 31, 2007, Agent Mercurio states that he was not aware Gil could not identify Plaintiff. (Mercurio Decl. ¶ 32.)

**\*3** At trial on March 29, 2007, the DEA's cooperating witness, Amadito, identified Plaintiff as a co-participant in the Gleason Avenue robbery. (Waszmer Decl., Exhibit G, Trial Transcript ("Trial Tr."), at 187–90.) On April 3, 2007, Socrates Vizcaino—one of the indicted defendants—also identified Plaintiff as participating in the Gleason Avenue robbery. (Trial Tr., at 591–95.)

Plaintiff was acquitted of all of the aforementioned charges on April 13, 2007 and was subsequently released from federal custody. (Compl.¶ 48–49.) He then timely filed an administrative tort claim with the DEA, dated August 14, 2007, which sought "damages and injury" against the DEA. (Compl.¶ 6–8.) On November 14, 2007, the DEA denied Plaintiff's administrative claim. (Compl.¶ 9.)

### III. Legal Standards

#### a. Motion to Dismiss

With respect to Defendants' motion to dismiss the claims under the FTCA in Count I and the defamation claims against the United States and Agent Mercurio in Count II, Plaintiff has the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction over these claims. *See Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000 (citing *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996)). If the Court does not have subject matter jurisdiction, it cannot rule on these claims, and the claims must be dismissed pursuant to Fed.R.Civ.P. 12(b) (1). In determining whether subject matter jurisdiction exists, the Court may consider evidence outside of the pleadings. *Id.*

#### b. Summary Judgment

Defendant Mercurio moves for summary judgment on any claims against him in his individual capacity for alleged violations of Plaintiff's constitutional rights. Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When determining whether a genuine issue of material fact exists, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Braham v. Clancy,* 425 F.3d 177, 181 (2d Cir.2005) (internal citations omitted). However, the party opposing summary judgment "must 'demonstrate more than some metaphysical doubt as to the material facts' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### IV. Count I: Plaintiff's False Arrest and False Imprisonment Claims against the United States

**\*4** In his claims for false arrest and false imprisonment under the Federal Tort Claims Act ("FTCA."), Plaintiff names the United States as a Defendant (Compl.¶ 10.), specifically the United States Department of Justice Drug Enforcement Agency ("the DEA"), "an executive agency of the United States of America, existing under and by virtue of the Laws of the United States." (Compl.¶ 4.) Plaintiff also names Agent Mercurio as a Defendant in his official capacity as "an employee and/or agent of the United States Department of Justice Drug Enforcement Agency." (Compl.¶ 6.)

An action against a federal agency or federal officers in their official capacities is essentially a suit against the United States. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994), *citing to Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 1005–06, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ("Under the doctrine of sovereign immunity, an action for damages will not lie against the United States absent consent. *Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States,* such suits are also barred under

2009 WL 2365549

the doctrine of sovereign immunity, unless such immunity is waived [i.e. through the FTCA].") (emphasis added).

### a. Sovereign Immunity and The Federal Tort Claims Act ("FTCA")

The United States, as well as federal government agencies and federal officials acting in their official capacities, are immune from suit absent an express waiver of sovereign immunity. *See United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("[T]he United States may not be sued without its consent and ... the existence of consent is a prerequisite for [subject matter] jurisdiction."); *accord Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) (" 'Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.' " (quoting *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994))); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994).

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow for civil suits arising out of negligent acts of agents of the United States. In enacting the FTCA, Congress waived the sovereign immunity enjoyed by the U.S. with respect to claims arising from "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment ." 28 U.S.C. § 1346(a). A tort action under the FTCA is defined in accordance with the law of the state where the negligence occurred. *See Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

The FTCA explicitly excludes from its coverage "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights...." 28 U.S.C. § 2680(h). However, this exception itself excepts claims "arising ... out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" when these acts are committed by "investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). [6]

[6]    28 U.S.C. § 2680(h) defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

### b. Allegations

**\*5** Plaintiff asserts claims under the FTCA, specifically under the exception that allows claims for false imprisonment and false arrest by an investigative or law enforcement officer. [7] *See* 28 U.S .C. § 2680(h). The Complaint alleges that Agent Mercurio, while acting within the scope of his employment by the United States (Compl.¶ 20.), negligently disregarded "known existing exculpatory evidence" and caused Plaintiff to be falsely arrested and falsely imprisoned. (Compl.¶ 74–75.) Specifically, Plaintiff contends that Defendants had knowledge of and access to "[t]he existence of a direct witness to the alleged robbery ...," but failed to conduct a "line-up" for the witness involving Plaintiff and failed to show the witness a "photo-array" involving Plaintiff prior to Plaintiff's indictment or trial. (Compl.¶ 50–54.) This direct witness (Malaisy Gil) testified at trial that she had never before seen Plaintiff. (Compl.¶ 56–59.) Plaintiff also alleges that Defendants intentionally destroyed a gun (Compl.¶ 70–73) and disregarded Plaintiff's assertion, during interrogations, that his cousin, a known felon, had stolen his identity and "falsely presented himself to others as the plaintiff." (Compl.¶ 38–41, 79.)

[7]    Before an action may be filed under the Federal Tort Claims Act, an administrative claim must be presented to the federal agency employing the person whose act or omission caused the injury. Presentation of an administrative claim to the appropriate agency is a jurisdictional prerequisite to suit. 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by ... mail."); *see generally McNeil v. United States,* 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). Plaintiff has satisfied this requirement. On or about August 13, 2007—within two years of his release from detention—Plaintiff filed a claim for damages and injury with the DEA. (Compl.¶ 6–7.) On or about November 14, 2007, Plaintiff's claim was denied by the DEA and, within six months of the denial, Plaintiff brought this action against the Government. (Compl.¶ 9–10.)

Plaintiff claims violations of his Fourth and Fourteenth Amendment rights (Compl.¶ 99).

The Defendants argue that the FTCA claims should be dismissed for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). According to the Defendants, Plaintiff's claims of false arrest and false imprisonment are barred by the "discretionary function" exception to the FTCA's waiver of sovereign immunity and, therefore, the United States retains its sovereign immunity and cannot be subject to suit.[8] *See* 28 U.S.C. § 2680(a).

[8]    The Government also asserts that Plaintiff's claims arising out of the destruction of the gun by state authorities are barred by the doctrine of collateral estoppel because Plaintiff had a full and fair opportunity to litigate that issue during his criminal trial. (Trial Tr. 35–47.) To the extent Plaintiff alleges negligent investigation, the Government contends that the claim must be dismissed because no such cause of action exists in New York. Because the Defendants' motion to dismiss the FTCA claim for lack of subject matter jurisdiction is granted, the Court does not address the collateral estoppel or negligent investigation issues.

### c. Applicable Law
The "discretionary function" exception to the FTCA provides that Congress's authorization for damage suits against the United States

> shall not apply to ... [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of ... an employee of the Government, whether or not the discretion involved is abused.

28 U.S.C. § 2680(a). In *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), the Supreme Court established a two-part test for evaluating whether particular government conduct falls under the discretionary function exception. First, the acts alleged must involve an "element of judgment or choice" and are not compelled by statute or regulation. *Berkovitz,* 486 U.S. at 536; *See Gaubert,* 499 U.S. at 324 ("If the employee violates the mandatory regulation, there will be

no shelter from liability because there is *no room for choice* and the action will be contrary to policy."). Second, the judgment or choice in question must have "involve[d] the permissible exercise of policy judgment." *Berkovitz,* 485 U.S. at 537, or, in other words, "can be said to be grounded in the policy of the regulatory regime ... [and] susceptible to policy analysis." *Gaubert,* 499 U.S. at 325. However, the court need not inquire as to whether the agent *"actually balanced* economic, social, and political concerns in reaching its decision. The discretionary function exception applies where there is room for policy judgment. Thus, the relevant question is not whether an explicit balancing is proved but whether the decision is susceptible to policy analysis." *In Re Joint E. & S. Dist. Asbestos Litig.,* 931 F.2d 31 (2nd Cir.1989) (emphasis added, citations omitted).

### d. Discussion
**\*6** Here, both prongs of *Berkovitz–Gaubert* test are satisfied, and the discretionary function exception of the FTCA bars Plaintiff's claims of false arrest and false imprisonment against the United States and Agent Mercurio in his official capacity.[9] First, there is no "federal statute, regulation, or policy [that] specifically prescribes a course of action" for Defendant Mercurio or the DEA to follow during an investigation. *Berkovitz,* 486 U.S. at 536–37; *see* Declaration of Michael A. Braun, dated September 16, 2008 ("Braun Decl."), at ¶ 8. Nor is there a there a statute, regulation, or policy requiring a certain method or means of identifying a suspect in a robbery. (Braun Decl. ¶ 8.) Decisions regarding the use of particular investigatory techniques such as a photo array, photo book, or line up are therefore within the discretion of a lead case agent and his supervisors. (*Id.*) Thus, the first prong of the *Berkovitz–Gaubert* test is satisfied because decisions by the DEA and its case agents with regard to its use of investigatory methods are discretionary. *See Pooler v. United States,* 787 F.2d 868, 871 (3d Cir.1986) ("When the sole complaint is addressed, as here, to the *quality* of the investigation as judged by its outcome, the discretionary function should, and we hold, does apply. Congress did not intend to provide for judicial review of the quality of investigation efforts."); *McElroy v. United States,* 861 F.Supp. 585, 591–92 (W.D.Tex.1994) (holding that discretionary function exception applied to drug enforcement operation and that "negligent acts or omissions" of drug enforcement task force officers "during the preliminary investigation ... were clearly guided by judgment and choices and not by an federal rule or policy"); *Mesa v. United States,* 837 F.Supp. 1210, 1213–14 (S.D.Fla.1993) (investigatory functions of

2009 WL 2365549

DEA officers "plainly within the discretionary function exception").

9    Plaintiff also claims he suffered Fourth and Fourteenth Amendment violations during Agent Mercurio's investigations and that "federal officials do not possess discretion to commit [constitutional] violations." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.Memo") at 5.) However, the United States has not waived sovereign immunity for constitutional tort claims and any claims relating to constitutional violations committed by the United States Government should be dismissed on subject matter jurisdiction grounds. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994), *citing to Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 1005–06, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Otherwise, "[p]laintiffs could argue that the Constitution, albeit indirectly and abstractly, controls the conduct or decisions of an officer in every circumstance. For example, one could argue that every decision an officer makes while conducting a search or an arrest is non-discretionary if it does not comply with the Fourth Amendment. If successful, these arguments would transform the discretionary function shield from steel to paper." *McElroy v. United States,* 861 F.Supp. 585, 593 (W.D.Tex., 1994.)

The second prong of the *Berkovitz-Gaubert* is also satisfied because the DEA's decisions in investigating the Gleason Avenue robbery involved policy considerations that the discretionary function exception was designed to shield. [10] The purpose of the discretionary function exception to the FTCA is to " 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort....' " *Gaubert* 499 U.S. at 324, *quoting United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Defendants argue that "a DEA agent's decision to conduct an investigation in a particular manner is subject to several policy considerations, such as maintaining secrecy, balancing the desire to protect the public with the goal of identifying all suspects, and avoiding tipping off targets of investigation," as well as "economic policy choices for allocating limited agency resources." (Braun Decl. ¶¶ 10, 12.) The judgments made as to what acts to perform in a federal investigation of criminal activity

are the kinds of policy decisions that the discretionary function exceptions seeks to protect. *See Pooler,* 787 F.2d at 871 (stating that "discretionary function" exception applies where officer's actions "required consideration of the use and availability of potential informants, and of the competing use and availability of personnel who might be needed for surveillance"); *Flax v. United States,* 847 F.Supp. 1183, 1190–91 (D.N.J.1994) (finding that "discretionary function" exception applies where agents had to "balance several competing concerns, all of which are grounded in considerations of public policy," such as conflicting interests of apprehending kidnappers and minimizing risk of harm to victim); *Rourke v. United States,* 744 F.Supp. 100, 103 (E.D.Pa.1988), aff'd 909 F.2d 1477 (3rd Cir.1990) ("[T]o the extent that [defendant] seeks compensation for having been erroneously arrested and charged due to flawed investigation, the discretionary function exception precludes the claims against the government in that the manner of conducting an investigation and the decision to seek an arrest warrant are the kind of 'quintessentially' discretionary activities for which sovereign immunity has not been waived.").

10    Some discretionary acts are not protected by the discretionary function exception because they are not "based on the purposes that the regulatory regime seeks to accomplish." *Gaubert,* 499 U.S. at 325. For example, if an official engaged in an act protected by the discretionary function exception drove an automobile in connection with that act and negligently caused an accident, the exception would not apply. "Although driving requires the constant exercise of discretion, the official's decisions in exercising this discretion can hardly be said to be grounded in regulatory policy." *Id.*

**\*7** Here, Plaintiff's claims that Agent Mercurio was negligent and reckless in failing to interview Gil, conduct a line-up, show Gil a photo-array, or otherwise further investigate Plaintiff's claims of mistaken identity. These kinds of decisions about how to conduct investigations fall squarely within the discretionary function exception. Accordingly, Plaintiff's claims for false arrest and false imprisonment against the United States and Agent Mercurio in his official capacity are dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

**V. Count I: Plaintiff's Claims Against Agent Mercurio In His Individual Capacity**

Case 1:23-cv-01323-MSN-JFA    Document 13-1    Filed 01/11/24    Page 74 of 76 PageID# 169
Valdez v. U.S., Not Reported in F.Supp.2d (2009)

2009 WL 2365549

#### a. Allegations

The Complaint does not specifically state claims against Agent Mercurio in his individual capacity. However, to the extent that claims of false arrest and false imprisonment against Agent Mercurio in his individual capacity pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) are arguable in Count I, Defendant Mercurio asserts that he is entitled to qualified immunity and moves for summary judgment on that basis.[11]

[11] In *Bivens,* the Supreme Court recognized a private right of action against federal officials in their individual capacities for alleged violations of constitutional rights. 402 U.S. 388 (1971).

#### b. Applicable Law

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The relevant inquiry is whether "the facts alleged show the officer's conduct violated a constitutional right" and if the violated "right was clearly established" at the time the actionable conduct took place. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The court may exercise its sound discretion in deciding which of the two prongs should be addressed first in light of circumstances in the particular case at hand. *Pearson v. Callahan,* ––– U.S. ––––, ––––, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

If a plaintiff adequately alleges a constitutional violation, and if the right at issue was clearly established, the court must then analyze the objective reasonableness of a defendant official's belief in the lawfulness of his actions. *Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995) (applying the "objective reasonableness" standard stated in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The qualified immunity defense protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act. *Anderson,* 483 U.S. at 641. This objective reasonableness test is met if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Lennon v. Miller,* 66 F.3d 416, 420–

21 (2d Cir.1995) ("[I]f the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate."). Even a law enforcement officer who "reasonably but mistakenly conclude[s] that probable cause is present" is entitled to immunity. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

**\*8** To promote greater confidence that the "fear of personal monetary liability and harassing litigation will [not] unduly inhibit officials in the discharge of their duties," *Anderson,* 483 U.S. at 638, the Supreme Court has emphasized that qualified immunity is "an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Saucier,* 533 U.S. at 201. Thus, the court may find for Agent Mercurio on a summary judgment motion if "the evidence is such that, even when it is viewed in the light most favorable to [Plaintiff] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for [Agent Mercurio] to believe that [he was] acting in a fashion that did not violate a clearly established right ." *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir.1996).

#### c. Discussion

Plaintiff's *Bivens* claims for false arrest and false imprisonment derive from his Fourth Amendment right to be free from unreasonable seizures, which includes the "right to remain free from arrest absent probable cause." *Caldarola v. Calabrese,* 298 F.3d 156, 161 (2d Cir.2002) (*citing to Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)).[12] There is no dispute that the rights at issue in this case—to be free from false arrest and from false imprisonment—were clearly established at the time of Plaintiff's arrest, trial, and incarceration. *See, e.g., Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) ("The right not to be arrested without probable cause is a clearly established right."). Therefore, the issue to evaluate is the "objective reasonableness of [Agent Mercurio's] conduct in light of clearly established law and the information ... [he] possessed." *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001) (quoting *Anderson,* 483 U.S. at 641).

12    The full text of the Fourth Amendment of the United States Constitution is: "The right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated and no Warrants shall issue, but upon probable cause, support by Oath or affirmation, and particularly describing the place to be searches or things to be seized." U.S. Const. Amend. IV.

The existence of probable cause is an absolute defense to these claims and affords Agent Mercurio qualified immunity from suit. *See, e.g., Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004) ("Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff."); *Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003) (noting that if there is probable cause, claims of false arrest and false imprisonment will fail). Probable cause exists "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (citation omitted). An officer is entitled to qualified immunity even where *"arguable* probable cause" exists, i.e., "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera,* 361 F.3d at 743 (emphasis added).

**\*9** Here, a reasonable officer would have believed, based on the grand jury's indictment and the federal magistrate judge's issuance of the warrant for Plaintiff's arrest on the charges in the indictment, that there was probable cause to arrest Plaintiff, and therefore Agent Mercurio is entitled to qualified immunity. Moreover, at the time of Plaintiff's arrest, Amadito had identified both Plaintiff and his cousin Tiko to Agent Mercurio as participants in the Gleason Avenue robbery. (Mercurio Decl. ¶¶ 5–7, 9.) Agent Mercurio learned from Amadito that Plaintiff, whom Amadito referred to as "Caonabo," had worn NYPD gear during the robbery, and Agent Mercurio confirmed that an individual named Caonabo Valdez had been enrolled in the NYPD Police Academy. (Mercurio Decl. ¶¶ 7–8.) Amadito also identified Plaintiff from a photograph obtained by the DEA from the New York State Department of Motor Vehicles as the "Caonabo" who participated in the Gleason Avenue robbery. (Mercurio Decl. ¶ 8.) On April 4, 2006—a year prior to trial—Plaintiff was identified by another defendant, Socrates

Vizcaino, as a participant in the robbery. (Mercurio Decl. ¶¶ 29.) Thus, although Malaisy Gil testified that Plaintiff was not a participant in the robbery, this evidence was contradicted by Plaintiff's co-defendants Amadito and Vizcaino. Plaintiff does not dispute any of these facts. Therefore, no rational jury could fail to conclude that it was objectively reasonable for Agent Mercurio to believe that Plaintiff was a participant in the Gleeson Avenue robbery. *See In re State Police Litigation,* 88 F.3d 111, 123 (2d. Cir.1996). Agent Mercurio is entitled to qualified immunity because there is no genuine issue of material fact as to whether he had "arguable probable cause." [13]

13    Plaintiff argues that Agent Mercurio should have pursued leads that would have uncovered purportedly exculpatory evidence. (*See* Compl. ¶ 50–75.) However, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997); *see also Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (arresting officers not required to investigate claim of mistaken identity or lack of requisite intent). Nevertheless, at the time of Plaintiff's arrest, Agent Mercurio was not aware of the handgun in possession of the NYPD, the whereabouts of Plaintiff's cousin Tiko, or that victim Malaisy Gil could not identify Plaintiff as a suspect. (Mercurio Decl. ¶¶ 22–24.)

Accordingly, any *Bivens* claims against Agent Mercurio are dismissed.

## VI. Count II: Plaintiff's Defamation Claim Against the United States

### a. Allegations

In his second cause of action, Plaintiff alleges that, prior to his arrest on February 15, 2006, Plaintiff was gainfully employed and had no prior arrests, convictions, or criminal record. (Compl.¶¶ 83–84.) Plaintiff further alleges to have been "defamed, libeled and slandered in his good name and reputation in the community" as a result of his alleged false arrest and subsequent false imprisonment. (Compl.¶¶ 89–90.) As a result of this alleged defamation suffered at the hands of Defendant United States Government, Plaintiff has

2009 WL 2365549

been "unable to secure gainful employment" since his release from custody, (Compl.¶ 94), and will "continue to be so hindered" from finding future employment. (Compl.¶ 94.) Defendants contend that Plaintiff's defamation claim is barred by sovereign immunity and should be dismissed for lack of subject matter jurisdiction.

**b. Applicable Law**

The FTCA explicitly excludes from its waiver of sovereign immunity "[a]ny claim arising out of ... libel, slander, [or] misrepresentation...." 28 U.S.C. § 2680(h). Accordingly, the Supreme Court has stated that "a [defamation] suit against the United States under the Federal Tort Claims Act ... could not be brought[ ] in the light of the exemption in that Act for claims based on defamation, see 28 U.S.C. § 2680(h)...." *Siegert v. Gilley,* 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In accordance with this Supreme Court precedent, federal courts in the Second Circuit have dismissed claims of defamation and libel brought against the United States. *See, e.g., Asto v. Mirandona,* 372 F.Supp.2d 702, 710 (E.D.N.Y.2005) (dismissing plaintiff's defamation claim for lack of subject matter jurisdiction); *Hightower v. United States,* 205 F.Supp.2d 146, 153 (S.D.N.Y.2002) (same).

**c. Discussion**

**\*10** Congress specifically excluded libel and slander from the FTCA, and this exception has been interpreted, by both the Supreme Court and federal courts in the Second Circuit, as also applying to defamation claims. Accordingly, Plaintiff's defamation claim against the United States and Agent Mercurio in his official capacity is dismissed for lack of subject matter jurisdiction.[14]

[14]   The Supreme Court has found that "[d]efamation, by itself, is a tort actionable under the laws of most States, but *not a constitutional deprivation."* *Siegert v. Gilley,* 500 U.S. 226, 227, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (emphasis added). As such, Plaintiff cannot bring a *Bivens* action in this case against Agent Mercurio for violation of his constitutional rights as a result of defamation because no constitutional deprivation occurred.

**VII. Conclusion**

For the foregoing reasons, Defendants' motion to dismiss Count I and II against the United States and Agent Mercurio in his official capacity is granted. Defendant's motion for summary judgment on any *Bivens* claims against Agent Mercurio for false arrest and false imprisonment is also granted.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2365549

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.